ACCEPTED
04-14-00807-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
6/19/2015 3:55:18 PM
KEITH HOTTLE
CLERK

No. 04-14-00807-CV

# In The Fourth Court Of Appeals
## San Antonio, Texas

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
06/19/2015 3:55:18 PM
KEITH E. HOTTLE
Clerk

**BRAD AERY, LLOYD HOUSE, ET AL.,**
*Appellants*

## V.

**C. CLIFTON HOSKINS, ET AL.,**
*Appellees*

FROM THE 36TH JUDICIAL DISTRICT COURT, MCMULLEN COUNTY, TEXAS
CAUSE NO. M-12-0045-CV-A
HONORABLE STARR BOLDRICK BAUER, PRESIDING

## APPELLANTS' REPLY BRIEF

**NORTON ROSE FULBRIGHT US LLP**

Rosemarie Kanusky
State Bar No. 00790999
rosemarie.kanusky@nortonrosefulbright.com
John W. Weber, Jr.
State Bar No. 21046500
john.weber@nortonrosefulbright.com
Jeffrey A. Webb
State Bar No. 24053544
jeff.webb@nortonrosefulbright.com
300 Convent, Suite 2100
San Antonio, Texas 78205
Telephone: 210.224.5575
Fax: 210.270.7205

*Counsel for the House Family*

**LAW OFFICES OF DAN POZZA**

Dan Pozza
State Bar No. 16224800
danpozza@yahoo.com
239 E. Commerce Street
San Antonio, Texas 78205-2923
Telephone: 210.226.8888
Fax: 210.224.6373

*Counsel for the Aerys*

**ORAL ARGUMENT REQUESTED**

# Table Of Contents

Index Of Authorities ......................................................................................4

Introduction ..................................................................................................7

Argument......................................................................................................8

    I.      Hoskins confuses semantics with substance by labeling the Quinns' pooled royalty interest as "NPIR/NPRI."..............................8

    II.    Pooling is subject to both property and contract law. .........................10

    III.   Sam's pooled royalty interest passed to House as a contract right..................................................................................................10

    IV.   Sam's pooled royalty interest passed to House pursuant to the greatest estate rule. ...............................................................................12

    V.    Sam's pooled royalty interest passed to House as an appurtenance......................................................................................13

        A.     Hoskins' cross-conveyance theory is not dispositive. .............13

        B.     The Quinns' express intent is dispositive. ...............................14

        C.     Precedent from this Court and the Supreme Court controls.................................................................................16

        D.     Commentators agree pooled royalty interests are appurtenances.........................................................................19

        E.     *Avery* and *McCall* are not binding on this Court. ....................20

    VI.   Recitations in the House and Aery chain of title have no effect........22

    VII.  Hoskins' position is not logical..........................................................22

Conclusion .................................................................................................23

Certificate Of Compliance & Service.................................................................25

## Appendix

OWEN ANDERSON, ET AL., KUNTZ, A TREATISE ON THE
  LAW OF OIL & GAS (1989 & Supp. 2014)
  volume 1 § 6.1
  volume 3 § 42.6

LEO J. HOFFMAN, VOLUNTARY POOLING &
  UTILIZATION 169-189 (1954)

Edwin P. Horner, *McCall v. McCall Discussion Notes*,
  145 OIL & GAS REP. 415-421 (2001)

BRUCE M. KRAMER & PATRICK H. MARTIN, THE LAW OF POOLING &
  UNITIZATION (3d ed. 2014)
  volume 1 § 7.00 at 7-3
  volume 2 § 19.01[1]
  volume 2 § 19.02[2]

BRUCE M. KRAMER & PATRICK H. MARTIN, WILLIAMS & MEYERS OIL
  & GAS LAW (2013)
  volume 3 § 660
  volume 6 § 929.1

ERNEST E. SMITH & JACQUELINE LANG WEAVER,
  TEX. LAW OF OIL & GAS (2d ed. 2014)
  volume 1 § 2.4[A]
  volume 1 § 3.4

# Index Of Authorities

**Page(s)**

**Cases**

*Avery v. Moore*,
144 S.E.2d 434 (W. Va. 1965)..............................................................20

*Bibb v. Nolan*,
6 S.W.2d 156 (Tex. Civ. App.—Waco 1928, writ ref'd)..................22

*Coolbaugh v. Lehigh & Wilkes-Barre Coal Co.*,
67 A. 615 (Pa. 1907)............................................................................11

*Cox v. Campbell*,
143 S.W.2d 361 (Tex. 1940) .......................................................17, 18

*Day & Co., Inc. v. Texland Petroleum, Inc.*
786 S.W.2d 667 (Tex. 1990) ..............................................................21

*Eastin v. Dial*,
288 S.W.3d 491 (Tex. App.—San Antonio 2009, pet. denied).........12

*Forister v. Coleman*,
418 S.W.2d 550 (Tex. Civ. App.—Austin 1967), *writ ref'd n.r.e.*,
431 S.W.2d 2 (Tex. 1968)....................................................................18

*Gage v. Owen*,
435 S.W.2d 559 (Tex. Civ. App.—Fort Worth 1968,
writ ref'd n.r.e.)....................................................................................12

*Harris v. Currie*,
176 S.W.2d 302 (Tex. 1943) ...............................................................21

*Key Operating & Equip., Inc. v. Hegar*,
435 S.W.3d 794 (Tex. 2014) ...............................................................19

*Killam Ranch Properties, Ltd. v. Webb County*,
376 S.W.3d 146 (Tex. App.—San Antonio 2012, pet. denied)
(en banc).........................................................................................17, 21

*Landgrebe v. Rock Hill Oil Co.*,
  273 S.W.2d 636 (Tex. Civ. App.—San Antonio 1954,
  writ ref'd n.r.e.) ...................................................................................................17

*Lott v. Lott*,
  370 S.W.2d 463 (Tex. 1963) ................................................................................12

*McCall v. McCall*,
  24 S.W.3d 508 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) ...........20, 21

*MCEN 1996 P'ship v. Glassell*,
  42 S.W.3d 262 (Tex. App.—Corpus Christi 2001, pet. denied) .......................10

*Merrill Eng'g Co. v. Capital Nat'l Bank of Jackson*,
  5 So. 2d 666 (Miss. 1942)................................................................................9, 14

*Sharp v. Fowler*,
  252 S.W.2d 153 (Tex. 1952) ...............................................................................12

*Southland Royalty Co. v. Humble Oil & Ref. Co.*,
  249 S.W.2d 914 (Tex. 1952) ..........................................................................19, 20

*Tanner v. Title Ins. & Trust Co.*,
  129 P.2d 383 (Cal. 1942)................................................................................14, 15

*Teal Trading & Dev., LP v. Champee Springs Ranches*
  *Prop. Owners Ass'n*, 432 S.W.3d 381
  (Tex. App.—San Antonio 2014, pet. denied).....................................................22

*Thomas v. Fin & Feather Club*,
  171 S.W. 698 (Tex. 1914)....................................................................................18

*Wagner & Brown, Ltd. v. Sheppard*,
  282 S.W.3d 419 (Tex. 2008) ....................................................................11, 14, 18

*Westland Oil Dev. Corp. v. Gulf Oil Corp.*,
  637 S.W.2d 903 (Tex. 1982) ...............................................................................18

**Other Authorities**
**(alphabetized by first author's last name and then title)**

OWEN ANDERSON, ET AL.,
3 KUNTZ, A TREATISE ON THE LAW OF OIL & GAS § 42.6 (1989) ......................19

Edwin P. Horner, *McCall v. McCall Discussion Notes*,
145 OIL & GAS REP. 415 (2001) ...................................................................20, 21

WILLIAM O. HUIE, *Apportionment of Oil & Gas Royalties*,
78 HARV. L. REV. 1113 (1965) ...........................................................................19

BRUCE M. KRAMER & PATRICK H. MARTIN,
WILLIAMS & MEYERS OIL & GAS LAW (2014)
volume 3 § 660...............................................................................................19
volume 6 § 904...............................................................................................13
volume 6 § 919.2 ............................................................................................15
volume 6 § 929.1(6)..............................................................................14, 15, 19
voluem 6 § 930.4 ............................................................................................20

RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 1.5 (2000) ..........................17

NANCY SAINT-PAUL, 4 SUMMERS OIL & GAS § 54.3 (3d ed. 2014).........................13

JOSEPH SHADE & BONNIE BLACKWELL,
PRIMER ON THE TEXAS LAW OF OIL & GAS 20 (5th ed. 2013).........................9, 10

ERNEST E. SMITH & JACQUELINE LANG WEAVER,
TEX. LAW OF OIL & GAS (2d ed. 2014)
volume 1 § 2.4[B][1] .......................................................................................9
volume 1 § 2.49[A]..........................................................................................8

## Introduction

The Quinn siblings originally shared an undivided interest in the mineral estate of the Rose Teal Quinn Ranch. When they later partitioned the mineral estate, they expressly pooled their royalty interests. Sam Quinn then conveyed his estate to House, together with all rights and appurtenances. Sam's pooled royalty interest in the entire ranch necessarily passed to House. At this point, Sam had nothing left to give — as such, his subsequent deed to Hoskins conveyed nothing.

Hoskins argues that, by cross-conveyance, the Quinns did not pool their royalty interests but instead splintered their interests into distinct parts for each sibling's tract that could not be appurtenant to the tract committed to the pool (despite admitting that each tract is burdened by all of the other siblings' royalty interests). Hoskins' argument ignores not only the Quinns' express intent to pool, but also the plain terms of their agreement to cross-convey only as "necessary to effectuate the pooling." Hoskins overlooks the fundamental nature of pooling as a form of joint ownership involving both contract and real property law.

As Hoskins concedes, Sam's tract was burdened by the pooled royalty interest, making that interest an appurtenance as a matter of law. Respected cases and commentators agree that pooled royalty interests are both rights and appurtenances. Because Sam's pooled royalty interest passed to House and not to

7

Hoskins, the trial court's judgment should be reversed and judgment rendered in favor of House and Aery.

### Argument

Appellees filed eight briefs, which generally join the arguments of Clifton Hoskins. For the sake of brevity, the appellees are addressed collectively as "Hoskins" unless noted otherwise. This term explicitly includes the oil and gas producers, whose summary judgments are entirely derivative of the motion granted in favor of Clifton. *See* Appellants' Brief at 25; CR5:1631-32.

## I.    Hoskins confuses semantics with substance by labeling the Quinns' pooled royalty interest as "NPIR/NPRI."

Clifton Hoskins insists on using the novel term "non-participating interest in royalty" (NPIR) to describe the Quinns' pooled royalty interest in the entire Rose Teal Quinn Ranch. *See, e.g.,* Clifton's Brief at vii. Other appellees use the traditional term "non-participating royalty interest" (NPRI). *See, e.g.,* Jane's Brief at 4 n.1. Either term is a red herring. *See* ERNEST E. SMITH & JACQUELINE LANG WEAVER, 1 TEX. LAW OF OIL & GAS § 2.49[A] (2d ed. 2014) (defining "royalty" as a "chameleon-hued" term).

The dispute here is ***not*** whether the Quinns' pooled royalty interest is non-participatory in the costs of production. Instead, the dispute is whether the Quinns created a ***pooled*** royalty interest that, by contract and property law, was conveyed to House.

While Hoskins contends that the sole issue in this appeal is the construction of the deed from Sam to House, he ultimately recognizes that the scope of Sam's ownership interest depends on his prior agreement with his siblings — an agreement to, in their own words, "pool their interests in the royalties from the production of oil, gas and any other mineral, produced and saved from any part of the 2,471.8 acres of land, more or less, known as the Rose Teal Quinn Ranch." Clifton's Brief at viii, 17; CR2:416. Hoskins' label (either NPIR or NPRI) completely ignores any concept of pooling. *See, e.g.,* Clifton's Brief at 3-4.

Additionally, Hoskins' label does not affect the law governing the Quinns' pooled royalty interest, despite Hoskins' suggestion to the contrary. *Compare* Blake's Brief at 3-4 (arguing that cases involving lease royalty interests cannot be applied to cases involving NPRIs) *with* SMITH, 1 TEX. LAW OF OIL & GAS § 2.4[B][1] ("In analyzing rights of royalty owners, Texas courts have tended to ignore distinctions between types of royalties") & *Merrill Eng'g Co. v. Capital Nat'l Bank of Jackson,* 5 So. 2d 666, 671 (Miss. 1942) ("We are unable to conceive of any sound basis for a distinction …"); *see also* JOSEPH SHADE & BONNIE BLACKWELL, PRIMER ON THE TEXAS LAW OF OIL & GAS 20 (5th ed. 2013) ("[S]imilarities among the different types of royalties far outweigh their differences"). Hoskins' label should be set aside as irrelevant.

## II.    Pooling is subject to both property and contract law.

Not only does Hoskins attempt to use irrelevant labels to divert the Court's attention from the key documents, Hoskins also attempts to draw a sharp distinction between contract and real property law. *See, e.g.,* Clifton's Brief at 15, 30. Texas, however, applies both contract and property law in the oil and gas context.

For example:

- Pooling is a real property interest. *MCEN 1996 P'ship v. Glassell*, 42 S.W.3d 262, 263 (Tex. App.—Corpus Christi 2001, pet. denied).

- Pooling is contractual. SHADE, PRIMER ON THE TEXAS LAW OF OIL & GAS at 143.

- Oil and gas law is a blend of contract law and property law. SHADE, PRIMER ON THE TEXAS LAW OF OIL & GAS at 4

Under either contract or real property law, House and Aery win.

## III.    Sam's pooled royalty interest passed to House as a contract right.

Significantly, Hoskins agrees that if pooled royalty interests are contractual, then they pass whether explicitly described in a deed or not. Clifton's Brief at 26 (conceding that "contract-theory jurisdictions treat pooled interests as appurtenant" but arguing that Texas does not recognize pooling as contractual); Aurora's Brief at 5 (conceding the Quinns' pooling agreement is contractual). In an attempt to avoid this concession, Hoskins claims that House and Aery waived any reliance on contract. Clifton's Brief at 26.

House and Aery have consistently applied both contract and property law. *See, e.g.,* Appellants' Brief 27 (noting that review should be de novo under property and contract law); *id.* at 28 (citing multiple cases for property and contract principles); *id.* at 28 (quoting Professor Bruce Kramer, Hoskins' expert in the trial court, for the proposition that pooling agreements are contracts that grow out of property law); *id.* at 29 (explaining that Sam's pooled royalty interest passed to House under "contract and property law"); *id.* at 35 (highlighting Sam's transfer of all rights to House); CR2:394-96 (describing the express contract language in the Quinns' pooling agreement).

Likewise, House and Aery have consistently relied on *Wagner & Brown, Ltd. v. Sheppard*, 282 S.W.3d 419, 424 (Tex. 2008) — a case not mentioned or acknowledged by Hoskins — for the rule that pooling is contractual. *Compare* Appellants' Brief at 28 & CR2:395 *with* Clifton's Brief at v.

In this case, the pooling agreement signed by all of the Quinns was a valid contract that gave Sam rights in the pooled royalty interest in the entire Rose Teal Quinn Ranch. CR2:408-19; *Wagner*, 282 S.W.3d at 424. There can be no doubt that Sam, in his deed to House, explicitly transferred his contract right to House. CR2:432 (transferring to House "all and singular the rights … in anywise belonging"); *Coolbaugh v. Lehigh & Wilkes-Barre Coal Co.*, 67 A. 615, 615 (Pa.

11

1907) (illustrating that a deed's reference to rights passes pooled contractual rights). The trial court erred in concluding otherwise.

## IV. Sam's pooled royalty interest passed to House pursuant to the greatest estate rule.

Falling back on real property law, Hoskins insists that Sam's pooled royalty interest must be particularly described in a deed before it can be conveyed. Clifton's Brief at 10-11 (citing *Gage v. Owen*, 435 S.W.2d 559, 562 (Tex. Civ. App.—Fort Worth 1968, writ ref'd n.r.e.). Neither *Gage* nor any of the cases it cites have been used to overrule the long-standing principle that a deed confers upon the grantee the greatest estate owned by the grantor, whether particularly described or not. *See, e.g., Lott v. Lott*, 370 S.W.2d 463, 465 (Tex. 1963); *Eastin v. Dial*, 288 S.W.3d 491, 500 (Tex. App.—San Antonio 2009, pet. denied).

Sam's deed to House broadly conveys all rights and appurtenances. CR2:432. Moreover, Sam's deed to House actually describes the entire Rose Teal Quinn Ranch. CR2:431 (identifying "623.93 acres … being a part of the Rose Teal Quinn Ranch consisting of 2471.8 acres, more or less, and being described in a certain Deed of Trust"). Finally, Sam's deed to House expressly reserves only one thing:  his mother's life estate described in the pooling agreement. CR2:431-32; *Sharp v. Fowler*, 252 S.W.2d 153, 154 (Tex. 1952) (holding that a warranty deed passes the entire estate absent a reservation to the contrary). By application of the greatest estate rule, Sam's pooled royalty interest passed to House.

**V.  Sam's pooled royalty interest passed to House as an appurtenance.**

Hoskins denies that a pooled royalty interest is an "appurtenance," but Hoskins is wrong. *See* Clifton's Brief at 17. The Quinns' pooled royalty interest in the entire Rose Teal Quinn Ranch is directly appurtenant to Sam's own land.

**A.  Hoskins' cross-conveyance theory is not dispositive.**

Hoskins argues that the Quinns' pooling agreement, as a cross-conveyance, "resolves this case." *Id.* at 17 & n.8 (citing NANCY SAINT-PAUL, 4 SUMMERS OIL & GAS § 54.3 (3d ed. 2014)). Ironically, after criticizing House and Aery for relying on secondary sources, Hoskins does the same. *Compare id.* at 28. Hoskins' reliance on SUMMERS, however, is inconsistent with Texas law.

According to Hoskins' reading of SUMMERS, a contract state characterizes pooling as a contract right, while a cross-conveyance state characterizes pooling as a property interest ***that is not*** appurtenant to any unit committed to the pool. Clifton's Brief at 17 (citing SAINT-PAUL, 4 SUMMERS OIL & GAS § 54.3). While SUMMERS is actually addressing a community lease, a community lease is a type of voluntary pooling agreement where a single oil and gas lease covers two or more tracts executed by the separate owners as if they were joint owners. BRUCE M. KRAMER & PATRICK H. MARTIN, 6 WILLIAMS & MEYERS OIL & GAS LAW § 904 (2014).

13

Hoskins then characterizes Texas as a cross-conveyance state. Clifton's Brief at 17. Whether Texas is a cross-conveyance state is a nonstarter, in part because Texas does ***not*** sharply distinguish contract and property law in the oil and gas context. As Professor Kramer further explains, the adoption or rejection of the cross-conveyance theory has ***no effect*** on whether the interest in a pooled unit is appurtenant (passes with the land) or in gross (does not pass with the land). KRAMER, 6 WILLIAMS & MEYERS § 929.1(6).

For example, both California and Mississippi are cross-conveyance states, but Mississippi considers a pooled royalty interest to be appurtenant, while California does not. *Id.* § 930.1, § 930.4; *Merrill*, 5 So. 2d at 672 (holding that "in the absence of a reservation to the contrary[,] a subsequent grantee of any part of the pooled area would be entitled to the benefits"); *Tanner v. Title Ins. & Trust Co.*, 129 P.2d 383, 386 (Cal. 1942) (holding that the pooled royalty interest is "an incorporeal hereditament in gross"). Thus, SUMMERS' position is an oversimplification, and Hoskins' reliance on it is misplaced.

### B. The Quinns' express intent is dispositive.

Consistent with Texas principles of contract and deed construction, Kramer concentrates on the "intent of the parties, not whether pooling or unitization effects cross-conveyances." KRAMER, 6 WILLIAMS & MEYERS § 929.1(6); *see also Wagner*, 282 S.W.3d at 424 (construing a Texas pooling agreement based on the

14

intent reflected in the agreement). Even *Tanner*, the leading "in gross" case cited above from California, is consistent with this basic tenant of document construction. *Tanner*, 129 P.2d at 389 (concurring that the intention of the parties as expressed in their agreement controls).

Kramer further notes that if the parties did not adequately manifest their intent, "the courts should usually take the position that the grantor's interest in unit production is included in a conveyance of the premises he has committed to the unit." KRAMER, 6 WILLIAMS & MEYERS § 929.1(6). "In other words, the interest of a party in unit production should ordinarily be viewed as appurtenant to his interest in premises committed to the unit rather than 'in gross.'" *Id.*

Here, although it leads to the same result in favor of House and Aery, the Court need not resort to Kramer's default position because the Quinns fully manifested their intent. The Quinn siblings pooled all of their royalty interests. CR2:416 (expressing the Quinns' "desire to and do hereby pool their interests in the royalties from the production of oil, gas and any other mineral, produced and saved from any part of the 2,471.8 acres of land, more or less, known as the Rose Teal Quinn Ranch").

Furthermore, the Quinns evidenced their intent to cross-convey only to the extent "necessary to effectuate" their pooling agreement. CR1:231; *see also* KRAMER, 6 WILLIAMS & MEYERS § 919.2 (pooling language may negate any

15

undesirable consequences of cross-conveyance by agreement of the parties). If the Quinns had intended to create the separate and distinct royalty interests in each sibling's tract that Hoskins advocates, then they would have used a simple conveyance to reach that result without implicating pooling at all.

In their pooling agreement, the Quinns bound their heirs and assigns, further evidencing their intent to pass their pooled royalty interest with the tracts committed to the pool. CR2:409. This intent is further underscored by the recitations regarding the siblings' prior undivided interests in the mineral estate of the entire ranch and by the inclusion of their mother as a party to the agreement and holder of a life estate in the ranch's mineral estate. CR2:408, 418-49.

Later, when Sam conveyed his rights and appurtenances to House, he evidenced his intent to convey his pooled royalty interest in the entire ranch. CR2:432. Not only did Sam mention all "rights and appurtenances," but he also described the entire Rose Teal Quinn Ranch by name and cross-reference to other filed documents. CR2:431-32. The trial court erred in granting summary judgment in favor of Hoskins rather than House and Aery.

### C. Precedent from this Court and the Supreme Court controls.

Hoskins contends that Sam's pooled royalty interest cannot be an appurtenance because is not necessary to the enjoyment of Sam's tract, but Hoskins' contention focuses only on Sam's surface tract. Clifton's Brief at 19.

16

That narrow focus is misplaced and is inconsistent with Hoskins' admission that Sam's tract was "burdened" with an obligation to share royalties. *Id.* at 25 (row three of Hoskins' chart).

"A burden that obligates the owner or occupier of a particular unit or parcel in that person's capacity as owner or occupier is an appurtenant burden." *Killam Ranch Properties, Ltd. v. Webb County*, 376 S.W.3d 146, 156 n.4 (Tex. App.—San Antonio 2012, pet. denied) (en banc) (citing RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 1.5 (2000), which defines "appurtenances"). An appurtenance may also be a beneficial right essential to the proper enjoyment of the premises. *Cox v. Campbell*, 143 S.W.2d 361, 364 (Tex. 1940).

Pursuant to the Quinns' pooling agreement, if oil and gas were ever produced on Sam's acres, then he would be required to share royalty with his siblings. As Hoskins conceded, Sam's tract was "burdened" by the pooled royalty interest in the entire ranch. Clifton's Brief at 25; *see also* CR3:852 & 861 n.13. Thus, Sam's pooled royalty interest is an appurtenance. *Killam*, 376 S.W.3d at 156 n.4; *see also Landgrebe v. Rock Hill Oil Co.*, 273 S.W.2d 636, 638 & 640 (Tex. Civ. App.—San Antonio 1954, writ ref'd n.r.e.) (holding that parties to a pooled lease continued to receive their proportionate share even when their subsequent partition deeds did not mention the prior pooled royalty interest).

17

Additionally, under the pooling agreement, if oil and gas were ever produced on the tracts of Sam's siblings, they would be required to share royalty with Sam, conferring on him a beneficial right essential to the proper enjoyment of his own tract. *See Cox*, 143 S.W.2d at 364. In this sense, a pooled royalty interest is not unlike an appurtenant easement, which "inheres in the land, concerns the premises, and pertains to its enjoyment." *Forister v. Coleman*, 418 S.W.2d 550, 559 (Tex. Civ. App.—Austin 1967), *writ ref'd n.r.e.*, 431 S.W.2d 2 (Tex. 1968).

The Quinns' pooled royalty interest in the entire ranch certainly "affected the nature and value" of their respective tracts. *See Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 911 (Tex. 1982) (defining an agreement to share leases in a geographic area as an appurtenance). Hoskins discounts *Westland* because "the interest at issue was one created by contract." Clifton's Brief at 27. *Westland*, however, is controlling here because the Quinns' pooled royalty interest is contractual. *See Wagner*, 282 S.W.3d at 424.

Furthermore, Hoskins' attempt to divorce contract law from property law once again fails. *See Westland*, 637 S.W.2d at 905 (describing the agreement as a contract to convey real property interests); *see also Thomas v. Fin & Feather Club*, 171 S.W. 698, 700 (Tex. 1914) (holding that Bateman's fishing contract with the club, recorded in the real property records, was an appurtenance to land Bateman

conveyed to Thomas). Because Sam's royalty interest in the pool was appurtenant to the tract he committed to the pool, that pooled royalty interest passed to House.

### D. Commentators agree pooled royalty interests are appurtenances.

For Professor Kramer, the pooled royalty interest "should ordinarily be viewed as appurtenant to [the] interest in premises committed to the unit rather than 'in gross.'" KRAMER, 6 WILLIAMS & MEYERS § 929.1(6); *see also* 3 WILLIAMS & MEYERS § 660. Under Kramer's analysis, even if the Quinn siblings owned fractional royalty interests in each other's tracts as Hoskins claims (when they did not), those interests would still be appurtenant to the tract committed to the unit. *Id.*; *see also* William O. Huie, *Apportionment of Oil & Gas Royalties*, 78 HARV. L. REV. 1113, 1145 n.65 (1965) (characterizing pooled royalty interests as appurtenances).

This outcome makes sense given Supreme Court authority holding that production anywhere on a pooled unit is considered production on every tract in the unit. *See, e.g., Key Operating & Equip., Inc. v. Hegar*, 435 S.W.3d 794, 798-99 (Tex. 2014) (citing *Southland Royalty Co. v. Humble Oil & Ref. Co.*, 249 S.W.2d 914, 916 (Tex. 1952)). "Under such reasoning, the right to receive royalty from production which is realized from wells located on other land covered by the community lease would necessarily follow the ownership of each tract of land contributed to the community lease." OWEN ANDERSON, ET AL., KUNTZ, 3

A TREATISE ON THE LAW OF OIL & GAS § 42.6 (1989) (citing *Southland*, 249 S.W.2d at 916).

**E.    *Avery* and *McCall* are not binding on this Court.**

In rejecting pooled royalty interests as appurtenances, Hoskins relies heavily on *McCall* and the West Virginia case it cites. Clifton's Brief at 20-25 (discussing *McCall v. McCall*, 24 S.W.3d 508 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) and *Avery v. Moore*, 144 S.E.2d 434 (W. Va. 1965)). Neither case is controlling.

*Avery* arises in a contract theory state, which under Hoskins' analysis, would not apply in Texas. *See* KRAMER, 6 WILLIAMS & MEYERS § 930.4. Regardless, as Hoskins admits, *Avery* does not explicitly discuss appurtenances (nor does it even discuss contractual rights); it simply draws a conclusion without relating enough facts to make a comparison here. *See* Clifton's Brief at 21.

As for *McCall*, the "facts as stated in the court's opinion are not entirely clear." *See* Edwin P. Horner, *McCall v. McCall Discussion Notes*, 145 OIL & GAS REP. 415, 419 (2001). Nonetheless, there was no pooling of the royalty interest concurrent with the partition of the remaining mineral estate. For that simple reason, *McCall* has no bearing on the Quinns' pooling agreement.

Moreover, Professor Horner criticized *McCall* for reaching the wrong result. First, the opinion defined the term "appurtenance" too narrowly in the royalty context. Horner, 145 OIL & GAS REP. at 420.

Second, the opinion disregarded *Harris v. Currie*, 176 S.W.2d 302 (Tex. 1943), and *Day & Co., Inc. v. Texland Petroleum, Inc.*, 786 S.W.2d 667 (Tex. 1990), which provide that a grantor conveys the greatest estate owned absent a reservation to the contrary. Horner, 145 OIL & GAS REP. at 418-19. According to Professor Horner, "where the owner of a tract included in a pooled unit sells his tract, then his conveyance also includes his interest in the production from the pooled unit, which production may come from another tract in the unit." *Id.* at 418-19.

While Hoskins discounts Professor Horner and the other Texas commentators, their observations offer valuable insight into Texas law. Regardless, Hoskins himself proves why *McCall* has no precedential value here. When discussing *McCall*, Hoskins concedes that Sam's tract was "***burdened*** by a royalty interest in favor of the owners of the other tracts." *See* Clifton's Brief at 25 (emphasis added).

*McCall* rejects burdens as appurtenances, which conflicts with this Court's recognition of burdens as appurtenances. *Killam Ranch*, 376 S.W.3d at 156 n.4.

Moreover, *McCall* is narrowly focused on appurtenances and fails to address the contractual rights reflected in the Quinns' pooling agreement.

## VI. Recitations in the House and Aery chain of title have no effect.

In his factual statement, Hoskins mentions the "subject to" language in the House and Aery chain of title. Clifton's Brief at 6-8. This language acknowledges the recording of Sam's deed to L.R. Hoskins (dated after Sam's deed to House), but the reference does not acknowledge the validity of the second deed. *See Teal Trading & Dev., LP v. Champee Springs Ranches Prop. Owners Ass'n*, 432 S.W.3d 381, 391 (Tex. App.—San Antonio 2014, pet. denied). In light of this authority, Hoskins makes no argument based on his factual recitation.

## VII. Hoskins' position is not logical.

Although Hoskins insists his position is logical, it is not. *See* Clifton's Brief at 15, 17. In Texas, if a landowner enters an ordinary oil and gas lease and subsequently conveys the land by warranty deed without reserving any mineral interests, then the grantee takes the land and any royalty due under the lease. *Bibb v. Nolan*, 6 S.W.2d 156, 157 (Tex. Civ. App.—Waco 1928, writ ref'd). The same result must occur if the land is subject to a pooled lease — all the more so in this case, where the grantors expressly pooled their royalty interests by agreement before entering any oil and gas leases.

**Conclusion**

This case illustrates the blending of contract and property law. The Quinns agreed to partition their jointly owned mineral estate, but for their royalty interests, which they expressly agreed to pool in perpetuity. Whether Hoskins characterizes the Quinns' pooled royalty interest as an NPIR or NPRI or a cross-conveyance is irrelevant. Nor does it really matter whether the pooled royalty interest can be spatially divided as Hoskins wrongly asserts.

The bottom line is that the Quinns' pooled royalty interest was both a contractual right and interest in real property. The pooled royalty interest in the entire Rose Teal Quinn Ranch also necessarily (and admittedly) burdened all of the tracts committed to the pool and affected their value. As a result, the pooled royalty interest in the entire Rose Teal Quinn Ranch was appurtenant to Sam's tract.

When Sam transferred and conveyed the "described premises, together with all and singular the rights and appurtenances thereto in anywise belonging" to House, Sam's pooled royalty interest passed to House (and subsequently to Aery). The trial court erred in concluding otherwise.

As outlined in more detail in the prayer of their opening brief, Aery and House ask the Court to reverse the trial court's summary judgment in favor of Clifton Hoskins, as well as the other summary judgments and final judgment upon

which it is based. Aery and House ask the Court to render judgment on their cross-motion, and they pray for all other relief to which they may be entitled.

Respectfully submitted,

By: */s/ Rosemarie Kanusky*

Norton Rose Fulbright US LLP
Rosemarie Kanusky
State Bar No. 00790999
rosemarie.kanusky@nortonrosefulbright.com
John W. Weber, Jr.
State Bar No. 21046500
john.weber@nortonrosefulbright.com
Jeffrey A. Webb
State Bar No. 24053544
jeff.webb@nortonrosefulbright.com
300 Convent, Suite 2100
San Antonio, Texas 78205
Telephone: 210.224.5575
Fax: 210.270.7205

*Counsel for the House Family*


Law Offices Of Dan Pozza
Dan Pozza
State Bar No. 16224800
danpozza@yahoo.com
239 E. Commerce Street
San Antonio, Texas 78205-2923
Telephone: 210.226.8888
Fax: 210.224.6373

*Counsel for Brad and Randi Aery*

## Certificate Of Compliance & Service

I certify that this brief complies with type-face and type-volume requirements. The document contains 4,788 words, not including the tables.

I certify that a copy of this brief was emailed or mailed to the following:

Dan Pozza
danpozza@yahoo.com
239 E. Commerce Street
San Antonio, Texas 78205-2923
*Appellate Counsel for Aery Family*

Marc K. Whyte
marcwhyte@gmail.com
Whyte, PLLC
209 Tuttle
San Antonio, Texas 78209
*Counsel for Aery Family*

David L. Ylitalo
dylitalo@coatsrose.com
Coats Rose PC
1020 Northeast Loop 410, Suite 800
San Antonio, Texas 78209
*Counsel for Leonard Hoskins*

Ellen B. Mitchell
emitchell@dykema.com
C. David Kinder
dkinder@dykema.com
Dykema Cox Smith Matthews
112 East Pecan, Suite 1800
San Antonio, Texas 78205
*Counsel for Hoskins, Inc., C. Clifton Hoskins, and Trudy Day*

Michael C. Sartori
State Bar No. 17655500
michael@msartori.com
Law Office of Michael C. Sartori
P.O. Box 1222
502A Houston Street
George West, Texas 78022
*Counsel for Hoskins, Inc., C. Clifton Hoskins, Trudy Day and Hazel Q. Hoskins*

Peter E. Hosey
phosey@jw.com
Julia W. Mann
jmann@jw.com
Jackson Walker L.L.P.
112 E. Pecan Street, #2400
San Antonio, Texas 78205
*Counsel for Lee Ann Kulka, Lee Roy Hoskins, III and Andrea Jurica*

Ezra A. Johnson
ejohnson@ufjblaw.com
Uhl, Fitzsimons, Jewett &
 Burton, PLLC
4040 Broadway, Suite 430
San Antonio, Texas 78209
*Counsel for Blake C. Hoskins*

Benjamin F. Youngblood III
bfy@prodigy.net
Benjamin F. Youngblood III, P.L.L.C.
8207 Callaghan Road, Suite 100
San Antonio, Texas 78230
*Counsel for Jane W. Hoskins*

Bruce D. Oakley
bruce.oakley@hoganlovells.com
Robert L. Pillow
Robert.pillow@hoganlovells.com
Hogan Lovells US LLP
700 Louisiana St., Suite 4300
Houston, Texas 77002
*Counsel for Armadillo E&P, Inc.,*
*Sea Eagle Ford, LLC, and*
*Sundance Energy, Inc.*

David W. Navarro
dnavarro@hsfblaw.com
Brendon C. Holm
bholm@hsfblaw.com
Hornberger Sheehan Fuller
 Beiter Wittenberg &
 Garza Incorporated
The Quarry Heights Blding
7373 Broadway, Suite 300
San Antonio, Texas 78209
*Counsel for Brent C. Hoskins*

Jason A. Newman
Jason.newman@bakerbotts.com
Baker Botts L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, Texas 77002-4995
*Counsel for Texoz E&P I, Inc.*

Roberta S. Dohse
rdohse@hfdlaw.com
Conner R. Jackson
cjackson@hfdlaw.com
Hoblit Ralls Hernandez & Hudlow,
LLP
2000 Frost Bank Plaza
802 North Carancahua
Corpus Christi, Texas 78401
*Counsel for Aurora Resources*
*Corporation*

*/s/ Rosemarie Kanusky*
Rosemarie Kanusky

Dated: June 19, 2015

26

| § 6.1 Voluntary partition |
|---|

By virtue of the power of a cotenant to convey his undivided interest, particularly his power to convey such interest to another cotenant and to acquire an interest from his cotenant,[2] joint tenants, tenants in common and coparceners may accomplish a voluntary partition of the common property by cross conveyances, without judicial decree.[3] One cotenant cannot accomplish a unilaterial partition, and the granting of an oil and gas lease upon a specific part of the jointly-owned land by one cotenant cannot accomplish a partition,[4] but a conveyance of a specific part by a cotenant may operate *as* a voluntary partition if acquiesced in by the other cotenants.[5] If less than all of the cotenants enter into voluntary partition, it is not binding upon cotenants who do not join,[6] and, where it is not ratified or acted upon,[7] it is also said not to be binding upon those who do participate unless it is binding upon all cotenants.[8] It would follow that a voluntary partition cannot be accomplished if one or more of the parties be incompetent.[9] A voluntary partition is void if the purpose of such partition is to defraud third persons by an attempt to defeat their rights under mortgages or leases on the undivided interests involved.[10]

A parol voluntary partition followed by possession of the allotted portions by the designated cotenants is valid.[11] In a voluntary partition, it is possible for the cotenants to partition the surface only and not the minerals, and if only the surface is partitioned, an attempt by one of the cotenants to reserve all of the oil and gas rights in a subsequent conveyance would not serve to divest his cotenants of their rights in the oil and gas.[12] In a voluntary partition, the cotenants may partition the surface and part of the minerals and retain the status of cotenancy with respect to certain incidents of ownership in the minerals. Thus, each owner may retain an undivided royalty interest in tracts allocated to other cotenants while taking ownership of all other incidents of mineral ownership, including the power of leasing his own partitioned tract. A subsequent conveyance by the owner of such a partitioned tract will carry with it all mineral rights in that tract, subject to the outstanding royalty interests, but it will not convey any of the grantor's royalty interest in the other tracts.[13]

Where two cotenants own the surface estate and a third cotenant owns an interest in the minerals, a partition deed by the two surface owners partitioning the land on the basis of the surface ownership will be construed to partition the

---

[1] See generally, American Law of Property (1952), §§ 6.19, 6.20; Powell, The Law of Real Property (1954), P610; Tiffany, The Law of Real Property (3rd ed. 1939), §§ 468–472.

[2] See § 5.5.

[3] Griffin v. Reilly (**Tex** CivApp 1925), 274 SW 242.

But see Zapatero v. Canales, 730 S.W.2d 111, 96 O&GR 178 (Tex. App.—San Antonio 1987, writ ref'd n.r.e.), wherein it was held that a partition deed is not a conveyance.

[4] Medina Oil Development Co. v. Murphy (**Tex**CivApp 1921), 233 SW 333. But see § 6.7.

[5] Fugate v. Smith, 290 **Ky** 115, 160 SW(2d) 328 (1942).

[6] Sparks v. Union Manufacturing &c. Co., 121 **SC** 220, 114 SE 322 (1922).

See Barfield v. Holland, 844 S.W.2d 759, 120 O&GR 556 (Tex. App.—Tyler 1992, writ denied).

[7] Sutton v. Porter, 119 **Mo** 100, 24 SW 760, 41 AmStRep 645 (1893) .

See Barfield v. Holland, 844 S.W.2d 759, 120 O&GR 556 (Tex. App.—Tyler 1992, writ denied).

[8] Cochran v. Cochran, 277 **Ill** 244, 115 NE 142 (1917); Carter Oil Co. v. McQuigg (7th Cir. 1940), 112 **F**(2d) 275.

See Barfield v. Holland, 844 S.W.2d 759, 120 O&GR 556 (Tex. App.—Tyler 1992, writ denied).

[9] Carter Oil Co. v. McQuigg (7th Cir. 1940), 112 **F**(2d) 275.

[10] Id.

[11] See Tiffany, The Law of Real Property (3rd ed. 1939), § 469.

[12] Griffin v. Reilly (**Tex**CivApp 1925), 275 SW 242.

[13] Avery v. Moore, 150 **WVa** 136, 23 O&GR 1012, 144 SE(2d) 434 (1965).

McCall v. McCall, 24 S.W.3d 508 (Tex. App.—Houston [1st Dist.] 2000) (distinguishing Day & Co. Inc. v. Texland Petroleum, Inc., 786 S.W.2d 667 (Tex. 1990)).

surface only. This result and the underlying reasons are clearly described in the following concise statement by Justice Smith:

> "This case is controlled by our decision in Hutchinson v. Sheppard, supra. There we held that where the parties to a partition deed owned two estates in the land, one in common and in the same ratio *as* the division and the other not in common and therefore not in that ratio, the deed should be construed *as* a conveyance only of the estate held in common. And that conclusion was reached even though the deed purported to convey all the grantor's 'right, title, interest and claim' in and to the land. The governing rule is obviously both sensible and just, for it prevents either party from gaining an advantage at the other's expense."[14]

Whether or not the voluntary partition was intended to partition the mineral *as* well *as* the surface interest raises a problem of construction of the partition deeds. In the case of deeds not involving a partition, it is uniformly held that upon a conveyance of land, the ownership of or the rights to oil and gas pass to the grantee unless they are expressly reserved or excepted.[15] Partition deeds are not subject to all of the formalities required of other conveyances, but the usual rules of construction apply, and it may be found that it was intended to partition the minerals *as* well *as* the surface, although the minerals are not specially mentioned.[16] Partition deeds which cover both mineral and surface interests by mistake can, because of the mutual mistake, be reformed to cover only the surface and not the mineral interest.[17]

If an oil and gas lease is outstanding on the entire tract owned by the cotenants at the time of the voluntary partition of the surface and mineral estates, it is not necessary that the oil and gas lessee be a party to the partition,[18] but such partition can not impair the rights of the lessee who is entitled to develop the entire tract *as* a unit and not *as* separate tracts.[19]

A voluntary partition may be rescinded for mutual mistake, but it cannot be rescinded for a unilateral mistake unless the other party knew of the mistake or induced it. *Zapatero v. Canales, 730 S.W.2d 111, 96 O&GR 178 (Tex. App.—San Antonio 1987, writ ref'd n.r.e.)*.

In Louisiana, natural gas produced from a compulsory unit is subject to partition, and the Conservation Commissioner is authorized to order a partition. *Amoco Production Co. v. Thompson, 516 So. 2d 376, 98 O&GR 273 (La. App. 1987)*, writ denied, *520 So. 2d 118 (La. 1988)*. Because of the authority to partition gas produced from a unit, the commissioner also has the authority to direct balancing and to order an accounting either in cash or in kind. *Amoco Production Co. v. Thompson, 566 So. 2d 138, 112 O&GR 65 (La. App. 1990)*, writ of cert. denied, *571 So. 2d 627, 628 (La. 1990)*.

---

In re Estate of Slaughter, 305 S.W.3d 804 (Tex. App.—Texarkana 2010), provides a good example of a partition in which each owner retained a royalty interest in the tracts allocated to the other cotenants, but acquired all other incidents of mineral ownership. The court rejected the claims of two of the original three cotenants that they were entitled to share in all rights in the mineral estate under the third tract, which had been leased. The court ruled that the provision in their father's will that left land to his three sons and that stipulated that they were to "share and share alike production royalty" clearly referred only to royalty and the effect of the sons' voluntary partition was to give each son all the other incidents of the mineral estate in the tract that he received.

[14] Johnson v. Ford, 16 O&GR 508, 510, 233 Ark 504, 345 SW(2d) 604 (1961).

[15] Moshiek v. Lininger, 130 Colo 266, 274 P.2d 965, 4 O&GR 121 (1954); Mark v. Bradford, 315 **Mich** 50, 23 NW(2d) 201 (1946); **Northern Pac. R. v. Advance Realty Co. (ND**), 8 O&GR 232, 78 NW(2d) 705 (1956); Cutright v. Richey, 208 **Okla** 413, 257 SW(2d) 286, 2 O&GR 980 (1953); Schlittler v. Smith, 128 **Tex** 628, 101 SW(2d) 543 (1937); McCoy v. Lowrie, 44 **Wash**(2d) 483, 268 P(2d) 1003, 3 O&GR 858 (1954).

[16] Bradley v. Teague (**Ark**App 1979), 64 O&GR 419, 589 SW(2d) 200; Garza v. De Montalvo, 147 **Tex** 525, 217 SW(2d) 988 (1949).

[17] Farris v. Moore (**Tex**CivApp 1956), 6 O&GR 864, 293 SW(2d) 683.

[18] Garza v. De Montalvo, 147 **Tex** 525, 217 SW(2d) 988 (1949).

[19] Garza v. De Montalvo, 147 **Tex** 525, 217 SW(2d) 988 (1949). See Pierce Oil Co. v. Schacht, 75 **Okla** 101, 181 Pac 731 (1919); Carter Oil Co. v. McQuigg (7th Cir. 1940), 112 **F**(2d) 275.

The cases are not uniform *as* to the rights of the cotenants under an outstanding lease after a partition of the mineral estate. Under the rule applied in the majority of states with decisions on the point, unless the partition agreement or decree specifically provides otherwise, each cotenant is entitled to benefits under the lease only insofar *as* they pertain directly to his partitioned portion of the tract. He is entitled to all of the royalty payments for production from his portion of the partitioned tract and is not entitled to a share of royalties for oil or gas produced elsewhere on the larger tract under the lease.[20] Under the rule applied in a minority of the jurisdictions having decisions on the point, royalties and payments under the lease would be apportioned, that is, royalties payable for oil or gas produced at any point on the larger tract would be divided among the various owners of the tracts into which it was partitioned. This result has been explained on the basis that oil and gas are fugitive in nature and that production must be apportioned among the partitioned owners because it is being drained from the entire tract.[21] In Kentucky, if nothing is said about the outstanding lease and royalties payable thereunder, the rule of apportionment applies on the theory that the royalties and other payments under a lease are not only payment for oil extracted but also serve *as* rentals by which the entire tract is held under the terms of the lease.[22] Such cotenants may, however, partition the minerals and rights under the lease so *as* to prevent such apportionment.[23]

The effect of a partition of land that is subject to an oil and gas lease may depend upon the provisions of the oil and gas lease. Thus, in Texas, where the nonapportionment rule is followed and it is held that royalty payable under an outstanding lease will not be apportioned after a partition of the mineral rights of the lessors, a federal court has concluded that a different result should be reached if the outstanding lease is a community lease. In reaching the conclusion that royalty payable under the community lease should continue to be apportioned after a voluntary partition of the mineral rights by the lessors, the court made a careful analysis of Japhet (applying the nonapportionment doctrine) and Parker (applying apportionment under the community lease concept), and made the following perceptive comment:

> "*As* we pointed out previously, Japhet and Parker have been distinguished on two grounds. First, a purchaser of a subdivided section of land under a lease is deemed to have purchased with 'his eyes wide open to the rights of the various parties.' Second, a single lessor is different from joint lessors because he cannot form a community with himself. Strict adherence to the second distinction perhaps even compels continuance of the apportionment presumption in a partition after unitization. Before the partition the parties have formed the community which was lacking in Japhet. The first distinction requires that no presumption be placed either for or against apportionment. With their eyes wide open, the parties joined a community and allowed one lessee to treat the lands *as* a unit. Their act of cooperation was based on a profit incentive, and each expected to reap benefits. Can it be said that each party to the partition then abandoned his assurance of royalties in favor of a gamble that the lessee would drill on his contributed land? At least no presumption to that effect can be defended when the instruments do not so provide. There can be a defiance of community by partition where the transaction is capable of being construed *as* an act of liberation; however, either the words or the incidence of the transaction must demonstrate some disavowal of former relationships."[24]

---

[20] **Texas.** Garza v. De Montalvo, 147 **Tex** 525, 217 SW(2d) 988 (1949).

**West Virginia.** Musgrave v. Musgrave, 86 **WVa** 119, 103 SE 302, 16 ALR 564 (1920).

See Osborn v. Arkansas Territorial Oil &c. Co.. 103 **Ark** 175. 146 SW 122 (1912): Hurst v. Paken Oil Co.. 287 **Ky** 257. 152 SW(2d) 981 (1941): Northwestern Ohio Nat. Gas Co. v. Ullerv. 68 **Ohio** St 259. 67 NE 494 (1903); Pierce Oil Co. v. Schacht, 75 **Okla** 101, 181 Pac 731 (1919); Lehew v. Lehew (**Tex** CivApp 1958),314 SW(2d) 146, 9 O&GR 754.

[21] *Wettengel v. Gormley, 160* **Pa** 559, 28 Atl 934, 40 AmStRep 733 (1894); 184 **Pa** 354, 39 Atl 57 (1898).

[22] McIntire v. Bond, 227 **Ky** 607, 13 SW(2d) 772, 64 ALR 630 (1929).

[23] Hurst v. Paken Oil Co., 287 **Ky** 257, 152 SW(2d) 981 (1941).

[24] Howell v. Union Producing Co. (5th Cir 1968), 392 **F**(2d) 95, 28 O&GR 238, 253.

An agreement to partition land which contained no provision regarding mineral rights will not be enforced where the land was acquired subject to numerous mineral reservations.[25]

Kuntz, Law of Oil and Gas
Copyright 2014, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

---

[25] Roberson v. Hollis (**La**App 1981), 71 O&GR 347, 403 S(2d) 845. For the creation of servitudes in Louisiana by voluntary partition, see § 10.7.

---

**§ 42.6 Effect of transfer by lessor.**

---

**[a]  Conveyance of entire interest by lessor.**

In considering what the effect will be upon the payment of royalty under an oil and gas lease if the lessor conveys the entire interest in the minerals, it is necessary to take into account two different facets of the problem. One such facet involves the respective rights of the lessor and the grantee *as* between themselves. The other fact involves the respective rights of the lessor and grantee *as* against the lessee. An analysis of both facets of the problem is aided by a consideration of certain fundamentals.

The right to receive royalties under an oil and gas lease is one of the separately alienable incidents of ownership of the minerals.[1] Although such right is capable of being alienated separately, the right to receive royalties will pass with a conveyance of the minerals, unless such right is expressly reserved or excepted.[2] Further, although the right to receive royalty bears some resemblance to the right to receive rent and there have been instances where the law relating to rent has controlled the results reached with respect to the right to receive royalty,[3] there is an important difference which must be recognized. Ordinarily, rent is not apportionable *as* to time and does not accrue from day to day but is payable to the owner of the reversion on the date that the rent becomes payable. Oil and gas royalties, on the other hand, ordinarily accrue from day to day and are regarded *as* being apportionable *as* to time even though provision may be made in the lease for an accounting period.

In the instance of the royalty which is payable *as* the result of oil production, the oil and gas lease commonly provides that the lessee shall deliver, to the lessor or to the lessor's credit in a pipeline, a portion of the oil produced and saved.[4] In the instance of the royalty which is payable *as* the result of gas production, the lease commonly provides that the lessee shall pay to the lessor an amount to be determined either by the value of gas produced or by the proceeds of the sale of such gas.[5] In both such instances, the payment of royalty is not made on the basis of the passage of time. The payment is made to compensate the lessor for the lessor's share of a substance that has been removed, and except in the rare instance where a fixed periodic gas rental might be used,[6] the amount of the royalty bears no relation to the passage of time. Provision is occasionally made for the lessee to make payments or to account periodically, but such a provision does not change the nature of the payment. Such a provision is obviously designed to solve a mechanical problem incident to payment and is not designed to alter substantive rights.

Accordingly, although the analysis suggested above has not necessarily been applied in the cases *as* a basis for decision, it has been uniformly held or assumed in connection with a related holding that, if after an oil and gas lease has been granted, the lessor should convey the minerals without exception or reservation or should otherwise make a complete disposition of the right to receive royalty payments, such lessor is entitled to receive those royalty payments which have accrued to the date of the conveyance.[7] With very rare exception,[8] it has likewise been held or assumed that the right to receive royalty passes with a devise or conveyance or inheritance of the mineral interest

---

[1] See § 15.1.

[2] See § 14.1.

[3] See. e.g.. Handlan v. Bennett (4th Cir 1931), 51 F(2d) 21; McIntire v. Bond, 227 Ky 607, 13 SW(2d) 772, 64 ALR 630 (1929). See also §§ 44.4(e) and 44.6.

[4] See § 39.1.

[5] See § 40.4.

[6] See § 40.2.

[7] Clark v. Richfield Oil Co. of Cal.. 127 CalApp 495. 16 P(2d) 162 (1932): McIntire v. Bond. 227 Ky 607. 13 SW(2d) 772. 64 ALR 630 (1929): Duvall v. Stone. 54 NM 27. 213 P(2d) 212 (1949); White v. McVey, 168 Okla 19, 31 P(2d) 850, 94 ALR 656 (1934); Handlan v. Bennett (4th Cir 1931), 51 F(2d) 21.

[8] See the second appeal in Wettengel v. Gormley. 184 Pa 354. 39 Atl 57 (1898). in which the court regarded the right to receive royalty under an oil and gas lease as a personal right of the lessor which did not pass with a devise of the land upon the death of the lessor.

and that royalty which accrues after the date of passage of title properly belongs to the grantee, devisee, or heir of the lessor, *as* being incident to the interest which was acquired by virtue of the conveyance, devise, or inheritance.[9]

The problem of determining which parties are entitled to receive royalty after the lessor has made a conveyance has a different appearance when considered from the standpoint of the lessee. From the standpoint of the lessee, the problem is one of determining what is required to discharge a liability. The lessee must pay the royalty to the party entitled to receive it, and a payment to the wrong party is no defense in an action by the party who is entitled to receive the royalty.[10] Consequently, it is of considerable importance to the lessee to be able to establish the effective date of a change in the parties entitled to receive royalty.

Although the effective date of the passage of title will control the right to receive royalty *as* between the lessor and the person to whom the mineral interest was conveyed, such date may or may not be the controlling date for purposes of determining the lessee's liability. Such date may be controlled by statutory provisions for notice. More likely, such date will be controlled by the presence of a provision in the oil and gas lease which provides that no change of ownership of the lessor's interest is binding on the lessee until a prescribed form of notice is given to such lessee.[11]

According to the operation of the change of ownership clause, the lessee is not required to recognize any change in ownership of the lessor's right to receive royalty until after receipt of the notice prescribed by such clause. Accordingly, until there is compliance with such charge of ownership clause, the lessee may discharge the liability to pay royalty by making payment in accordance with the status of title prior to any such change.[12]

### [b] Conveyance of undivided interest by lessor.

Similar to the situation where the lessor conveys the entire interest after having granted an oil and gas lease,[13] if the lessor conveys an undivided interest in the minerals after having granted an oil and gas lease, the resulting problem has two facets. One facet involves the respective rights of the lessor and the grantee toward one another. The other facet involves the respective rights of the lessor and the grantee *as* against the lessee.

With respect to the first facet of the problem, the principles which are applicable to a conveyance by the lessor of the entire interest may be applied with equal validity to the situation where the lessor conveys an undivided interest after having granted an oil and gas lease. With respect to the undivided interest conveyed, the grantor is entitled to all royalties attributable to such interest which have accrued up to the date of passage of title, and the grantee is entitled to all royalties attributable to such interest which are payable *as* the result of production on and after such date. The parties are cotenants after title has passed to an undivided interest in the minerals, and the remedies incident to such cotenancy are available to each cotenant if the other cotenant has received and retained more than a proper share of the royalty payable under the lease.[14] A cotenant is not, however, limited to such remedies against another cotenant but is entitled to proceed directly against the lessee.

---

[9] See Osborn v. Arkansas Territorial Oil & Gas Co., 103 Ark 175, 146 SW 122 (1912); Agaianian v. Cuccio, 141 CalApp(2d) 828, 6 O&GR 1, 297 P(2d) 755 (1956); Central Pipe Line Co. v. Hutson, 401 Ill 447, 82 NE(2d) 624 (1948); Chandler v. Pittsburgh Plate Glass Co., 20 IndApp 165, 50 NE 400 (1898); McIntire v. Bond, 227 Ky 607, 13 SW(2d) 772, 64 ALR 630 (1929); Succession of Woods (LaApp 1985), 480 S(2d) 444, 87 O&GR 298; Merrill Engineering Co. v. Capital Nat. Bank, 192 Miss 378, 5 S(2d) 666 (1942), Northwestern Ohio Natural Gas Co. v. Ullery, 68 OhioSt 259, 67 NE 494 (1902); Goetter v. Manahan, 192 Okla 600, 138 P(2d) 113 (1943); Japhet v. McRae (TexCommApp 1925), 276 SW 669; Campbell v. Lynch, 81 WVa 374, 94 SE 739 (1918).

[10] Clark v. Richfield Oil Co. of Cal., 127 CalApp 495, 16 P(2d) 162 (1932).

[11] See § 45.3.

[12] Id.

[13] See § 42.6(a).

[14] See § 5.6.

To a great extent, the rights of a grantee of a lessor who acquires an undivided interest and thereby becomes a cotenant with the grantor are similar to the rights of the grantee of the entire interest in the minerals.[15] If such grantee complies with the provisions of the lease with respect to notice of change of ownership, the lessee is required to recognize such change of ownership and becomes liable to the new owner for performance of the covenants in the lease. The special problem which is introduced when an undivided interest is conveyed is the problem of whether the lessee is required to pay each cotenant separately, is entitled to pay them jointly, or is entitled to discharge the liability by paying the entire amount to one of them _**as**_ joint obligee.

In a very early case, the right to receive royalty was treated _**as**_ the right to receive rent, and it was recognized that if a single lessor should grant an oil and gas lease and subsequently convey an undivided interest, an apportionment is necessary. It was held, however, that if cotenants grant a single lease they become joint obligees and if one of the cotenants conveys an interest, there is no apportionment and the lessee may pay the entire royalty to any one of the lessor's _**as**_ a joint obligee, either before or after the conveyance.[16] Under the principles applied in such case, if a sole lessor conveyed an undivided interest in the minerals after having granted an oil and gas lease, each cotenant lessor would be entitled to a share of royalty, and a payment by the lessee to one of them _**as**_ a joint obligee or to their joint account _**as**_ joint obligees would not discharge the lessee's obligation. If, however, the oil and gas lease were granted by joint lessors, then they would be joint obligees, and a payment of royalty to any one of the lessors or to all lessors jointly would satisfy the lessee's obligation. Further, a conveyance by any one of such joint obligees would not change the lessee's right to discharge the liability to the lessors _**as**_ joint obligees.

Even though the principles just described would otherwise apply, it must be assumed that the modern oil and gas lease, with its provisions for assignments and notice of change of ownership, and the common practices used in the delivery and sale of royalty oil[17] and royalty gas[18] demonstrate an intention that each owner of an undivided interest in the minerals is entitled to the receipt of such owner's share of the royalty, even though the lease was originally granted by joint lessors. If, after an oil and gas lease has been granted, the lessor or one of the lessors should convey an undivided interest in the minerals or otherwise disposes of the right to receive a part of the royalties payable under such lease, the lessee is required to make future royalty payments in the correct proportions to the new owners, after having received proper notice of such change in ownership.[19]

### [c]  Conveyance of interest in subdivided part of leased premises by lessor.[20]

If, after having granted an oil and gas lease, the lessor should convey an interest in a subdivided part of the leased premises, a question may arise with respect to the rights of such grantee to share in production realized under such lease. Specifically, the question which may arise is whether the grantee of such subdivided interest should share proportionately in the royalty on all production under the lease regardless of the locations of the wells or whether such grantee is entitled to participate only in the royalty on production which is realized from wells drilled on the subdivided part in which an interest is owned. Stated _**as**_ general matter, the problem is whether or not royalties are apportioned among the owners of mineral interests in subdivided parts of the leased premises if the subdivision occurred after the lease was granted. If, for example, the owner of an eighty-acre tract of land should grant an oil and gas lease and then convey to another the entire interest in a forty-acre portion of the leased premises, will such grantee be entitled to one-half of the royalty on production from any well on the eighty acres, or will such grantee

---

[15] See § 42.6(a).

[16] Swint v. McCalmont Oil Co., 184 Pa 202, 38 Atl 1021, 63 AmStRep 791 (1898) .

[17] See § 39.5.

[18] See § 40.6.

[19] See Carter Oil Co. v. Crude Oil Co. (10th Cir 1954), 201 F(2d) 547; Hafeman v. Gem Oil Co., 163 Neb 438, 80 NW(2d) 139, 7 O&GR 41 (1956).

[20] See Hardwick. "Apportionment of Royalty to Separate Tracts: the Entirety Clause and the Community Lease." 32 TexLRev 660 (1954); Huie. "Apportionment of Oil and Gas Royalites." 78 HarvLRev 1113 (1965); Masterson. "Division Order Problems Created by Apportionment of Royalty." 10 OklaLRev 289 (1957); Mosburg. "Effect of Lessor's Assignment of Part of Leased Premises upon Right to Receive Oil and Gas Royalties." 11 OklaLRev 149 (1958); Annos. "Respective rights of owners of different parcels into which land subject to an oil and gas lease has been subdivided," 5 ALR 1162, 16 ALR 588, 64 ALR 634. See also § 16.4.

be entitled to all of the royalty on production from the acquired forty acres and none of the royalty from production on the other forty acres?

The question of whether or not royalties payable under an oil and gas lease should be apportioned when there has been a subdivision of the lessor's interest in the leased premises after the granting of the lease has been the subject of a considerable volume of litigation,[21] and it has been the subject of a considerable amount of learned discussion.[22] *As* matters now stand, the state in which the question was first decided, Pennsylvania, is the only state in which the most recent decision applies a rule of apportionment under which royalties would be apportioned among all owners after a subdivision of the lessor's interest.[23] In all other jurisdictions with decisions on the point, although in some instances there has been an early tendency to follow the rule of apportionment, the most recent decisions adopt and apply a rule of non-apportionment under which the owner of a subdivision of the leased premises is entitled to all of the royalty on production from such owned tract and is not entitled to any of the royalty on production from any other part of the leased premises.[24]

In Ohio where the lease contained an entirety clause that provided for non-apportionment of royalty, a unit was created including the leased premises pursuant to a statute enacted and regulations promulgated after the lease was granted. It was held that the non-apportionment could not be changed retroactively. *Burtner-Morgan-Stephens Co. v. Wilson Co., 586 N.E.2d 1062, 118 O&GR 484 (Ohio 1992)*. The following statement was included in the syllabus by the court:

> "Pursuant to Section 28, Article II of the Ohio Constitution, R.C. 1509.27(D) may not be retroactively applied to determine the distribution of royalties that are provided for in an oil and gas lease that was entered into and recorded prior to the enactment of the statutory provision."

It has been observed that the non-apportionment rule is applicable regardless of the manner in which the subdivision of the leased premises was accomplished;[25] and in jurisdictions which follow such rule, the rule of non-apportionment has been applied indiscriminately in instances where the subdivision was the result of conveyance of a part of the leased premises by deed,[26] where the subdivision was accomplished by will,[27] and where the subdivision was the result of a partition,[28] unless the minerals were not divided by the partition.[29] The non-apportionment rule will be applied

---

[21] See Annos. "Respective rights of owners of different parcels into which land subject to an oil and gas lease has been subdivided," 64 ALR 634, 16 ALR 588, 5 ALR 1162.

[22] See Huie. "Apportionment of Oil and Gas Royalties." 78 HarvLRev 1113 (1965), for a particularly fine statement and incisive analysis of the arguments which have been urged or might be urged on the subject.

[23] Wettengel v. Gormley, 160 PaSt 559, 28 Atl 934, 40 AmStRep 733 (1894) ; on later appeal, 184 PaSt 354, 39 Atl 57 (1898).

[24] Osborn v. Arkansas Territorial Oil & Gas Co.. 103 Ark 175. 146 SW 122 (1912): Moshiek v. Lininger. 130 Colo 266. 274 P(2d) 965. 4 O&GR 121 (1954): Central Pipe Line Co. v. Hutson. 401 Ill 447. 82 NE(2d) 624 (1948): Fairbanks v. Warrum. 56 IndApp 337. 104 NE 983 (1914): Carlock v. Krug. 151 Kan 407. 99 P(2d) 858 (1940): Hurst v. Paken Oil Co.. 287 Ky 257. 152 SW(2d) 981 (1941). Merrill Engineering Co. v. Capital Nat. Bank. 192 Miss 378. 5 S(2d) 666 (1942): Hafeman v. Gem Oil Co.. 163 Neb 438. 80 NW(2d) 139. 7 O&GR 41 (1956): Raley v. Moore. 60 NM 200. 289 P(2d) 957. 5 O&GR 355 (1955): Northwestern Ohio Natural Gas Co. v. Ullery. 68 OhioSt 259. 67 NE 494 (1902): Kimbley v. Luckey. 72 Okla 217. 179 Pac 928 (1919); Hinds v. McCord (TexCivApp 1931), 45 SW(2d) 442, Musgrave v. Musgrave, 86 WVa 119, 103 SE 302, 16 ALR 564 (1920).

[25] Central Pipe Line Co. v. Hutson, 401 Ill 447, 82 NE(2d) 624 (1948).

[26] Osborn v. Arkansas Territorial Oil & Gas Co.. 103 Ark 175. 146 SW 122 (1912): Moshiek v. Lininger. 130 Colo 266. 274 P(2d) 965. 4 O&GR 121 (1954): Fairbanks v. Warrum. 56 IndApp 337. 104 NE 983 (1914): Carlock v. Krug. 151 Kan 407. 99 P(2d) 858 (1940): Hammond v. Hammond. 292 Ky 659. 167 SW(2d) 865 (1943): Northwestern Ohio Natural Gas Co. v. Ullery. 68 OhioSt 259, 67 NE 494 (1902); Kimberly v. Luckey, 72 Okla 217, 179 Pac 928 (1919); Hinds v. McCord TexCivApp 1931), 45 SW(2d) 442.

[27] Musgrave v. Musgrave, 86 WVa 119, 103 SE 302, 16 ALR 564 (1920).

[28] Hoffman v. Sohio Pet. Co.. 179 Kan 84. 292 P(2d) 1107. 5 O&GR 979 (1956): Coates v. DeGarcia (TexCivApp 1956). 286 SW2d 691. 5 O&GR 1351. See Atwood v. Humble Oil & Ref. Co. (5th Cir 1964), 338 F(2d) 502, 21 O&GR 402, cert. denied, *381 US 926, 22 O&GR 393 (1965)*.

even though the lessee makes an effort to overcome the effect of such rule by an unsuccessful attempt to drill on the boundary line.[30] Further, such rule will be applied despite the fact that the unproductive subdivision is used to provide sufficient acreage to permit drilling of a well on the productive subdivision under spacing regulations,[31] and despite the fact that the unproductive subdivision is attributed to the productive subdivision for purposes of determining the volume of production allowable under proration regulations.[32]

In a jurisdiction which follows the non-apportionment rule, the royalty may nevertheless be apportioned if the parties express an intention that it should be apportioned. Such an intention may be found expressed in a provision in the lease or in a provision of the deed or other instrument by which the subdivision was accomplished. A division order may serve _as_ a memorandum of a prior oral agreement for apportioning royalty and render such agreement enforceable.[33]

The provision which is deliberately placed in an oil and gas lease to overcome the non-apportionment rule and to provide for an apportionment of royalty in the event of a subdivision of the lessor's interest is the entirety clause. The effect of such clause is discussed elsewhere herein.[34] A provision which is not placed deliberately in the lease to overcome the non-apportionment rule but which might have such effect is the lesser interest clause. The effect of such clause is also discussed elsewhere herein.[35]

In the instance where the intention to apportion royalties is found in the deed or other instrument by which the subdivision is accomplished, the grantor may convey the mineral interest in a specified tract and also convey a royalty interest in the entire leased premises. Thus, if an owner of an eighty-acre tract of land grants an oil and gas lease and then subsequently conveys a one-half interest in a forty-acre tract but also provides that the interest is subject to a described outstanding lease and further states that the grantee is to be entitled to receive one-half of the royalty payable under such lease, the grantee of such deed will receive a conveyance of a one-half mineral interest in forty acres subject to a lease covering eighty acres and also a royalty interest in the entire eighty acres for the duration of such lease. The following quoted provision was construed to have such an effect:

"It is understood and agreed that this sale is made subject to said lease, but covers and includes one-half of all the oil royalty and gas rental or royalty due to be paid under the terms of said lease …"[36]

A similar provision appeared in the deed which was involved in another reported case, but the point was not discussed.[37]

A mere mention of the outstanding oil and gas lease should not be sufficient to have the effect of a conveyance of a royalty interest in the entire leased premises. Such a provision is easily accounted for _as_ a protective measure to

---

[29] See Stratton v. Kentucky & West Virginia Gas Co., 298 Ky 651, 183 SW(2d) 817 (1944). See also Collins v. Inland Gas Corp. (Ky 1964), 382 SW(2d) 194, 21 O&GR 141, in which the court held that the grantor did not intend to partition the mineral estate where subdivided portions of the land were conveyed to the grantor's children and the following provision was made for the mineral estate:

"The first parties reserving the oil and gas and to tend some of the tenable (sic) land on this tract or parcel of land when necessary for his support… . At the death of the first parties the oil and gas shall fall to the owners of the land."

[30] Galt v. Metscher, 103 Okla 371, 229 Pac 522 (1924).

[31] Hitchcock v. Sojourner Drilling Corp. (TexCivApp 1962), 360 SW(2d) 444, 17 O&GR 565.

[32] Republic Natural Gas Co. v. Baker (10th Cir 1952), 197 F(2d) 647, 1 O&GR 1142; Coates v. DeGarcia (TexCivApp 1956), 5 O&GR 1351, 286 SW(2d) 691.

[33] See Briggs v. Gaddis (IllApp 1985), 479 NE(2d) 350, 87 O&GR 10, wherein the owners of interests in subdivided portions of the land subject to the lease made an oral agreement for apportioning the royalty and then signed a division order specifying that the division would be effective until secondary recovery methods were put into operation on the premises. The parties stipulated in a pre-trial conference order that the division order constituted a legal and binding contract.

[34] See § 45.4 and 48.2.

[35] See § 45.5 and 52.4.

[36] _Hoffman v. Magnolia Pet. Co. (TexCommApp 1925), 273 SW 828_. See also § 16.4.

[37] See Republic Natural Gas Co. v. Baker (10th Cir 1952), 197 F(2d) 647, 1 O&GR 1142.

avoid liability on a covenant of warranty or to make specific a representation *as* to title. Thus, the language which is quoted below and which was contained in a deed was held not to require an apportionment of royalties under the outstanding lease mentioned.

"It is expressly understood and agreed that there is an oil, gas and mineral lease now in effect covering the above described tract together with other acreage, and the Grantors hereby convey and assign unto Grantees all their right, title and interest *as* Lessors under said lease so far *as* it applied to the above described tract of land, save and except the one-sixteenth (1/16th) royalty interest hereinabove provided … to have and to hold the above described premises together with all and singular the rights and appurtenances thereto in anywise belonging subject, however, to the royalty reservation hereinabove provided."[38]

Specifically, the court held that the use of the term "appurtenances" in the habendum clause of the deed did not reveal an intention to convey a royalty interest in the entire tract covered by the lease. Similarly, it has been observed that such an intention may or may not be expressed in the following language:

"This sale is made subject to the above mentioned oil and gas lease and to the above mentioned royalty deed but covers and includes the above described land in fee simple together with all rentals and royalties due under said lease together with all reversionary rights and other rights of every kind and character owned by grantor."[39]

If the oil and gas lease or related agreement make provision for payments other than the conventional delay rental and royalty payments, problems might be encountered in determining whether such payments should be treated *as* delay rentals and apportioned *as* to acreage or should be treated *as* royalty and not apportioned. It is to be expected that the degree to which the payment in question resembles either a delay rental or a royalty payment will govern the decision. Thus, in one instance payments which, according to an agreement, were made in lieu of further development after an initial producing well had been drilled were regarded *as* bearing more resemblance to a delay rental than a royalty and hence were apportioned among the mineral owners of subdivisions of the land under lease.[40] On the other hand, in another instance, payments to be made under a minimum production covenant were regarded *as* bearing more resemblance to royalty payments and hence were not subject to apportionment.[41]

After a lessor has conveyed interests so that there are separate owners of subdivided portions of the land subject to the lease, there is nothing to prevent such owners from entering into any arrangement among themselves for pooling their interests or apportioning the royalty payable under such lease. There is no reason why they cannot make cross-conveyances of royalty interests with the duration of such interests limited to the duration of the lease. Further, upon termination of the existing lease, there is no reason why the parties cannot then enter into a community lease and provide for an apportionment of the royalty payable under such a lease.[42] Difficulties might arise, however, when the parties enter into a transaction after they have acquired their subdivided interest and do not make their intentions clear.

If, after the existing lease terminates, the owners of interests in the subdivided tracts were to join in the granting of a common oil and gas lease covering all of such tracts, such conduct would be regarded *as* revealing an intention to enter into a community lease in many jurisdictions.[43] It is doubtful, however, that a ratification or extension of an existing oil and gas lease by the owners of the subdivided tracts would be similarly regarded. Such conclusion is

---

[38] McElvain v. Texas Co. (TexCivApp 1954), 273 SW(2d) 676, 4 O&GR 293.

[39] Frost v. Stanolind Oil & Gas Co. (TexCivApp 1957), 307 SW(2d) 136, 8 O&GR 818.

[40] Robinson v. Milam, 125 WVa 218, 24 SE(2d) 236 (1942).

[41] Atwood v. Humble Oil & Ref. Co. (5th Cir 1964), 338 F(2d) 502, 21 O&GR 402, cert. denied, *381 US 926, 22 O&GR 393 (1965)*.

[42] See § 42.5(b).

[43] Id.

particularly safe if there is another explanation for the ratification[44] or if the jurisdiction is one in which the fact of joint execution of a lease is not regarded *as* being of controlling significance.[45]

### [d] Conveyance by lessor of community lease and by lessor after unitization or pooling.[46]

The situations which are involved where a community lease has been granted and where lessors grant separate leases but enter into a unitization or pooling agreement are sufficiently similar that they may be discussed together. The principle circumstance which distinguishes such transactions is the matter of timing. The parties may pool their interests by entering into a community lease, or they may grant the leases and thereafter accomplish the same objective by subsequent agreement. There has been no demonstrated tendency on the part of the courts to treat such circumstance of timing *as* a significant factor. The view has been expressed that the situation where the lessors join in a community lease is not distinguishable from the situation where the lessors subsequently enter into a pooling or unitization agreement after granting separate leases.[47]

If, after having joined in a community lease or in a pooling or unitization agreement, a lessor should convey all or part of the mineral interest subject to such lease or agreement, a question is likely to arise with respect to the right of the grantee to participate in the royalty on production which is realized from wells drilled on other land covered by the transaction. The answer to such question will depend upon the theory entertained with respect to the effect of entering into a community lease or pooling agreement, and if the theory is entertained that the parties exchange conveyances, the answer will also depend upon the further theory *as* to the nature of the interests which are acquired by the cross-conveyances.

In those jurisdictions inclined toward the theory that community leases or pooling or unitization agreements do not result in cross-conveyances but create contractual rights among the parties, it is helpful in analyzing their rights and duties to identify the contractual provision involved. The contractual provision under consideration is the royalty clause in the lease granted, *as* it may be modified by a pooling or unitization agreement. Regardless of any such modification, such clause remains the source of the rights and duties. Accordingly, a lessor who conveys an interest in the minerals will, to the extent of the interest granted, part with the right to participate in royalty from production on the land covered by the agreement. The grantor parts with the right to participate in royalty produced from the owned land because such right follows the title.

Such grantor also parts with the right to royalty on production from the other land covered by the community lease or unitization agreement because the right to such royalty stems from the covenant in the lease that runs with the land or mineral interest conveyed.

It may also be reasoned that the grantor parts with the right to participate in royalty from the other land because such right arises by virtue of the contribution of land to the community of interest, and a lessor who disposes of an interest in land that was contributed to such community is no longer making the contribution required for participation. The successor in interest is the one making the contribution and should receive the compensating benefits.[48]

---

[44] See Seal v. Banes, 183 Okla 203, 80 P(2d) 657 (1938).

[45] See Raley v. Moore, 60 NM 200, 289 P(2d) 957, 5 O&GR 355 (1955).

[46] See Mosburg, "Effect of Lessor's Assignment of Part of Leased Premises upon Right to Receive Oil and Gas Royalties," 11 OklaLRev 149, 154 (1958).

[47] "We are unable to conceive of any sound basis for a distinction between a case where the respective owners of several tracts of land join in a single lease for the purpose of having the whole area developed *as* a unit for oil and gas, with the right to share in royalties according to the area of land owned by each, and a case where such owners have executed separate leases to the same lessee and thereafter enter into a pooling or community agreement for sharing the royalties on such basis from a well that may be produced anywhere on the pooled area." Merrill Engineering Co. v. Capital Nat. Bank, 192 Miss 378, 5 S(2d) 666, 671 (1942).

[48] See Hover v. Cleveland Oil Co., 150 Kan 531, 95 P(2d) 264 (1939); Merrill Engineering Co. v. Capital Nat. Bank, 192 Miss 378, 5 S(2d) 666 (1942); Garvin v. Pettigrew (OklaSupCt 1958), 350 P(2d) 970, 13 O&GR 992; Coolbaugh v. Lehigh v. Wilkes-Barre Coal Co., 218 Pa 320, 67 Atl 615 (1907).

It has been pointed out that the interest acquired by such successor in interest is correspondingly burdened with the right of other owners whose land is included within the community lease or pooling agreement.[49] Under the theory that the community lease or unitization agreement creates contractual rights, it would be more consistent to reason that the lessee's liability to pay royalty on the owned tract is reduced to compensate for the lessee's increased liability *as* a result of the agreement to pay royalty on production from other land.

In those jurisdictions which are inclined toward the theory that a community lease or a pooling or unitization agreement involves cross-conveyances by the parties, it is necessary to identify the interests which have been cross-conveyed and to determine whether such interests are *in gross* or are *appurtenant* to the interest originally owned.

In California, it has been held that each owner who joins in a community lease acquires a profit in the land of the other owners, that such profit is *in gross* and does not pass with a conveyance of the land,[50] and that such profit is not covered by an option to purchase a part of the land included in the community lease unless it is expressly mentioned.[51] A conveyance may be reformed so *as* to include and cover such profit *in gross*, if the parties intended to convey such interest but were not aware of the peculiarity of California law on the subject.[52] Further, the outstanding profit *in gross* may be extinguished by foreclosure of a pre-existing lien on the land contributed to the community lease and may be restored in the new owner by a subsequent execution of counterparts of the community lease.[53] It has been observed that the creation of a profit *in gross*, *as* distinguished from an interest which is *appurtenant* to the contributed land, is determined by the agreement of the parties; and it has been held that the right to share in production on other land is *appurtenant* to the contributed land and will pass with a conveyance of such contributed land in the instance of pooling pursuant to statutory conservation provisions.[54]

In Texas, the theory has been applied that the execution of a community lease results in cross-conveyances of royalty interests among the lessors.[55] A rigid application of the cross-conveyance theory for all purposes would lead to the same problems encountered in California, unless the royalty interests conveyed by the cross-conveyances were regarded *as* being *appurtenant* to the mineral interest contributed. There are reasons to believe, however, that the cross-conveyance theory will not be applied rigidly. It has been held that production from one tract covered by a community lease will prevent the termination of a terminable mineral interest in another tract covered by such community lease. In so holding, the court made the explanation which is set forth below and which reveals an attitude that each lessor enjoys a share of royalty on production from another tract because it is agreed that production shall be treated *as* coming from all parts of the leased premises. Under such reasoning, the right to receive royalty from production which is realized from wells located on other land covered by the community lease would necessarily follow the ownership of each tract of land contributed to the community lease.

"*As* between the lessors themselves, each relinquishes his right to have his own tract separately developed, his right to receive all of the royalties from production from wells on his own tract, and his right to have wells drilled on his tract off-setting other wells on the leased premises, and each gains the right to share proportionately in royalties from wells on the other included tracts. In short, the parties by the execution of a unitized lease agree that production

---

[49] Thomas v. Ley, 177 Okla 150, 57 P(2d) 1186 (1936).

[50] "By executing the community lease, the respondents and each of the other lessors assigned or conveyed to his colessors a percentage interest in all oil produced on his land by the lessee during the continuance of the lease. The consideration for that transfer was the similar mutual assignments of the other lessors. The royalty interest thus transferred by each landowner to his colessors is an incorporeal hereditament *in gross* … and the grantee's interest in the oil produced upon the property of one of the colessors is entirely separate and distinct from the royalty interest retained by him in oil which might be produced from his own premises." Tanner v. Title Ins. & Trust Co., 20 Cal(2d) 814, 129 P(2d) 383, 386 (1942).

[51] Agajanian v. Cuccio (CalApp 1956), 297 P(2d) 755, 6 O&GR 1.

[52] Sutter Youth Organization, Inc. v. Borsen (CalApp 1963), 29 CalRep 628, 18 O&GR 273. But see Vantress Farms, Inc. v. Svdenstricker (CalApp 1970), 90 CalRptr 251, 37 O&GR 1, wherein reformation was denied because the party seeking reformation accepted the other party's performance with knowledge that the contract *as* written was being relied upon.

[53] See Gillis v. Royalty Service Corp., 91 CalApp(2d) 365, 204 P(2d) 968 (1949).

[54] LeBard v. Richfield Oil Corp., 15 CalRep 617, 15 O&GR 1, 364 P(2d) 449 (1961).

[55] See, e.g., Brown v. Smith, 141 Tex 425, 174 SW(2d) 43 (1943).

of oil or gas from wells located on any tract included in the lease will be regarded during the life of the lease *as* production from each and all other tracts included therein. French v. George, supra.

"The leased premises here could not have been utilized without the joinder of the Powells. By joining in the lease they necessarily agreed to the legal consequences that production from any of the tracts would be regarded *as* production from all other included tracts. More specifically, by joining in the lease the Powells agreed with the other parties thereto, including Southland, that production from the 50 acre tract would be regarded during the life of the lease *as* production from the 160 and the 40 acre tracts."[56]

In Texas, it has been held by a federal court that the royalty payable under a community lease should continue to be apportioned after a voluntary partition of the mineral rights by the lessors, unless some special provision is made for discontinuing the apportionment of royalty.[57] It has also been held that where the granting clause of the mineral deed covers the entire tract covered by the outstanding pooled leases and the grantor does not own an interest in all parts of the tract, the mineral deed has the effect of conveying the described mineral interest in the tracts owned, and the "subject to" clause has the effect of conveying the described fraction of royalty under the existing leases.[58]

Kuntz, Law of Oil and Gas
Copyright 2014, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

---

[56] Southland Royalty Co. v. Humble Oil & Ref. Co., 151 Tex 324, 249 SW(2d) 914, 1 O&GR 1431, 1435 (1952).

[57] Howell v. Union Producing Co. (5th Cir 1968), 392 F(2d) 95, 28 O&GR 238. See also § 26.1.

[58] Kelln v. Brownlee (TexCivApp 1974), 517 SW(2d) 568, 50 O&GR 548.

# VOLUNTARY POOLING
## and
## UNITIZATION

---

## OIL and GAS

by

### LEO J. HOFFMAN
Member of the Texas Bar



1954

## MATTHEW BENDER & COMPANY
INCORPORATED
ALBANY, N. Y.

### JOHN R. MARA LAW BOOKS
DALLAS, TEXAS

not arrive at a contrary effect by their own private contract. Hence, it may be anticipated that such provisions as those mentioned above will ultimately be construed for their effect upon the doctrine of law which would otherwise apply in the absence of such provisions.

## Section 3. Effect of Subsequent Conveyances

One of the legal problems which is particularly created by the doctrine that the act of pooling or unitization effects a cross-conveyance of the real property interests (royalty or working interest) in the various tracts comprising the unit is that of dealing with conveyances of the separate tracts made after the formation of the unit. This problem generally arises where the conveyance of the separate tract, or of some interest in the separate tract, is accomplished by a deed or other form of conveyance which makes no mention of the unit or of the status of the tract in the unit. It is part of the very nature of the problem that it will ordinarily relate to the ownership of the unit royalty interests, since if there is a multiple working interest ownership and a conveyance is made of working interest in a segregated tract the parties to such a transaction will generally provide expressly and in sufficient detail for the intended effect of the conveyance with respect to the unit. As time goes on an increasing number of royalty transactions are handled in the same manner. But it is inherent that royalty transfers will not always be tended with care, and it is also inherent that even after a unit is formed the parties are naturally inclined to regard their legal titles as occupying the same status as their status

prior to pooling or unitization, burdened only with the additional contract covenant of sharing of production. Thus many subsequent conveyances inevitably are prepared on an individual tract basis, without mention of the prior pooling or unitization of the particular tract with other tracts. In a producing unit this type of conveyance imposes a substantial burden upon the purchaser of the production or other party paying the royalties since he must determine, if he can, the legal effect of the purported conveyance of an entire tract, or of some specified interest in the tract, representing only a portion of the unit area.

### Illustration of the Problem

In this instance again the problem is perhaps best illustrated by simplified hypothetical facts. It may be assumed that A, B, C, and D each leases his separately-owned 10-acre tract to the same lessee, X. Subsequently A, B, C, and D enter into a pooling agreement with X in which the four tracts are pooled to form the 40-acre drilling unit required by the spacing rules for the field for the drilling of one well. X then drills a well on the tract contributed to the unit by A and it is an oil producer. Subsequently B conveys his 10-acre tract to E under the usual form of warranty deed which describes only that tract and makes no reference to the pooling agreement. This, of course, represents the most simplified version of the problem, but it is typical of transactions occurring constantly within the boundaries of oil and gas units and involving fieldwide units as well as single-well drilling units.

## Application of the Cross-Conveyance Theory

The most pressing question in the situation illustrated above is that of what royalty interest, if any, E has acquired in the production from the well on A's tract by virtue of the simple warranty deed describing B's tract. If the cross-conveyance doctrine of pooling is applied without modification, as it seemingly should be in jurisdictions which purport to follow the theory of the Veal and Belt cases, the act of pooling resulted in the ownership by each A, B, C, and D of $\frac{1}{4}$ of the royalty interest in each of the four tracts. Since B could convey to E no more than he owned in the tract described in the deed he may have conveyed to E at most the surface, the reversionary interest, and only $\frac{1}{4}$ of the royalty interest in that tract. Such an analysis leaves B, even after the conveyance, with ownership of $\frac{1}{4}$ of the royalty in each of the tracts contributed to the unit by A, C, and D. This results, then, in the continued ownership by B of $\frac{1}{4}$ of the royalty on the production from A's tract, while E, the grantee, does not participate in such production at all. It is probably, although not necessarily, true that B and E did not at all contemplate such a result. They no doubt intended that with the unconditional conveyance of B's tract would go all interest in the unit production which was initially derived from the ownership of that tract. But in the light of such doctrine as that of the Veal and Belt cases are they defeated in their purpose by the failure of the deed expressly to convey, not only the tract described, but all of B's royalty interest in the entire unit? Moreover, can the latter conveyance be accomplished by anything less than an adequate legal description, by reference or otherwise, of all of the land

comprising the unit?   Or, on the other hand, without all this, does all of B's participation in the unit follow the ownership of his tract?

It is apparent that a strict application of the Veal and Belt decisions to the situation illustrated above results in the acquisition by the grantee of no participation in the royalty on the unit production while the grantor, having conveyed his entire ownership in the tract which constituted his sole initial contribution to the unit, nevertheless retains as great a royalty participation in the unit production as he had absent the conveyance.   The situation is, of course, aggravated by the location of the unit well on a tract other than that conveyed.   Were the unit well located on the tract conveyed the grantee, by virtue of his having acquired by the deed all of B's $\frac{1}{4}$ of the royalty in that tract, would have no immediate ground for complaint, since at best he is entitled to only $\frac{1}{4}$ of the royalty production.   However, the legal question exists to the same degree in either case.   It is only by a coincidence of circumstances that the grantee sustains no actual loss in the latter case on account of the seemingly defective deed so long as the unit production is from the tract conveyed to him.

There are infinite variations of the situation illustrated above.   The conveyance to E might have been of a fractional undivided interest in the tract or in the minerals or royalties in the tract.   Such variations serve to complicate the facts but the basic issue remains the same. In other circumstances the tract conveyed may represent only a small part of a fieldwide unit, complicating the matter still further.   But still the fundamental problem is the same.

## Available Interpretations

Even in the situation illustrated above there is a possible interpretation beyond those stated—i.e., the interpretation, on the one hand, which gives E $\frac{1}{4}$ of the royalty in the tract conveyed with no royalty interest in the remaining tracts in the unit and the interpretation, on the other hand, which gives E all of B's participation in the unit which was initially derived from the tract conveyed as an incident of the ownership in such tract. The third interpretation is a compromise, perhaps one of merit. This interpretation would recognize that by virtue of the cross-assignment theory of pooling B owned only $\frac{1}{4}$ of the royalty in the tract conveyed and that only such royalty interest in only such tract is conveyed to E under the deed—but subject immediately to the pooling agreement, so that the $\frac{1}{4}$ interest of E in the single tract is pooled with the retained $\frac{1}{4}$ interest of B in the remaining tracts. If this interpretation were applied and the pooling had been in proportion to acreage as illustrated, E would become the owner of 1/16 of the royalty on the production from the unit well, while B would retain 3/16 of such royalty. It is not likely that this third suggested interpretation is actually within the contemplation of the grantor and grantee, but this interpretation is perhaps as reasonable as the interpretation which denies the grantee practically all of the royalty ownership in the unit which was initially attributable to the tract presently conveyed.

## California Decisions

With this background it is well to consider the decided cases relating to the effect of the conveyance of a segregated tract after pooling or unitization has been accomplished. The California courts have adopted the most restricted view of those suggested above. The leading California decision in this regard is that of the Supreme Court in Tanner v. Title Insurance & Trust Co.,[44] previously cited here in other connections. For this purpose the statement of the case can be simplified. The case involved a community lease of several lots which contained express pooling provisions. One of the lessors who had contributed two tracts to the lease later executed a deed of trust on his tracts and still later the property was sold at a trustee's sale. The lessee drilled two producing oil wells on the lease, neither of which was located on the tracts sold at the trustee's sale. In this case the purchaser of these tracts claimed the royalty interest of the lessor-mortgagor in the production from other parts of the community lease. The court, however, rejected the claim. The court first ruled, as has previously been noted, that when two or more landowners join in a community lease of their separate tracts each of them assigns or conveys to each of the others (during the term of the lease) a royalty interest in his tract which is an estate in real property. "The royalty interest thus transferred by each landowner to his colessors is an incorporeal hereditament in gross and the grantee's interest in the oil produced upon the property of one of the colessors is **entirely separate and distinct** from the roy-

---

[44] 20 Cal. 2d 814, 129 P. 2d 383, 387 (1942).

. alty interest retained by him in oil which might be produced from his own premises." The court then ruled that "the incorporeal hereditament owned by the grantor in the oil produced from the land of the colessors, **existing in gross,** obviously does not follow the conveyance of the lessor's land, but **can only be conveyed by a specific transfer of that interest."**[45] (Emphasis is supplied in the quotations.) Since the trust deed did not purport to convey specifically the grantor's incorporeal hereditament in gross in the producing tracts of the community lease these interests did not pass to the purchaser at the trustee's sale.[46]

---

[45] 129 P. 2d 383, 387 (1942).

[46] Several more recent California decisions have confirmed and applied this rule of the Tanner case. See Howard v. General Petroleum Corp., 108 Cal. App. 2d 25, 238 P. 2d 145, 148 (1951), on second appeal, 114 Cal. App. 2d 91, 249 P. 2d 585; Brown v. Copp, 105 Cal. App. 2d 1, 232 P. 2d 868, 871 (1951); Friedrich v. Roland, 95 Cal. App. 2d 543, 213 P. 2d 423, 427 (1950); Gillis v. Royalty Service Corporation, 91 Cal. App. 2d 365, 204 P. 2d 968, 969 (1949). It is interesting, however, to compare the decision in the much earlier California case of Higgins v. California Petroleum & Asphalt Co., 109 Cal. 304, 41 P. 1087, 1088 (1895). There one of the community lessors had conveyed his separate tract to the lessee. Since the only production was from the tract conveyed and the lessor-grantor was not a party to the suit the point involved in the cases cited above was not actually in issue. But in noteworthy dictum the court seemed to construe the effect of the conveyance of the separate tract in the same manner as if the grantor had been a tenant in common in both tracts covered by the community lease and had conveyed all of her interest in the whole to the lessee. The courts in the later cases obviously did not choose to follow this analysis.

### Decision of Federal Court — Oklahoma

Perhaps in accord with the result of the Tanner decision, but employing an entirely different means of arriving at such result, is the decision of the Federal court in Oklahoma in Boren v. Burgess.[47] There an undivided mineral interest in a segregated tract was conveyed after the tract had been included with other land in a community lease. Production was secured by the lessee only on the land in the community lease which was not described in the conveyance. The grantee of the mineral interest in the segregated tract asserted his right to participate on a pro rata acreage basis in the royalty on the production elsewhere on the community lease. The court rejected this claimed participation, reasoning that the question presented was whether the owner of an interest in a subdivision of a tract of land covered by a single lease has a right to participate in the royalty from oil produced on other subdivisions and holding that under Oklahoma law the royalty belongs solely to the owners of the land on which the well is located. It is not clearly apparent from the opinion whether the court held that the community lease did not effect a pooling of the tracts for royalty purposes in the first instance or that the initial pooling was accomplished but that the conveyance of an interest in a separate tract subsequent to the pooling completely segregated that interest. However, the authorities cited by the court have no relation to the first proposition of no pooling in the first instance, but support only the proposition that when the land covered by the ordinary lease is later subdivided

---

[47] 97 F. Supp. 1019 (E. D. Okl. 1951).

·in ownership the owner of each subdivision owns only the royalty on production from his subdivision and there is no apportionment of such royalties.[48] If the court intended to rule that there was no pooling accomplished in the making of the community lease, then it properly held that a subsequent grantee was not entitled to an apportionment of royalties any more than were the original lessors, but in so doing the court necessarily ignored important Oklahoma law to the effect that there is a presumption of pooling in the making of a community lease.[49] On the other hand, if the court intended to rule that the tracts were pooled as to the interests of the lessors by the making of the community lease but that the subsequent conveyance of an interest in a separate tract effectively "unpooled" that interest, there is substantial doubt that the authorities cited as precedent for that result actually lend any support at all. The authorities cited relate to the ordinary lease of a single area having a common ownership throughout and the later subdivision of the land into separate ownerships. There the parties are presumed as a matter of law, under the majority·rule, to intend that each shall own only the royalties on production· from his own land. It is an entirely different matter to attempt to apply this rule to tracts which were segregated in ownership in the first instance and then consolidated by an agreement of pooling. It is as reasonable to assume under the

---

[48] These authorities support the rule corresponding to the principle of Japhet v. McRae in Texas. See Note 10, supra, Chapter 2.

[49] See Note 33, supra, Chapter 2.

latter facts that the grantor and grantee of a separate tract, unless they expressly agree to the contrary, intend for the grant to be subject to the pooling agreement and to continued apportionment thereunder. Here there is no cause for creating and imposing by law an apportionment of royalties but only cause for continuing an existing apportionment in effect, a result which the parties might reasonably be expected to anticipate.

### Mississippi Decision — Contrary Rule

The leading decision propounding the contrary rule that the conveyance of a tract comprising part of a unit, even though made without mention of the unit, will pass the grantor's interest in all royalties derived from his ownership of that tract is by the Supreme Court of Mississippi in Merrill Engineering Co. v. Capital Nat. Bank of Jackson.[50] It is worthy of note that the case involved not the ordinary pooled community lease but the pooling of a number of separate tracts and the prior leases thereon by a separate and independent pooling agreement entered into by the landowners and the lessee. This is the more typical situation. After the various tracts were thus pooled a producing gas well was drilled on one of them. With respect to one of the nonproducing tracts there were a number of conveyancing transactions, including a deed of trust and trustee's sale, but suffice it to say here that in none of the conveyances was the unit or the pooling agreement mentioned and in none was more than the individual tract of

---

[50] 192 Miss. 378, 5 So. 2d 666 (1942).

land described. One of the intermediate grantors contended in the case that its conveyance of the tract did not pass title to any share of the royalties on the production from another tract in the unit. The Mississippi court overruled this contention and held that a proportionate share in the royalties on the production from one tract in the unit passed with a conveyance of a nonproducing tract even though no mention of the unit or the pooling agreement was made in the conveyance.[51] The court indicated that this rule would apply in every case in the absence of a specific reservation in the conveyance to the contrary. Although the court was not precise in stating the legal effect of the pooling agreement in the first instance, it indicated that a proportionate share of the royalties throughout the unit

---

[51] The court stated that. "* * * we are of the opinion that in the absence of a reservation to the contrary a subsequent grantee of any part of the pooled area would be entitled to the benefits to flow from the pooling or community agreement so long as it remained in force and effect against his land; and that this would be true without regard to whether or not such agreement made provision for the sharing of the royalties by anyone other than the original parties thereto." The last clause of the above-quoted opinion was in response to a contention that the pooling agreement was a personal contract for the sole benefit of the property owners therein mentioned and that the sharing benefits of the pooling could not pass to any subsequent grantee. In this connection see Hover v. Cleveland Oil Co., 150 Kan. 531, 95 P. 2d 264 (1939), holding that the particular pooling agreement there involved was a personal contract of the lessors and that a conveyance of his pooled tract by one of the lessors automatically terminated the pooling arrangement.

passes with the title to one of the separate tracts within the unit as a covenant running with the title to that tract. This, of course, is directly contrary to the ruling in the Tanner decision that the royalty interest of the grantor in other tracts in the unit is an interest in gross and will not pass to the grantee of one of the tracts unless specifically conveyed. It must be recognized, of course, that the Mississippi court has not held, as has the California court, that the act of pooling effects a cross-conveyance of the real property interests among the royalty owners. Thus the Mississippi court found it somewhat easier to arrive at the result which it did by treating the sharing arrangement imposed by the pooling agreement as a simple covenant running with the title to the respective tracts comprising the unit.

It is noteworthy that the Mississippi court in the Merrill Engineering Co. case expressly considered the majority rule that where the owner of a tract of land leases it as a whole and thereafter subdivides the land into several tracts by conveyances which do not reserve the royalty, each owner of a subdivided tract is thereafter entitled to the royalty on the production from his tract alone. But, in contrast with the Federal decision in the Boren case, the Mississippi court held that that doctrine has no application to the situation where the pooling agreement of two or more landowners is made in advance of the subdividing conveyance in question and where the sharing of royalties thus imposed is in effect a covenant running with the land. There is sound basis for such a distinction in the two situations and the decision of the

Mississippi court in this regard appears the more reasonable and logical.[52]

## Pennsylvania Decision

The same general conclusion reached in the Merrill Engineering Co. case was arrived at by the Supreme Court of Pennsylvania in the much earlier decision in Coolbaugh v. Lehigh & Wilkes-Barre Coal Co.,[53] previously cited in another connection. The separate owners of adjoining lots 28 and 29 had entered into a community coal mining lease of the two lots in which they had agreed to share the royalties. Subsequently lot 28 was sold but the administrator of the estate of the lessor of that lot contended that the interest of that lessor in the royalties in lot 29, existing by virtue of the community lease, did not pass to the purchaser of lot 28. The court held, however, that the pooling did not effect a transfer of estates in real property but that only the royalty coal production had been put in hotchpot by the lessors. Since the interest of the lessor of lot 28 in the pot came solely from his ownership in lot 28, when that was sold the purchaser took all the lessor had in both lots. For its simplicity and logic the opinion in this decision merits the close scrutiny of those interested in the analogous oil and gas leases.

---

[52] See also Thomas v. Ley, 177 Okl. 150, 57 P. 2d 1186 (1936); Shell Petroleum Corp. v. Calcasieu Real Estate & Oil Co., 185 La. 751, 170 So. 785 (1936).

[53] Note 41, supra.

## Suggested Analysis

In the light of the many aspects of this problem it would appear that the better reasoning lies in favor of the general rule which causes all of the unit royalty participation initially derived from a tract in a unit or an interest in such tract to pass to the purchaser of such tract or such interest, whether or not specifically mentioned in the conveyance, unless, of course, there is a contrary reservation in the conveyance. It requires a much lesser mental burden to arrive at this conclusion where the foundation rule of cross-conveyances of real property interests as effected by pooling or unitization is avoided in the first instance. If this rule of law be avoided then the effect of pooling or unitization is to leave the estates in real property as they exist prior to pooling or unitization but to impose upon each such estate the proportionate burden and benefit of the sharing of unit production after production is achieved. Thus the pooling or unitization agreement creates a sharing covenant which runs with the land and other interests in real property. Any conveyance of any such interest, whether expressly stated or not, would then be subject to the terms of the pooling or unitization agreement (assuming actual or constructive notice to the grantee of the existence of such agreement) and would carry with it the proportionate benefits and burdens of the sharing arrangement specified in the agreement. This appears to be the conclusion reached by the Mississippi court and appears to constitute the better reasoning. As previously stated, however, even in jurisdictions which generally recognize the rule of cross-conveyances

as applied to pooling or unitization the rule can possibly be avoided in particular cases by the recognition of language of the agreement indicating the intention of effecting a contrary result. As previously pointed out, such provisions in pooling or unitization agreements as those specifically negativing all transfers of real property interests under the agreement or those providing for the allocation of unit production to the respective tracts and the payment of interests within each tract just as if the allocated production had actually been produced therefrom, clearly indicate that under such agreements no cross-conveyances or transfers should be recognized. Any subsequent conveyance of a tract or interest within a unit so created should pass with it all the covenants of the pooling or unitization agreement which were initially attributable to that tract or interest. The grantee should then share proportionately in all unit production, whether from the tract acquired by him or other tracts in the unit.

The same result can be reached even where the doctrine of cross-conveyances is imposed, although the route is not yet completely clear. One method of arriving at such result would be to consider that all royalty interests created in the unit by virtue of the presumed cross-conveyances are incident or appurtenant to the interests from which they were derived and that any transfer of any interest in the latter category passes with it all of the incidental or appurtenant interests in the other tracts in the unit.[54] Thus the lessor who contri-

---

[54] See Walker, Developments in the Law of Oil and Gas in Texas During the War Years—a Resume, 25 Texas Law Re-

butes a 10-acre tract to a 40-acre drilling unit and subsequently conveys his 10-acre tract without mention of the unit would pass title with his conveyance to all of his present interest in the tract described and $\frac{1}{4}$ of the royalty interest in each of the other tracts as an incident of or appurtenant to the tract described. Proportionately smaller interests in the royalty in the other unit tracts would pass with a smaller interest conveyed in the tract described. The description of the other tracts in the unit would necessarily be implied from the unit agreement of which the grantee will almost invariably have actual or constructive notice. Such reasoning as this conflicts with the ruling of the California court that the royalty interest of the lessor in the land of his colessors in the unit is a right or interest in gross and is, therefore, not transferred unless specifically conveyed. However, it is believed that such interest in land of the colessors is better treated as a right or interest appurtenant, rather than in gross.

The principal objective, where overriding considerations of public policy are not involved, is to give effect to the probable intention of the parties in the transaction. And in this type of situation the actual intention of the grantor and grantee is normally to convey all of the grantor's ownership in the unit which he acquired by virtue of the contribution to the unit of the interest described in the conveyance. Where the parties have not specifically expressed themselves in the instrument

view 1, 14 (1946); Shank, Pooling Problems, 28 Texas Law Review 662, 678 (1950); Case note, 25 Texas Law Review 274 (1947).

the courts should presume such an intention and give effect to it. Where the grantor and grantee have clearly expressed themselves in the instrument, however, the courts should give effect to their intention as expressed, whether it enlarges or restricts the conveyance. But in this respect it is necessary to determine whether or not the royalty owners in the unit should be permitted, as a matter of policy, by their own private contracts or conveyances, to "unpool" any interest without the consent of the lessee or lessees in the unit.[55]

## Comparison to Japhet v. McRae Situation

It has been stated that the doctrine of Japhet v. McRae[56] as applied in Texas and most other oil and gas jurisdictions should have no application to the problem discussed here since the situations are clearly distinguishable. There is justification for presuming as a matter of law that the grantor and grantee do not intend an apportionment of the royalties where the conveyance of a segregated part of a single lease is made and that the grantee deliberately purchases the particular segregated tract or interest for speculative reasons. But where several separate leases are consolidated by pooling or separately owned tracts are pooled under a community lease and a subsequent conveyance of a single tract is made while an agreement of apportionment is in force it is in the very nature of the pooling arrange-

[55] See Garza v. DeMontalvo, 147 Tex. 525, 217 S. W. 2d 988, 992 (1949).
[56] Note 10, supra, Chapter 2.

ment that the grantor and grantee would probably intend and expect the apportionment of royalties thereunder to continue in force. And the same reasons for presuming a deliberate speculative desire on the part of the grantee are absent in the case of the usual pooled unit. It will ordinarily consist of proven or semiproven acreage throughout and the wildcatting instinct finds no basis for existence. Moreover, in the case of the drilling or allowable unit neither the grantor nor the grantee can reasonably anticipate that any further drilling after the first well will be done. In the case of the larger units the unit area is ordinarily either fully developed or at least fully proven prior to the creation of the unit so that there is no logical place for the speculation which is fostered by the doctrine of the Japhet case.

## Comparison to Entirety Clause

It should also be added that the situation of the creation of the pooled unit and the subsequent conveyance of a separate tract within the unit is actually more nearly akin to the situation created by the "entirety clause" which appears frequently in the lease forms used in some areas and which was designed to avoid the sometimes harsh injustice of the Japhet doctrine.[57] The

---

[57] The typical entirety clause appears in the lease as follows: "If the leased premises shall hereafter be owned severally or in separate tracts, the premises nevertheless shall be developed and operated as one lease and all royalties accruing hereunder shall be treated as an entirety and shall be divided among and paid to such separate owners in the proportion that the acreage owned by each such separate owner bears to the entire leased acreage."

entirety clause in effect provides that if the ownership of the land covered by the lease is segregated during the term of the lease the royalties shall nevertheless be apportioned to all owners in proportion to their acreage. Where subsequent to the making of such a lease the lessor conveys a smaller tract covered by the lease by an instrument which describes only the tract conveyed and does not specifically provide for an apportionment to the tract of a pro rata portion of all royalties produced from any part of the original lease, it has been held that the apportionment or entirety clause of the lease nevertheless applies and is binding upon both the grantor and grantee of the tract involved as a covenant burdening the land and the interests therein.[58] The entirety clause has been particularly enforced where the conveyance contains no provision purporting to negative its effect and where no ground for reformation of the instrument of conveyance exists. The situation of the conveyance of a segregated tract in a unit after an express pooling agreement has been made is analogous

---

[58] See Carter Oil Co. v. Crude Oil Co., 201 F. 2d 547 (10th Cir. 1953); Gypsy Oil Co. v. Schonwald, 107 Okl. 253, 231 P. 864 (1924); Eason v. Rosamond, 173 Okl. 10, 46 P. 2d 471 (1935); Schrader v. Gypsy Oil Co., 38 N. M. 124, 28 P. 2d 885 (1934). But compare Iskian v. Consolidated Gas Utilities Corp., 207 Okl. 615, 251 P. 2d 1073 (1952); Coyne v. Simrall Corporation, 140 F. 2d 574 (6th Cir. 1944); Shell Petroleum Corporation v. Carter, 187 La. 382, 175 So. 1 (1937); Harley v. Magnolia Petroleum Co., 378 Ill. 19, 37 N. E. 2d 760 (1941). These cases are discussed in Hardwicke, Jr., Problems Arising out of Royalty Clauses in Oil and Gas Leases in Texas, 29 Texas Law Review 790, 806 (1951). See also discussion note, 1 Oil and Gas Reporter 1218 (1952).

to that of the conveyance under an entirety clause in the original single lease. However, the case of the conveyance after pooling will ordinarily provide even a stronger case in logic for the continued enforcement of the apportionment under the pooling agreement since the pooling agreement in this situation is obviously intended as a covenant which will run with the land and bind all future purchasers and is just as obviously a reasonable restraint on the future alienation of the lands comprising the unit.

### Procedure for Purchaser

From what has been said it is apparent that this problem has not yet been fully developed and decided by the courts in most of the oil and gas jurisdictions. It is likewise apparent that the problem will furnish the basis for future litigation and that the purchasers or other parties charged with the duty of making payment for unit production meanwhile can not feel wholly secure in making such payments to the grantor or grantee in the type of situation envisaged here in those jurisdictions in which the matter has not been fully dealt with in the appellate courts. It would behoove such parties charged with paying for unit production to suspend payments attributable to the interests involved in such situation until the grantor and grantee have both agreed more fully with respect to the effect of their transaction, preferably by a further instrument in recordable form so that the title question may be permanently cleared for all purposes. If the instrument of further agreement is not recorded (as is true in the case of the usual transfer order) a similar instrument

should be required of the grantor and grantee each time the interest involved changes hands, since the unrecorded agreement will not provide constructive notice to innocent purchasers for value.

## Section 4. The Nonconsenting Mineral or Royalty Owner

One of the important categories of legal problems in the field of voluntary pooling and unitization is the category which centers on the position of the mineral or royalty owner who refuses to join in the pooling or unitization agreement. The problem of nonjoinder is a troublesome one for the nonjoining party himself, since he may feel sincerely that his individual interest and rights will be seriously jeopardized by his participation in the pooling or unitization arrangement, yet he must recognize at the same time that in many instances his interest will be affected by the operation of the unit even though he does not participate. In the case of the operator or lessee in the unit, on the other hand, the problem created by the refusal of mineral or royalty owners to join can be even more troublesome. The nonjoinder creates the necessity in many instances for a separate accounting for production—one accounting to the pooled interests and yet another type of accounting to the unpooled interests. Moreover, the method of operation of the unit may be substantially affected by the existence of unpooled interests, and may give rise to the necessity for drilling interior offset wells, one of the very things the pooling or unitization is designed to eliminate. The problem of the operator where there are unpooled interests in the

REAL ESTATE

# OIL and GAS *Reporter*

## VOLUME 145

*Edited by*

**The Southwestern Legal Foundation**

**2001**

# LEXIS Publishing™

LEXIS-NEXIS® · MARTINDALE-HUBBELL®
MATTHEW BENDER® · MICHIE™ · SHEPARD'S®

FROM THE LIBRARY OF
FULBRIGHT & JAWORSKI L.L.P.

JAN 3 1 2001

HOUSTON, TEXAS

tracts.[9] We find the trial court did not err in holding the McCall deeds were unambiguous as a matter of law.

Where there is no ambiguity, disagreement over the interpretation of the reservation will not make it ambiguous, Sun Oil Co. v. Madeley, 626 S.W.2d 726, 727 [73 O&GR 106] (Tex. 1981), for a party's construction is immaterial. Id. at 732.

The court's primary duty when construing an unambiguous deed is to ascertain the intent of the parties from the "four corners" of the deed. Luckel, 819 S.W.2d at 461. Under the "four corners rule," the intention of the parties, especially that of the grantor, will be gathered from the instrument as a whole and not from isolated parts of the instrument. Plainsman Trading Co. v. Crews, 898 S.W.2d 786, 789 [129 O&GR 280] (Tex. 1995); Texas Pac. Coal & Oil Co. v. Masterson, 160 Tex. 548, 334 S.W.2d 436, 439 [12 O&GR 1198] (Tex. 1960).

Under our interpretation of the 1975 Partition, and applying the four corners rule to the McCall deeds, we find the trial court did not err in holding that the royalty interests at issue were not conveyed in the McCall deeds.

We affirm the judgment of the trial court.

---

## DISCUSSION NOTES

**Deeds: Partition—Mineral and Royalty Interests.**

The facts as stated in the court's opinion are not entirely clear to the writer. The confusion is about the facts surrounding Lila's claim to a royalty share in the Taub and Dwyer production. Shortly after the execution of the partition agreement, Mrs. McCall, by four separate deeds, conveyed three

---

[9] We will not address Lila's summary judgment proof affidavit of Mrs. McCall's attorney, who claims Mrs. McCall intended to convey all her royalty interests relating to the 3,300 acre tract. Even assuming this affidavit is accurate, this proof is inadmissible because, where there is no claim of any fraud, accident or mistake, parol evidence is inadmissible to vary, add to, or contradict the terms of an unambiguous agreement. Nowlin v. Frost Nat'l Bank, 908 S.W.2d 283, 286 (Tex.App.—Houston [1st Dist.] 1995, no writ) (citing Kuper v. Schmidt, 161 Tex. 189, 338 S.W.2d 948, 952 (Tex. 1960)).

tracts to her daughters Mildred and Patricia, her son Verner, and her daughter-in-law Lila. The writer believes it is this deed to Lila under which she is basing her claim for royalty on the Taub and Dwyer tracts. It is stated afterward that the three children and Lila conveyed their interests to MCDCO. What is not clear from the facts as stated is that if Lila claims the interest under a deed executed by Mrs. McCall, why did Lila not convey this interest to MCDCO? It is not apparent to the writer how Lila could claim an interest in production from new wells on the Taub and Dwyer tracts.

These Discussion Notes are based on the assumption that Lila never sold her interest acquired from Mrs. McCall. The appellees apparently maintained that Lila never acquired an interest in the Taub and Dwyer tracts—the ones that did not belong to Mrs. McCall. It is assumed that all the tracts involved had been a part of the 3,298 acres partitioned.

There are several ways in which a person may acquire a mineral or royalty interest in another's tracts other than by a straight "buy and sell" transaction. It is stated in the facts that the 3,296-acre tract was commonly owned by Taub, Dwyer, and Mrs. McCall before its partition into sixteen separate tracts. The land was under three oil and gas leases at the time of partition. When a tract is partitioned, the minerals and the surface usually remain together. In the principal agreement, it was provided that each continued to own a stipulated interest as existed in the tracts prior to partition and that in future leases, each would continue to own a stipulated royalty interest in the tracts of others. In other words, each became a nonparticipating royalty owner of the agreed fraction in the other tracts. Their agreement was unlike that involved in Garza v. Montalvo,[1] where the siblings partitioned their jointly owned 1,100 acres, which tract was under lease. No mention was made in the partition of the oil and gas lease or the minerals. The subsequent production was held to belong solely to the owner of the tract on which the producing well was located.

No mention was made of any production from Mrs. McCall's tract during the period of time involved in the

---

[1] 217 S.W. 2d 988 (Tex. Sup. Ct. 1949).

principal case. The production at issue was from the eight new wells drilled on the Taub and Dwyer tracts.

The question arises as to the creation of Mrs. McCall's interest in production from the others' tracts. One possibility is that her interest was similar in principle to that set forth in Veal v. Thomason,[2] in which owners of separate minerals in separate tracts committed them to a unit agreement under which each tract would share in the production from the other tracts, and Parker v. Parker,[3] where owners of separate tracts signed a single lease combining their tracts, with it being held that each tract shared in subsequent production from the others. Such transactions are frequently referred to as cross-conveyances; the interest being conveyed is a royalty, an interest in real property.

The facts in the opinion state that the partition agreement provided that each was to continue to own the existing interest at the time of partition "in each of the tracts granted to the other parties." If this existing interest was a continuation of the jointly owned interest in the other tracts and each tract partitioned was burdened with the existing lease and royalty ownership, then it would appear, as stated above, that each would continue to own a nonparticipating royalty interest in all of the tracts. Mrs. McCall would then own a royalty interest in each of the producing tracts on the Taub and Dwyer land. But if the ownership in each other's land had been a result of a cross-conveyance, then the issue would be controlled by *Veal* and related cases.

In any event, there was no problem as to whether Mrs. McCall and her assignees would share in the production on the other tracts. The case turned on whether Mrs. McCall assigned an interest in the disputed production to Lila under the deed in which she was a grantee or conveyed this royalty in the deed executed in the 1997 conveyance to her three children, excluding Lila.

The following analysis of the deed under which Lila claimed an interest in production of the eight new wells on the Taub and Dwyer tracts is in contrast and conflict with

[2] 159 S.W. 2d 472 (Tex. Sup. Ct. 1942).

[3] 144 S.W. 2d 303 (Tex. Civ. App.—Galveston 1940, error ref'd).

the analysis in the opinion. The deed executed by Mrs. McCall, in which Lila was a named grantee, provided as shown in the opinion that the grantor did "GRANT, BARGAIN, SELL and CONVEY that certain tract of land . . . particularly described in Exhibit A . . . and appurtenances thereto . . . unto Grantees . . . ."[4] It is not stated whether the land described in Exhibit A included the entire 3,298-acre tract formerly commonly owned, or only those tracts set aside to Mrs. McCall in the partition deed. In this deed, no mention was made of any minerals, exceptions, or reservations. If Exhibit A described the 3,298-acre transaction, then the royalty interest owned by Mrs. McCall in the tracts of the others would be included in the description, but if Exhibit A included only those tracts partitioned by Mrs. McCall, then the question would involve the conveyance of royalty in tracts not described in the deed, but which would be included as an appurtenance to Mrs. McCall's royalty in the tracts of the others under the cross-conveyance theory.

In Harris v. Currie,[5] it is stated: "When the owner of the entire estate in land conveys it by an ordinary form of deed containing no exception or reservation, his grantee acquires the same title which the grantor had and such title includes all minerals." The case held that delay rentals under an oil and gas lease are a part of the mineral estate, and that unaccrued delay rentals, although not mentioned in the deed, pass as a part of the mineral estate to the grantee. This rule has been cited as authority that a deed conveys the grantor's interest in the tract, including the minerals, less those excepted or reserved.[6] If Mrs. McCall had expressly stated in her conveyance that she conveyed only the tracts that she owned after the partition, she would have also, under the rule stated in *Harris,* conveyed her royalty interest in the Taub and Dwyer tracts. This is the rule that where the owner of a tract included in a pooled unit sells his tract, then his conveyance also includes his interest in the production from the

---

[4] Supra at p. 404.

[5] 176 S.W. 2d 302, 304 (Tex. Sup. Ct. 1943).

[6] Cockrell v. Texas Gulf Sulphur Co., 299 S.W. 2d 672, 675, 7 O&GR 109, 112 (Tex. Sup. Ct. 1956).

pooled unit, which production may come from another tract in the unit. The royalty interest that Mrs. McCall owned both in her tracts and in the other tracts is a part of her mineral estate, and although unmentioned in a conveyance of the ordinary deed form, would pass under *Harris.*

Day & Co., Inc. v. Texland Petroleum Co., Inc.,[7] was cited by Lila for the rule from *Harris* and *Cockrell.* The court distinguished *Day* by stating that the deed in that case only purported to convey ten acres of the ninety-acre tract. The principal issue in *Day* was the court's holding that the executive right is neither a power nor akin to a power, but is an attribute of the complete mineral estate, i.e., a "stick" that can be separately owned and conveyed. As an interest in the mineral estate, it passed under the warranty deed involved. It is submitted that the royalty interest owed by Mrs. McCall in others' tracts, being an interest in realty, passed under the rule stated by the Texas Supreme Court in *Harris, Cockrell,* and *Day.* The application of the rule is a matter of law. If a party contends that by the application of the rule, it does not reach a result intended by the parties, then there is a case for reformation of a mutual mistake. The reasoning that the *Day* case was not applicable because it applied only to ten acres and not to the entire ninety-acre tract is difficult to follow. *Harris* and *Cockrell* were not cited in the opinion.

In *Harris,* the court defined "appurtenant" consistently with the definition given in Note 8 of the principal case.[8] The court stated, "[T]he grant or reservation carries with it, as a necessary appurtenance thereto, the right to use . . . the surface . . . ."[9]

Lila argued that the word "appurtenance" in the warranty deed caused the royalty interest in the Taub and Dwyer tracts to pass under the warranty deed. The court rejected this argument, defining "appurtenance" in the footnote as limited to that which is necessary to the enjoyment of the principal thing granted or indispensable to the proper use of the premises demised. There is apparently limited authority as

---

[7] 786 S.W. 2d 667, 105 O&GR 590 (Tex. Sup. Ct. 1990).

[8] Supra at p. 412.

[9] 176 S.W.2d at 305.

to the meaning of the word "appurtenance," and in construction of a mineral or royalty deed, whether it is a separate and independent property interest like the executive right or is as defined by the court in its Note 8.[10] According to Leo Hoffman:

The same results can be reached even when the doctrine of cross-conveyance is imposed, although the result is not yet completely clear. One method of arriving at such result would be to consider that all royalty interests created in the unit by virtue of the presumed cross-conveyances are incident or *appurtenant* to the interests from which they were derived and that any transfer of any interest in the latter category passes with all of the incidental or *appurtenant* interests in the other tracts in the unit. Thus, the lessor who contributed a 10-acre tract to a 40-acre drilling unit and subsequently conveys his 10-acre tract without mention of the unit would pass interest in the tract described and 1/4 of the royalty interest in each of the other tracts as an indicant of or *appurtenant* to the tract described.[11]

But whatever definition is given to the word "appurtenance," whether a broad definition or a narrow one, it is submitted that Mrs. McCall's royalty interest in the others' tracts was a real property interest, a part of the "mineral package" acquired by her either in the partition agreement or by cross-conveyance, and when she executed the deed without mineral or royalty, the rule in *Harris* and *Cockrell* applied to pass to the grantees (including Lila) an interest. Although Lila had never been paid royalty on production, the nonpayment did not preclude the conveyance to her of the royalty interest by the deed in question.

As a side note, not involved in the opinion, is a drafting question. In the June 1, 1997, deed, MCDCO conveyed to Lila, Patricia, and Mildred "in equal shares, an undivided 1/3 interest in all oil, gas and mineral then owned by MCDCO

---

[10] Supra at p. 412.

[11] Hoffman, *Voluntary Pooling and Unitization,* at 83 (Matthew Bender 1954) (emphasis added).

anywhere in Texas . . . ."[12] Did this deed convey an undivided one-third interest to be divided among the three grantees (one-third of one-third), or did it convey an undivided one-third interest to each of the grantees?

E.P.H.

---

[12] Supra at p. 406.

# THE LAW OF
# POOLING AND
# UNITIZATION
# THIRD EDITION

## VOLUME 1

**Bruce M. Kramer**
*Maddox Professor of Law Emeritus*
*Lubbock, Texas*
*Texas Tech University School of Law*

**Patrick H. Martin**
*Campanile Professor of Mineral Law*
*Paul M. Hebert Law Center*
*Louisiana State University*
*Baton Rouge, Louisiana*

## 2014

*Filed Through:*
RELEASE NO. 44, NOVEMBER 2014



[1] Some Examples

[2] Purposes

[3] Validity of the Clause

[4] Entirety Clauses as Real Covenants That Limit the Power of the Lessor to Transfer Interests

[5] The Reversible Entirety Clause—Clear Language Creating Non-Apportioned Royalty Interests Will Be Implemented

[6] Some General Problem Areas

    [a] Present or Future Severances

    [b] Defining the Leased Premises

    [c] The Anti-Entirety Clause

§ 7.05 Pooling Agreements

[1] Introduction

[2] Non-Executive Interests

    [a] The Texas Rule—Brown v. Smith

    [b] The Louisiana Approach

    [c] The Alabama Approach

    [d] Wyoming

    [e] More Problems About Ratification

[3] Pooling and Cotenants

[4] Royalty Pools

[5] Anti-Pooling Agreements

[6] Innovative Alternatives to Pooling

    [a] The Allocation Well Methodology

    [b] Production Sharing Agreements

Units may be created by the execution of various instruments including a community or communitized lease, by the exercise of the powers granted a lessee in a pooling and/or unitization clause, by the voluntary execution of a pooling or unitization agreement, by the compulsion of a state or local administrative body authorized by law to force-pool or unitize, or by the impact of state conservation regulations as interpreted by a court. This chapter examines the creation of units by the voluntary actions of the owners of the affected mineral, working, or royalty interests. In addition, the chapter explores how certain common-law concepts, such as the apportionment or non-apportionment doctrine relating to royalties, have affected the voluntary creation of units. The impact of entirety clauses on the apportionment of royalties issues also is discussed. Finally, the chapter analyzes the negotiation and execution of pooling and unitization agreements, including a discussion of the typical provisions that are used to pool or unitize separately owned interests in oil and gas.

## § 7.01 A Historical Digression—Apportionment or Non-Apportionment of Royalties

One of the factors that triggered lessee and lessor acquiescence in the inclusion of



1 of 1 DOCUMENT

The Law of Pooling and Unitization, 3rd Edition

Copyright 2014, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

CHAPTER 19 The Nature of the Unitized Title

*2-19 The Law of Pooling and Unitization, 3rd Edition § 19.01*

## § 19.01 Contract or Cross-Conveyance Theories

### [1] Introduction

The nature of the unitized title after a pooling or unitization has more than a purely academic interest to the oil and gas attorney. n1 Problems and solutions to problems flowing from voluntary pooling and unitization agreements may in large part be caused by the judicial characterization of the nature of the pooled or unitized title. This section focuses on the two major approaches to resolving the question of the characterization of what is the post-pooled or unitized title.

In reviewing the cases and the doctrines it is crucial to remember the context in which the court is deciding whether to opt for the contract or cross-conveyance theory. A decision relating to joinder issues, such as what constitutes a necessary or indispensable party, may have different considerations than a decision relating to whether the Rule Against Perpetuities has been violated. Likewise, the plaintiff's views as to the continued validity of the pooled or unitized entity might also impact the court's choice. Finally, in looking at these competing theories or doctrines, most courts are searching for the intent of the parties as expressed in the instrument that created the pooled or unitized title. Many of the problems and differences between jurisdictions are caused by the court's varying interpretations of standard provisions in community leases or pooling or unitization agreements. In most of these cases, there is no express statement of intent to create contractual rights or property rights. It is that lacunae that these decisions attempt to fill. The emphasis on the intent of the parties suggests that when the parties expressly state their preference, the courts will follow that language and not resort to the choice made by that state when the parties have left the issue undecided. Two different theories have been developed to describe the nature of the unitized title where the parties to a voluntary pooling and unitization agreement have not specified if they intended to convey property rights in the pooled or unitized area. These two theories have been labeled the cross-conveyance (cross-assignment) theory and the contract theory. These theories do not exist in the abstract but in the context of the following issues: who may effect a pooling of interests; who will be indispensable parties to litigation regarding the pooled unit; and what is the appropriate venue for litigation. Yet as these problems get resolved by reference to the two theories they mask the underlying issues that are not resolvable by the choice of a cross-conveyance or contract theory.

The only real issues that could be affected by the adoption of either theory have not been the subject of much litigation. For example, an important issue relates to whether or not the terms of a pooling or unitization agreement are binding on assignees. Whether the original agreement was a contract or a cross-conveyance would affect the outcome of that issue.

The descendability or inheritability of pooled or unitized interests would also be affected by the choice of doctrine. Other issues such as the affect of recordation of instruments, third party rights and/or liabilities, and the impact of lien and other security interest statutes would also be impacted by the characterization decision as a contract or a cross-conveyance of property interests.

Whatever the context of the dispute, the choice between the two doctrines may be outcome determinative. That is, the choice of which doctrine to apply will necessarily lead to a single result. Therefore, it becomes important to have sound and easily understood rules that can be applied in an evenhanded manner.

The two theories develop naturally from the purposes and nature of a pooling or unitization agreement that purports to combine various interests for the purpose of joint operations. In essence, the internal property lines within a pooled unit and a unitized area have been erased pursuant to the express terms of the agreement. The two theories attempt to explain whether that combination is property-based or contractually-based. The courts have been trying to deal with oil and gas production and development that had no counterpart in the traditional estate system developed in medieval England. Trying to fit the oil and gas property system in general and the nature of the pooled or unitized title into classical property theory has led to substantial doctrinal uncertainty. That uncertainty is present in many court decisions relating to the two doctrines. The soundest approach to the underlying issue is to treat pooling and unitization agreements as a special area of contract law, but clearly note that these contracts grow out of, and affect, property rights. Rather than trying to fit these issues into the old bottle of estates-in-land and classic property doctrine, it would be better if a new bottle was created that recognizes the interrelationship between contract and property rights and makes a suitable accommodation between those rights in order to carry out the intent of the parties without undue interference or confusion from the courts.

### [2] Effects of the Classification Scheme

Perhaps in no other area than the determination of who are indispensable parties has the choice between the contract and cross-conveyance theory led to the greatest doctrinal conflict. n2 It is important, however, to place in context many of the cases that were decided in an era in which there was still a substantial distinction between in rem and in personam jurisdiction. That distinction affected the ability to join parties if the contract or cross-conveyance theory was adopted. In today's world of long-arm statutes, where personal jurisdiction is available on a "minimum contacts" theory, one could get jurisdiction over any party who is part of a pooling or unitization agreement, since it is clear that a party to those agreements has sufficient minimum contacts with the jurisdiction regardless of the label attached. The question of proceeding with litigation affecting a pooling or unitization agreement, with or without the joinder of all the parties, should not turn on the question of whether the agreement was a contract or cross-conveyance of property interests. The underlying issue should be the impact of the litigation on the rights of the parties, however one classifies those rights.

It is clear, however, that under most definitions of indispensable parties, if the court applies the cross-conveyance theory the other pooled or unitized owners will be indispensable. However, the converse is not true. A choice of the contract theory does not necessarily lead to a result that the pooled and unitized owners are not indispensable. Whatever its exact nature, whether an ordinary contract provision that provides for a changed manner of operation and of calculating royalties or a real covenant that runs with the land, it still cannot be denied that in a title suit involving the title to a tract of land committed to the unit that all participants in the unit have an interest in the tract involved. Treating the agreement as a contract affecting property interests would more accurately describe what the pooling or unitization agreement concerns. Not allowing the contract/cross-conveyance theory to decide issues of indispensable parties is the better approach. By requiring a more ad hoc exploration of the nature and the agreement of the lawsuit, in order to answer the question of whether the non-joined interests are indispensable, will allow the court to consider such important and diverse issues as where are the producing well or wells located, what is the allocation formula, and what are the minimum or maximum size requirements, if any, that will be affected by a change in ownership on one of the tracts.



The Law of Pooling and Unitization, 3rd Edition

Copyright 2014, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

CHAPTER 19 The Nature of the Unitized Title

*2-19 The Law of Pooling and Unitization, 3rd Edition § 19.02*

## § 19.02 State Analysis

### [1] Contract Theory States

### [a] Kansas

Two cases clearly suggest in dictum that Kansas has rejected the cross-conveyance theory and has adopted the contract theory for pooled or unitized titles. The first case, *Hover v. Cleveland Oil Co.,* n101 is typical of court decisions that struggle with the concept of what a unitized title should be but never directly answer the question. Adjacent lessors had entered into an agreement whereby they would share certain economic benefits, including oil runs, bonuses, and rentals, on a surface acreage basis until they mutually agreed otherwise. One of the lessors then conveyed his interests to a third party through the use of a warranty deed. The issue before the court was whether the sale of one of the interests terminated the sharing or pooling agreement even when the other parties had not joined in the conveyance. The application of one theory would produce different consequences than the application of the other theory. Under cross-conveyance theory, the lessors would each own an undivided interest in the others' interest, and each would thereby have conveyed to the others a similar interest in the premises originally owned. Undoubtedly the warranty deed did not mention a reduced share of the described premises, nor did it include the vendor's share of the other premises that were the subject of the pooling agreement. However, if the lessor had merely given contractual rights to the other lessors, those could be terminated unilaterally under the provisions of the agreement, and the warranty deed would be satisfied insofar as it transferred all of the vendor's interest in the described premises. Under a contract theory the deed would be effective to transfer a non-pooled interest and, in effect, terminate the pooling agreement.

The holding of the court would support the contract theory, although the language of the opinion is somewhat ambiguous. The court found that the pooling agreement had terminated by the sale by one of the parties to the agreement. After the sale the seller no longer had anything to contribute to the pooling agreement and the court was unwilling to substitute the purchaser for the seller as being bound by the terms of the pooling agreement. n102 If there had been a cross-conveyance of interests, unilateral termination would arguably be impossible unless expressly provided for in the agreement. The pooling agreement would have cross-conveyed interests that would remain with the parties until the agreement terminated by its own provisions or until there were later conveyances of the cross-conveyed interests. Thus, the result and the reasoning are consistent with the contract doctrine; all that was created was a contractual right to share, which would terminate upon the transfer of the contributed mineral or royalty interest even in the absence of a formal provision.

Further support for the contract doctrine in Kansas can be inferred from the holding and analysis in *Kenoyer v. Magnolia Petroleum Co.* n103 *Kenoyer* involved an exercise of a pooling power that was alleged to be in violation of the common-law Rule Against Perpetuities. n104 In ruling that the rule was not applicable to an exercise of the pooling power, the court found that the pooling power was not a traditional property-based power but merely a means of effecting a contractual change in the way that royalties were to be paid and the leasehold estate operated. Again, if the court were to have adopted a cross-conveyance theory it would have been much more difficult to dismiss the rule challenge, although states such as Texas that have adopted the cross-conveyance theory also find that the rule is not violated by the exercise of the pooling power. The Kansas court said:

> we fail to see how the provision in question violates the rule against perpetuities. The lease does not create any future estates ... . It granted to lessee the right to operate the lands covered by it separately or as a part of a consolidated unit. The royalty provisions fit either operation and provide a formula by which the amount of royalties payable to the lessor is capable of accurate and definite ascertainment. These rights were vested ... .

> ... .

> In our opinion the rule against perpetuities simply has no application to the provision of the lease under consideration. n105

No further light has been shed on the problem in Kansas, but the clear indication from *Hover* and *Kenoyer* is that Kansas treats a voluntary pooling and unitization agreement as merely involving the transfer of contractual rights.

### [b] Oklahoma

Oklahoma appears to have shifted ground in the cross-conveyance/contract controversy. The early case of *Lusk v. Green* n106 involved whether the signing of a single lease covering two non-contiguous parcels, each owned separately by a husband and wife, constituted a community lease and a pooling of royalty interests. The court eventually concluded that the signing of the single lease with the two parcels described therein did not create a community lease, and, therefore, there was no effective pooling of the separate interests. In reaching that conclusion the court said:

> under the state of facts disclosed by the record in this case, we are not willing to say that, because the lessors executed a lease covering their respective tracts of land, which were not contiguous but several miles apart, on the same piece of paper, that they thereby each intended to convey to the other a half interest in the royalties. n107

One can infer that if the parties had shown an intent to enter into a community lease or, for that matter, a pooling or unitization agreement, they would have in effect cross-conveyed to each other a one half interest in their respective tracts. n108

Although *Lusk* received some support in dictum in *Amis v. Bryan Petroleum Corp.,* n109 there were some early signs that there was not widespread support for the cross-conveyance theory. In at least two instances the Oklahoma Supreme Court found that the Statute of Frauds would not be applicable to agreements to pool or apportion royalties. n110 Since the Statute of Frauds requires a writing for conveyances, with a few irrelevant exceptions, it would have been inconsistent to state that a pooling agreement amounted to a cross-conveyance of the royalty interests and to find simultaneously that the Statute of Frauds is not applicable. n111

The death knell for the cross-conveyance theory in Oklahoma began tolling with *Sinclair Crude Oil Co. v. Oklahoma Tax Commission.* n112 Oklahoma was seeking to apply the state's gross production and proration tax to royalty oil that was payable to several Indian allottees. The allottees had entered into several unitization agreements that provided them

a proportional share of royalties from production located anywhere on the unit. The basis for the liability was the Tax Commission's conclusion that the Indian allottees had conveyed their otherwise tax exempt interest to the other parties who had signed the unit agreement. In exchange they received a cross-conveyance from the other unit members of a proportional share of their royalty interests in the entire unit. n113 This newly created interest, according to the Tax Commission, did not fall under any of the tax exemption provisions of the otherwise applicable Cherokee Allotment Act.

The unitization agreement did not contain any specific provision relating to the issue of whether the parties intended to apply a cross-conveyancing or contract theory. Without citing *Lusk* or *Amis* the Oklahoma Supreme Court determined that the language of the unitization agreement did not evince an intent to cross-convey the various unitized interests. It emphasized the lack of specific words of grant that it concluded were vital to treating a document as a conveyance of a property interest. It did ignore, however, one provision of the unitization agreement that provided that the agreement would constitute a real covenant running with the land. n114 Under the normal requirements of privity of estate, a real covenant can only be created when there is a transfer of a property interest or a tenurial relationship between the parties, such as landlord and tenant. In this case there was neither; the language suggesting that the promises contained in the agreement were to be construed as real covenants does evince an intent to cross-convey interests that would provide the privity requirement for real covenants. Nonetheless, the court concluded that the absence of words of grant was critical. It said:

> ...in order for the communitization agreements to constitute and effect an exchange, conveyance or cross transfer between the royalty owners of title and ownership to an undivided fractional share and interest in the oil ..., it was essential that the agreements contain adequate operative words such as grant, bargain, convey, or others of like import, sufficient to effect a conveyance of title to the minerals underlying the land ... . n115

The court emphasized the contractual nature of the agreements when it concluded:

> The communitization agreements here in question constitute a valid form of private contract ... . From a consideration of the agreements as a whole we fail to agree with the findings and holdings of the Tax Commission wherein it holds that the agreements constitute and effect an exchange of title to the mineral or royalty interests ... ." n116

While not citing *Lusk,* the court was aware of the contrary position on this issue that had been taken in Texas. It clearly chose to follow the contract doctrine largely on the basis that the weight of "persuasive" authority treated the contract doctrine as the one that more closely reflected the true intent of parties to pooling and unitization agreements not to effect a cross-conveyance of their interests. n117

If further evidence was needed that the Oklahoma Supreme Court had adopted the contract theory, it was provided in *Garvin v. Pettigrew.* n118 In *Garvin,* some ten owners of both unleased mineral and royalty interests entered into an agreement whereby they would share in the royalties that would accrue to each separate tract in proportion to the acreage that each contributed to the agreement. Specific language contained in the agreement evinced an intent not to convey or transfer any interest in the lands themselves. n119 The defendant's predecessors had conveyed to that plaintiff's predecessors all of the acreage committed to the unit. The plaintiff was seeking a declaratory judgment that the defendant was not entitled to share in the benefits of off-unit production. The jury found for the defendant, but the trial court ordered a new trial, concluding that the pooling agreement violated the Rule Against Perpetuities and was therefore void. The Supreme Court affirmed the trial court's granting of the motion for a new trial but differed as to the reason for overturning the jury verdict. Principally relying on the *Hover* case, the court found that a pooling agreement, such as the one used in this case, does not result in a cross-conveyance of any royalty or mineral interests. This was especially evident from the specific language of the agreement denying a transfer of any mineral or royalty interests. n120 The court could have decided this case on narrower grounds, such as a specific lack of intent to transfer interests

or that the rights to share in unit production were attached to the lands that were contractually contributed and once those lands were no longer owned by a party, the contractual right to shared royalties also expired. n121

The court's language, however, goes beyond the narrow interpretation of the specific terms and broadly rejects the cross-conveyance doctrine. The court stated:

> The contract here involved constituted a pooling agreement. It was so referred to in the record and in the briefs of the parties. It could not have been a conveyance of a mineral interest. Nowhere does it appear therein a granting clause of any kind. Nor was it an assignment of royalties in perpetuity. n122

Nonetheless, this broad language must be read in the context of the express disclaimer of interest in the "lands-of-others" provision of the agreement which was emphasized by the court.

It is interesting to note that this decision followed *Sinclair Crude Oil* by about six weeks, yet *Sinclair* 's clear language rejecting a cross-conveyance theory is not cited. This is particularly n123 troublesome since there was a vigorous dissenting opinion that clearly preferred an express approval of the cross-conveyance theory for pooling and unitization agreements. The majority's emphasis on typical language in the pooling agreement and its failure to overrule *Lusk* and cite *Sinclair,* muddied the waters of Oklahoma oil and gas jurisprudence until 1970.

In Tenneco Oil Co. v. District Court n124 the Oklahoma Supreme Court again rejected the cross-conveyance theory for pooling agreements. The plaintiffs were the lessees of certain lands that were voluntarily unitized; the defendant was declared the operator of the unit under the unit agreement. The unit was approved by the Corporation Commission. The plaintiffs were seeking a partition of the interests committed to the voluntary unitization order. They also sought an injunction prohibiting an expansion of a secondary recovery operation that was being proposed by the unit operator. A requirement before a party can seek partition is the existence of a cotenancy between the parties. If the cross-conveyance theory for voluntary unit agreements is followed then, by necessity, a cotenancy is created. However, if the contract theory is followed, there have been no property interests transferred and therefore no cotenancy. n125

Thus, the issue was squarely before the court. The court rejected the cross-conveyance theory and adopted the contract theory as it applies to the typical unitization or pooling agreement. No special terms or disclaimers need to be placed in those agreements for a court to find that only contractual rights are created. In the absence of provisions to the contrary, it will be presumed that the parties to the pooling and unitization agreement do not intend to cross-convey any property interests. n126 In answering the question of whether or not a cotenancy had been established the court definitively stated:

> co-tenancy has never been established or created. The parties have title and ownership to separate tracts. No party has been conveyed an interest in the property of the other. The plan of unitization is not a cross conveyance of interest, but rather a plan to unitize their several tracts ... . Neither the plan of unitization nor the statutes which authorized the Corporation Commission to approve and regulate the same intended to convey an interest between the parties. The Plan of Unitization has no operative words of conveyance and it is apparent from the instrument itself that none was intended. n127

It is clear that Oklahoma has rejected the cross-conveyance theory for the typical pooling and unitization agreement because the typical agreements normally disclaim any intent to cross-convey property interests. Where the partners are silent on the issue, the court would also find no cross-conveyance because there would be no operative words of conveyance. If parties want to cross-convey property interests they need to amend the standard forms and put in explicit granting or conveying language evincing such an intent. n128 Thus, Oklahoma has finally planted its feet firmly in the camp of contract theory states, notwithstanding an initial decision opting for the cross-conveyance theory.

Oklahoma's compulsory pooling system also raises issues over the nature of the unitized title. n129 Non-operating

working-interest owners sometimes are given an option not to participate in well production expenses and instead receive a bonus payment and/or some overriding royalties. Is an assignment of the working interest so that the non-operator is divested of all of his or her interests within the pooled unit? In *Ranola Oil Co. v. Corporation Commission,* n130 the court concluded that when the non-operator accepted a bonus payment in lieu of participation, the entire working interest was deemed transferred to the operator. That precluded the non-operator from participating as a matter of right in increased-density wells approved later. The pooling order when accepted by the non-operator terminated the non-operator's working interest in the minerals within the pooled unit.

 *Ranola Oil* is perhaps inconsistent with an earlier decision of the Oklahoma Court of Appeals, *Southern Union Production Co. v. Eason Oil Co.* n131 This decision of the Court of Appeals is not binding as precedent because it was not ordered released for publication by the Oklahoma Supreme Court. In *Southern Union,* Eason as a working-interest owner had opted by default for the bonus payment alternative to participation in production expenses. Eason never formally assigned its working interest to Southern Union, the operator. A dry hole was drilled and the Corporation Commission eventually deleted the Eason acreage from the pooled unit. Eason then drilled a producing well on a re-spaced 80-acre unit, and Southern Union claimed a conversion of its working interest had occurred. That claim was based on the prior assignment of Eason's working interest that was ordered in the creation of the 640-acre unit. The Court of Appeals disagreed that Eason had conveyed a fee interest in its working interest. It concluded that no assignment had taken place or, alternatively, if an assignment had occurred it had been extinguished with the termination of the 640-acre unit. *Ranola Oil* clearly would have found that Eason had conveyed its interest when it chose the bonus alternative. But the termination of the unit was a factor that the *Ranola Oil* court did not face. The Corporation Commission never provided whether the assignment was a full fee simple absolute assignment or a defeasible fee assignment that automatically terminated upon the termination of the unit. The *Southern Union* court concluded that it was the equivalent of a defeasible fee assignment, if any assignment of an interest took place at all.

In *Unit Petroleum Co. v. Mobil Exploration & Production North America, Inc.,* n131.1 the court explored in the context of a gas balancing dispute the relationship between working interest owners who have executed a joint operating agreement. n131.2 Relying on *Harrell v. Samson Resources Co.*, n131.3 the court described the relationship between the parties to the JOA as "cotenant-like." This labeling affected the outcome of the suit because the court found that the JOA did not provide for immediate cash balancing but said that Mobil's sale, if it derogated Unit's rights as a cotenant and "beneficiary of the trust relationship," might trigger an immediate right to cash balancing. In addition, if the sale by Mobil caused it to deny further liability for the overproduction then Unit could be entitled to immediate cash balancing. The use of the term trust relationship is somewhat troubling because the parties to a JOA normally are not treated as being in such a relationship. In many JOAs the parties can protect themselves against the sale of working interests by including a preferential right to purchase provision or other type of clause that gives them the right to approve of a transfer of a working interest. In order to determine whether or not there is a derogation of the trust relationship or a denial of future liability, an ad hoc determination of the facts of each case must be made by the trial court.

### [c] Utah

While no state court decision has adopted either theory, an opinion of the Tenth Circuit applying Utah law apparently assumes that Utah would adopt a contract theory rather than a cross-conveyance theory. In *Phillips Petroleum Co. v. Peterson,* n132 the Rule Against Perpetuities was again at the center of the controversy. The lessors claimed that the leasehold pooling clause was invalid because it violated the rule, and, therefore, the placement of their acreage into various units was likewise invalid. The Tenth Circuit concluded that the rule was only applicable if the pooling or unitization agreements constituted a conveyance of interests in realty. n133 The court held that the pooling clause in the lease and the terms of the unitization agreement did not evince a clear intent to cross-convey the respective royalty interests. It adopted the view suggested by Leo Hoffman that pooling and unitization agreements generally use contractual terms rather than language typical of conveyances. There was no special provision in the agreement stating that no cross-conveyance was intended. Instead the general language regarding allocation of production costs and

royalty payments was deemed to evince an intent not to cross-convey. n134 The court also followed what it believed to be the more persuasive case authority that adopts the contract doctrine. n135

### [d] West Virginia

West Virginia is here classified as adopting the contract theory, but the cases upon which this classification are based are unclear and perhaps contradictory. The first case that suggested that the court was opting for the contract doctrine was *Lynch v. Davis.* n136 *Lynch* involved a community lease whereby several separate owners of mineral estates joined in one lease of their respective tracts. n137 The ultimate issue related to whether or not there should be an apportionment of royalties based on a surface acreage allocation formula. The court rejected an argument that finding for apportioned royalties is the equivalent of finding that the parties cross-conveyed their interests; it ruled that the community lease was not a conveyance of an interest in the minerals. If it was a conveyance, the court would have to find that the non-apportionment rule would apply. n138 While not a model of clarity, the opinion suggests that a community lease does not entail a conveyance of interests in real property unless it undertakes to do so through specific language of grant. n139

While *Lynch* standing alone would cause us to place West Virginia in the ambiguous category, the case of *Boggess v. Milam* n140 would support a conclusion that West Virginia has embraced the contract doctrine. *Boggess* involved the right to share in royalties where there had been a pooling of less than all of the interests in the pooled tracts. Boggess owned an undivided interest in a tract of land. He was given an opportunity to join in a pooling or unitization agreement, but he refused. The agreement was executed by the other owners, including those who owned fractional shares in the same tract as Boggess. The unit well was drilled off of the Boggess acreage. He nonetheless claimed a share of the royalty from the unit well's production. Under either a contract or cross-conveyance theory Boggess had to lose because he had refused to execute the agreement. His argument was based on a cross-conveyance theory, asserting that he was a cotenant of the royalty interests of those owners who had joined the agreement. While that argument would be persuasive had he executed the agreement, his failure to join gave him no rights whatsoever in the off-tract pooled production. While not critical to its holding, the court discussed the contract and cross-conveyance theories and concluded that a unitization agreement merely involves the merging of contractual rights. n141 By stating that the unitization agreement did not effectuate a merger of title the court was in essence rejecting a cross-conveyance theory, which if adopted would cause a merger of title between the parties to the agreement. While not a solid member of the contract theory group, the combination of *Boggess* and *Lynch* clearly indicate a judicial predilection for treating pooling and unitization agreements as merely entailing contractual relationships.

### [2] Cross-Conveyance Theory States

### [a] California

Although California is now considered a state firmly committed to the cross-conveyance theory, some of its early opinions suggested that the contract theory was the preferable approach. In *Bayside Land Co. v. Dabney,* n142 the lessor entered into a lease with the defendant that contained a form of pooling clause that gave the lessee the power to enter into subsequent leases with other parties. The lessee could then jointly develop the separate leasehold estates as long as there was a sharing of the royalties. The court concluded that the lessee had properly signed leases with other parties, which provided for a sharing of royalties. In describing the relationship between the plaintiff and the other lessors the court clearly distinguished this case from an earlier case n143 on the basis that in this case there was no tenancy in common formed by the lessee's exercise of the pooling clause, even when there was a pooling of the royalties. n144 If there was no tenancy in common there could be no conveyance of royalty interests. The court emphasized the fact that only contractual rights were involved so that no cotenancy situation would exist. n145

The adoption of the cross-conveyance theory occurred in 1946 with *Tanner v. Title Insurance & Trust Co.* n146 A community lease was the subject of the litigation in *Tanner.* In resolving the dispute between transferees of the original

lessors and the lessee regarding the right to pooled or apportioned royalties, the court made the following statement about the nature of the pooled title that ensued from the signing of the community lease:

> By executing the community lease, the respondents and each of the other lessors assigned or conveyed to his colessors a percentage interest in all oil produced on his land by the lessee during the continuance of the lease. The consideration for that transfer was the similar mutual assignments of the other lessors. n147

The interest that was transferred to each of the colessors was distinct from the royalty interest that may have been retained by the lessor in production on his own premises. This view was followed in other cases that reiterated the conclusion that community leases or other forms of pooling or unitization agreements constitute a cross-conveyance of royalty interests. n148

The *Tanner* rule was followed in another community lease case, *Southern California Title Clearing Co. v. Laws.* n149 In this case, the legal issue was whether all of the community lessors were indispensable parties to a lawsuit seeking partition of the lessors' interest. n150 The original community lease combined thirteen different tracts with thirteen different owners. The partition suit was solely directed at the divided ownership of one of the lots. The owners of the twelve remaining tracts were not joined. The court used the *Tanner* rationale to find that the act of executing a community lease cross-conveyed royalty interests between the lessors. As such, a partition action seeking to terminate the lease as to one of the tracts would also affect the other lessors who were owners of a fractional share of the royalty interest in the tract where the partition was being sought. Under the California test for indispensable parties, they were indispensable because their ownership rights were being affected. n151

Doubts about the commitment of the California courts to the cross-conveyance theory was raised by the case of *LeBard v. Richfield Oil Corp.,* n152 although the facts of the case are unique. *LeBard* involved the very limited statutory compulsory pooling laws that exist in California. n153 Under the statute at issue, when one acre or smaller parcels are located adjacent to existing leased parcels and certain other requirements are met these smaller parcels are deemed included within the lease, and the owner of the minerals is entitled to a proportionate share of the royalty payments. After the plaintiff's interest had been committed to the pooled unit, she sold her entire estate to the defendants or their predecessors in interest. She then claimed that the pooled royalties she was entitled to by virtue of the statutory forced-pooling were interests in gross and were not therefore transferred with the mineral estate conveyance. The court rejected that reading of the rights created by the statutory pooling procedure. Then the plaintiff argued that the statute in effect made her the equivalent of a community lessor, which, under the *Tanner* rule, would constitute a cross-conveyance of the royalty interests in the pooled unit. n154 While agreeing that the *Tanner* court adopted a cross-conveyance doctrine, this court attempted to limit the application of the doctrine by stating that it did "not fit the pattern established by Section 3608 for compensating owners who have been deprived of the right to recover oil and gas from their lands." n155 The court was correct in not making equivalent a voluntary community lease or pooling agreement and a compulsory pooling statute. In dealing with voluntary agreements, the courts are interpreting the language of the agreements to ascertain the intent of the parties. Where the choice of contract or cross-conveyance theories is expressly stated the court will enforce the language as written. n156 The *Tanner* rule merely states that where the community lease or pooling or unitization agreement does not contain express language indicating a choice of theories, the courts will find that a cross-conveyance of property interests has occurred. The *Laws* decision recognized that the parties are free to make that choice but if they do not the *Tanner* rule will apply when the court said: "Whether in any given agreement for unit development the Tanner rules will be applicable between the parties will depend on the terms of the agreement." n157

But in this case we are not dealing with voluntary agreements and the intent of the parties but with a question of statutory interpretation. Here the court looked at the provisions of the compulsory pooling statute and determined that the legislature had not intended to effect a cross-conveyance of property interests whenever the compulsory pooling process was used. This would be consistent with the general rule that actions of state conservation agencies, while

affecting property interests, cannot convey or affect the title to property interests held by those who have been brought into the regulatory process.

### [b] Illinois

Illinois has shown some support for the cross-conveyance theory in a case involving the joinder of indispensable parties. In *Ragsdale v. Superior Oil Co.,* n158 the plaintiffs claimed that the operator of a pooled unit that had included the plaintiffs' lands had committed tortious acts including trespass, wrongful entry, and conversion. The unit contained 37 working-interest owners and 140 royalty-interest owners. None but the unit operator was named in the suit. The intermediate appellate court had found that those parties were not indispensable without opting for the contract theory. n159 The Illinois Supreme Court reversed and found that the action should be dismissed for failure to join indispensable parties. The rationale for that result is not as clear as it could have been had the court simply adopted the cross-conveyance theory as the one applicable in Illinois. After describing the usual effects of unitization, the court simply concluded that a judgment for the plaintiff in this case would by definition adversely impact all of the other owners. The court concluded:

> The oil produced is pooled, regardless of the separate tracts upon which the wells are located and from which the oil is produced. They all share in the oil produced, saved and sold in the proportion which each owner's tract bears to the entire unitized tract. For all practical purposes the same situation exists as though there was a single owner-lessor and a single lessee ... . Assuming that the well, or even one of several, is on the tract in question and title failed. The production would belong to the successful litigant rather than to the record owners. The unitized tract would be broken and every party owning an interest in it would be adversely affected. n160

While consistent with the cross-conveyance theory, the Illinois court properly refused to allow the choice of theory to affect the determination of who are indispensable parties. Under either theory it could be argued that the non-joined parties' interests would be substantially affected by the removal of the Ragsdale tract from the unit. If the lessee would lose this case and be forced off of the tract, other interests might be terminated or otherwise affected. The analysis correctly focused on the legal and practical impacts of the litigation and not on the choice of theory.

### [c] Mississippi

Mississippi, as a general matter, follows fairly closely the oil and gas jurisprudence of the Texas courts. It would thus not be surprising if Mississippi followed the lead of Texas and adopted the cross-conveyance theory. The limited case law does suggest that result, although there is no clear indication in any Mississippi case that it has opted for the cross-conveyance doctrine. n161 In *Merrill Engineering Co. v. Capital National Bank,* n162 the main issue was whether a royalty interest was realty or personalty such that when the owner of a royalty transferred his realty his royalty interest was also conveyed. The answer was clearly yes, but the answer was made more difficult because the lessor's interest had been pooled with adjacent tract owners pursuant to a pooling agreement. While only tangentially involving a cross-conveyance or contract issue, the court's repeated emphasis that both the pre-pooling and post-pooling royalty interests were realty lends support to the idea that those interests were conveyed to the parties who executed the pooling agreement.

A federal case applying Mississippi law, *Hudson v. Newell,* n163 found that Mississippi would follow the cross-conveyance theory. Again, the issue related to indispensable parties to litigation involving interests which had been committed to a unitization agreement. The plaintiffs sought to quiet title in themselves because certain transfers had been executed by a life tenant without the joinder of the remaindermen. After one of those transfers, a lease of the minerals had taken place and a unitization agreement was executed pursuant to the lease. The court saw the issue quite plainly. If the unitization agreement constituted a cross-conveyance of royalty interests, no litigation could occur unless all royalty owners within the unit were joined, since their interests would be affected. Noting the close ties between

Texas and Mississippi oil and gas law the Fifth Circuit resolved the issue as follows:

> The district judge held that in Mississippi the oil in place is, as in Texas, conveyed by oil leases, royalty sales, and other formal recorded contracts, and that a unitization contract vests joint ownership jointly in all the unitized reserves in place and in the royalty oil produced from the well, citing *Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472* . While no Mississippi authorities on point are cited, we believe this to be correct, so that all these owners must be parties, or the unitized lands must be excluded from any decree. n164

The finding that a cross-conveyance occurs requires the conclusion that the other royalty owners are indispensable parties to a lawsuit relating to the title of one of the royalty owners. As was discussed earlier in § 19.01[2][a][ii], on rehearing, the Fifth Circuit eventually held that the non-joined royalty owners were not indispensable after the plaintiffs filed affidavits disclaiming any intent to interfere with the unitization agreements executed by the defendants to the litigation. n165

### [d] Texas

Texas has been the state where the choice of the cross conveyance theory has had the most influence. While not the first case to adopt the cross conveyance theory, *Veal v. Thomason*  n166 is perhaps the most oft-cited and important decision, which has clearly placed Texas among those states that follow the cross-conveyancing theory. *Veal* involved a community lease where the plaintiff was challenging the title of one of the community lessors. The plaintiff only served the community lessors whose title he was directly attacking, failing to serve the community lessee and the remaining community lessors. The defendants argued that the suit had to be dismissed for failing to join indispensable parties. In finding that the non-joined parties were indispensable the court made the following statement:

> To our minds, when we look to the substance and intent of this lease contract as a whole, the above-recited provisions can have no effect other than to constitute all the lessors of land in the unitized block joint owners, or joint tenants, of all royalties reserved in each of the several leases in such block, the ownership being in proportion which the acreage of the unitized block. n167

Regardless of the choice of theories, the non-joined parties were indispensable because the plaintiffs were seeking to terminate the relationship between their alleged mineral interest and the community lease.

Shortly after *Veal* the court was faced with the same indispensable party issue where the plaintiffs were not seeking to terminate the relationship with the community leasehold interests but were merely seeking to substitute themselves for the defendants as the proper royalty owners. In *Belt v. Texas Co.,*  n168 the same community lease that was litigated in *Veal* was before the court. The court refused to distinguish *Veal* on the different relief sought, instead opting to apply the cross-conveyance theory to all interests created by a community lease. Once the court applied the theory it was inescapable that the non-joined community lessors would be indispensable. n169

The *Veal* holding was followed in *Brown v. Smith.*  n170 While *Brown* directly involved the right of the owner of the executive power to lease non-participating royalty interests, the court in discussing the rights of the non-executive owner clearly embraced the cross-conveyance theory as the one that best describes the nature of the unitized title. n171 In finding that the executive did not possess the power to pool the interests reserved to the non-executive through a community lease, the court described the consequences of executing a community lease as follows:

> An oil and gas lease jointly executed by the owners of two or more tracts of land owned in severalty, with provision for pooling or sharing, on the basis of acreage, the royalties from oil or gas produced anywhere on the leased land, has the effect of vesting all of the lessors, at least during the life of the lease, "with joint ownership of the royalty earned from all the land in such block." *Veal v. Thomason, 138 Tex. 341, 349, 159 S.W.2d 472, 476* . The lease so executed is a conveyance by each lessor to each of

the other lessors of an undivided interest in the royalties. n172

Since the non-executive had not joined in the community lease, she did not convey her interest to the community. The executive did not possess the power to convey that interest without her further consent. She could not be divested of her full interest, nor could she receive the interests from the other royalty owners unless she joined in the lease. n173

The first Texas case extending the cross-conveyance doctrine to a pooling agreement was *Miles v. Amerada Petroleum Corp.* n174 The court followed the *Veal* holding that an exercise of the power by a lessee was a conveyance or exchange of a part of the lessor's royalty interest for a part of the interests of other royalty owners who were included in the pooled unit. n175 Later Texas cases have applied the cross-conveyance theory in other contexts. n175.1 For example, in Renwar Oil Corp. v. Lancaster, n176 the plaintiffs sought to interpret a survey so that it would include their lands within a lease that had a producing well located thereon. The procedural issue raised related to the proper venue for the action. The suit was filed in Dallas County although the land itself was located in Nueces County. The defendant objected to the trial court's jurisdiction through a properly filed plea of privilege asserting that the lawsuit was one that related to the recovery of land, which under the then existing venue statute had to be filed in the district court for the county where the land is located. The action, while sounding in contract, was affected by *Veal* because the interest being litigated had been pooled. Since the plaintiffs sought to have the pooling terminated as to their claimed interest because they never agreed to the pooling, the court concluded that *Veal* was applicable. The survey interpretation sought by the plaintiff would change the nature of the ownership of the other royalty owners who had received a cross-conveyance of the contested interest; under the *Veal* rationale they granted to others a proportionate share of their reserved royalty interest. The court concluded:

> In addition plaintiffs seek an adjudication that certain unitization agreements are void and ineffective as to them. Since these agreements are essentially a conveyance of an interest in realty, *Veal v. Thomason* ... , this constitutes an effort to remove cloud from title, even though alleged as an effort to construe a contract. n177

The Court of Civil Appeals decision in *Minchen v. Fields,* n178 which confirmed the holding in *Brown v. Smith* n179 that the executive cannot pool, or authorize the lessee to pool, non-executive interests used the cross-conveyance theory to support that result. The court stated:

> The reason of the rule is that where mere executive rights are conferred or reserved, there is no intention evidenced to vest authority to convey a royalty interest reserved or the royalty interest attributable to the minerals leased and to hold that such holder can unitize or pool the interest would allow him to convey such royalty interest because a unitization of the royalty and minerals under different tracts effects a cross-conveyance to the owners of minerals under the various tracts of royalty or minerals so that they all own undivided interests under the unitized tract in the proportion their contribution bears to the unitized tract. n180

The adoption of either the cross-conveyance or contract doctrine is irrelevant in resolving the pooling power question. The major issue in determining if the non-executive's interest can be pooled should be one of intent, or more precisely, presumed intent of the parties since they have not expressed their intent through the relevant documents. That issue should not be affected by the categorization of a pooling or unitization agreement as a contract or cross-conveyance. The lessee can or cannot pool based on the intent of the parties as expressed in the instruments creating the non-executive interests. The fact that the pooling would, if effective, transfer property interests or merely create contractual rights should not affect the determination of the intent of the parties creating the non-executive interests.

The consequences of choosing between the cross-conveyance and contract theories also affect ancillary matters such as joinder problems, the Rule Against Perpetuities, and the Statute of Frauds. n181 The option does not, and should not, effect the basic impact of the pooling or unitization decision, which is to provide a sharing of risks, benefits and costs

among the various owners within the pooled unit or unitized area.

The cross-conveyance theory was also reaffirmed in dictum in *Texaco, Inc. v. Letterman,* n182 a case involving the exercise of a leasehold pooling clause. The major issue was whether a pooling clause could be exercised a second time, after the original pooled unit had been abandoned. The court concluded that the lessee could pool the lessor's royalty interest so long as the lease was still alive. In dictum, however, the court suggested that if the court had held that the lessee could not have exercised his pooling power after the initial pooled unit had been abandoned the attack on the later exercises of the pooling clause would have had to have been dismissed for failure to join necessary and indispensable parties, the other pooled royalty owners in those units. n183

In *Wagner & Brown, Ltd. v. Sheppard*, n183.1 the court effectively reaffirmed the continued adherence to the cross-conveyance theory as it relates to a voluntary pooling created under a leasehold pooling clause, despite the pooling clause stating "Pooling hereunder shall not constitute a cross-conveyance of interests." The Texas Supreme Court ruled that the effectiveness of the pooling by the lessee continued even after the termination of the lease. Thus the possibility of reverter had been committed to the unit by the lessee. The lessee, the court found, was empowered to commit the lessor's interests for a period longer than it committed its own interest.

The merging of the cross-conveyance doctrine with other rules or canons affecting interpretation of mineral deeds has caused some problems. In *Kelln v. Brownlee,* n184 the Kellns owned the equivalent of 151 undivided acres in Section 59. They leased the entire 640 acres even though they only owned that lesser amount. The lease contained a pooling clause that was exercised to pool all of the interests in Section 59. The Kellns then transferred certain undivided interests in Section 59 subject to the lease, and the grantees sought an apportioned share of the royalties based on the cross-conveyance theory. The court found that the royalty interests that the Kellns received by virtue of the pooling agreement were transferred to the grantees under the doctrine of after-acquired title in order to make the grantees whole. The grantees were entitled to the benefit of the pooling agreement because their interest was transferred subject to the lease.

There are only a few cases that depart from the cross-conveyance theory. In *Sohio Petroleum Co. v. Jurek* n185 the plaintiffs claimed that a constructive or resulting trust should be placed on an undivided mineral interest that had been leased and then placed into a voluntary pooled unit. The mineral interest had been purchased with funds that were to be shared between the plaintiff's children and their mother. The defendants asserted that the cross-conveyance was applicable, and since none of the other royalty owners within the pooled unit were joined the suit had to be dismissed for failing to join necessary parties. Rather than blindly applying the cross-conveyance theory, the court could have seen whether the non-joined parties' interests would be affected by the litigation. It is not likely that they would be affected since the plaintiffs were seeking merely to have their ownership interest recognized. There was no suggestion that they sought to terminate either the lease or the pooling agreement. n186

There is no way to reconcile *Jurek* with *Veal.* Other Texas cases have followed *Jurek* and not found non-joined pooled or unitized owners indispensable parties in actions where the relief sought is not the termination of the interest's participation in the pooled or unitized development. n187 Thus some courts have recognized the fact that not all litigation involving owners of pooled or unitized interests affects the other owners. n187.1

Not all forms of joint or cooperative development necessarily invoke the *Veal* rule. In *Atlantic Richfield Co. v. Exxon Corp.,* n188 the Court of Civil Appeals found that there was no cross-conveyance of natural gas pursuant to the terms of a joint operating agreement. Several oil companies, including the plaintiff and the defendant, entered into a series of joint operating agreements to expand an existing gasoline plant and construct additional gas gathering facilities. The parties agreed to allocate ownership of the plant and the extracted products in proportion to the ownership interest in the gas reserves in the field. The plaintiff's reserves were produced faster than the defendant's, but it was only allocated its proportionate share of the reserves originally held. At that time, the defendant sought to exercise a termination clause in the contracts and execute a new contract that had terms very unfavorable to the plaintiff. One of the theories proffered

by the plaintiff to avoid the express terms of the termination clause was that the original contracts had in effect constituted a cross-conveyance of the gas in place, analogous to a pooling or unitization agreement. Once conveyed, the plaintiff's interest in the remaining reserves could not be diminished without its express consent. While admitting that gas reserves are realty under Texas law and therefore capable of being conveyed, the Court of Civil Appeals agreed with the trial judge that the contracts in question did not evince an intent to cross-convey those reserves. In looking at the instrument as a whole, the court could not find express words of grant, nor could it find an adequate description of the subject matter of the deed. No mention is made of the *Veal* doctrine that essentially presumes an intent to convey from the language of a community lease or a pooling or unitization agreement, which usually does not contain express orders of grant either. Nonetheless, the result in *Atlantic Richfield* shows that the cross-conveyance theory will not be blindly followed when there is clearly no intent to convey a mineral or royalty interest. While community leases, pooling clauses, and pooling and unitization agreements create a presumed intent to cross-convey, joint operating agreements between lessees do not. The Texas Supreme Court did not disturb the finding of the Court of Civil Appeals that no cross-conveyance took place. It reversed the lower court's application of an implied covenant to the agreement since it determined that express covenants governed the parties' relationship, preempting the use of implied covenants.

While joint operating agreements may not necessarily invoke the cross-conveyance doctrine, that is not to say that such agreements do not create a cotenancy relationship between the working interest owners. A number of Texas cases reinforce the view that the working interest owners are co-tenants. n188.1

A second case that distinguished *Veal* raises some interesting questions. In *Puckett v. First City National Bank of Midland,* n189 the lessor's royalty interest was pooled by the lessee into two separate gas production units. Gas from both units was subject to split stream sales, some being sold at higher intrastate prices, and some at lower interstate prices. The weighted average sale price of plaintiff's lease was lower than the other lessee's overall weighted average sale price. Nonetheless, the plaintiff was receiving a royalty in excess of the sales price attributed to his acreage. Language in the lease and the division order as well as language in the operating agreement evinced an intent to pay the plaintiff based upon on the price received for the gas produced that was allocated to his tract. One of the arguments raised by the plaintiff was that the pooling agreement cross-conveyed the respective royalty interests under *Veal* so that the plaintiff was entitled to the overall weighted average of all sales from both units. The court dismissed this argument by stating that *Veal* dealt with indispensable parties and not the calculation of royalties from split stream gas sales out of a pooled unit. The better explanation offered by the court was that the parties' express language regarding the allocation of royalty evinced an intent not to effect a cross-conveyance as to payments of unitized royalty. n190

In *Parker v. HNG Oil Co.,* n190.1 the cross conveyance theory was apparently ignored in a situation in which it otherwise might have applied. A lease had been executed in 1973 covering approximately 93 acres. Almost 24 acres were committed to an oil unit where there was an existing producing well. The original lessee assigned the lease, retaining an overriding royalty. In 1982 the lessors sought a release of the lease as to all non-pooled acreage. HNG mistakenly issued a release covering the entire 93 acres while other working interest owners only released the acreage outside of the pooled unit. The lessors brought this action to have HNG's affidavit claiming an interest in the 24 acres inside the pooled unit removed from the county records as a cloud on its title. HNG counterclaimed seeking reformation of the release. Neither litigant would be interested in having the lawsuit dismissed for lack of joinder of indispensable parties. The lessors wanted to have the affidavit removed from the title records, and the lessee wanted to quiet title and reform the written release instrument. While the status quo may have favored the lessee's position, undoubtedly it wanted the title issue resolved rather than wait for a new lawsuit to be filed.

Since this litigation involves title to a pooled interest, *Veal* would seemingly be applicable and if followed, would require that all of the other working interest owners in the pooled unit be joined as indispensable parties. Apparently, neither of these two parties raised the issue given the nature of the dispute, so the court did not deal with the *Veal* requirement of joining all of the other pooled unit owners. On the merits, the case was resolved in favor of HNG since it met the two pronged test for reformation of a written instrument, to wit, the true agreement of the parties is shown and the provision was erroneously entered by mutual mistake.

The unexplored issue of indispensable parties and the *Veal* cross conveyance rule raise some interesting questions. It is clear that the owners of the pooled unit production, and more specifically, the assignee of HNG's leasehold interest, have an interest in the outcome of the litigation. The overriding royalty amounted to 30% of all oil and gas produced after lessor royalties were paid. Why the original lessors wanted to terminate the interest was unclear. Their landowner royalty was unaffected by the override. But the assignee who was obligated to pay the override was clearly an interested, and probably an indispensable, party since it was out of their share that the override was being taken. The other working interest owners in the pooled unit would have been greatly affected by the litigation if they were sharing the cost of the override. They were still interested since if the lease was terminated, in theory an unleased mineral owner would now be part of the mix of owners. Since the well was off of the leasehold acreage, it can be presumed that the lessors would ratify the pooling, otherwise they would lose the right to share in the production from the pooled unit well.

### [3] Undecided States

### [a] Louisiana

The early Louisiana decisions would support the cross-conveyance theory, but more recent decisions suggest Louisiana would be more properly considered a contract theory state. In *Martel v. A. Veeder Co.,* n191 the court in dictum stated that if the instruments had been effective to pool the royalty interests, then an exchange of those mineral rights would have occurred. Since the court had found that the instruments did not constitute a community lease, the discussion on a possible cross-conveyance was dictum. n192

A clearer statement opting for the cross-conveyance doctrine was made in *Coyle v. North American Oil Consolidated.* n193 The issue was clearer because the necessary and indispensable party doctrine was involved in the decision. The plaintiff used an abandonment theory in seeking to cancel a lease as to certain formations. The trial court found no abandonment was proven, partially on the basis that the evidence was not clear that there was more than one producing sand. However, the court said that even if the trial court had determined that there had been an abandonment of one of the horizons, it would have been powerless to order the lease canceled because that acreage had been pooled, and the other royalty owners were not served as defendants in the lawsuit. n194 The case was remanded for reconsideration of the abandonment evidence for one of the formations, with the requirement that all parties to the pooling agreement be joined so that the plaintiff's attempt to terminate the pooling agreement for his claimed interest could be adjudicated. On a motion for rehearing both the plaintiffs and defendants argued that it was not necessary to serve all of the other royalty-and working-interest owners. The court refused to repudiate the language of its original opinion regarding the necessity to join those parties, but it otherwise found that the parties to the lease never intended to treat the separate horizons as segregated portions of the lease, which could be individually abandoned. The choice of the cross-conveyance theory was not clearly decided because of the presence of an alternative rationale for the decision.

The clearest statement by a Louisiana court that it has opted for the cross-conveyance doctrine came in *Vizier v. Howard.* n195 The plaintiffs owned several non-contiguous tracts that they alleged had been included in a community lease that entailed approximately thirty additional tracts of land. The plaintiffs were seeking an accounting for unpaid royalties and an order terminating the lease. The trial judge issued a preliminary order requiring the plaintiff to join the owners from the thirty additional tracts or face dismissal of the lawsuit. The plaintiffs responded by attempting to convert their lawsuit into a class action representing all of the royalty owners in the communitized leasehold area. That was held by the trial court to be insufficient, and the judge dismissed the petition. The Court of Appeals accepted without question the propriety of the preliminary order demanding that all communitized lessors be joined. Its opinion was solely concerned with the legitimacy of the class action sought by the plaintiffs. Obviously, the Court of Appeals agreed that the communitized lessors are either necessary or indispensable, which lends support to the adoption of the cross-conveyance theory for community leases. The opinion, however, cites no cases to support the view that Louisiana has opted for that theory.

Two later cases, however, suggest that Louisiana is either opting for a contract theory or is making the determination of whether the non-joined parties are indispensable on the merits of each case, without regard for either of the contract or cross-conveyance theories. In *Melancon v. Texas Co.,* n196 the lessor sought cancellation of a lease when the lessee, who was apparently trying to coerce the lessor to approve a pooling or unitization agreement, withheld royalty payments that were properly due and owing. The lease contained a pooling clause with limited pooling to 40 acres. The clause was exercised, a pooled unit was created, and a producing well was placed on the unit. However, the lessee wanted the lessor to agree to a revision of the unit that would be larger than that authorized by the pooling clause. Other royalty interest owners were joined as parties defendant. The court recognizes that those other owners were necessary parties and, if not joined, the suit could not continue. n197 The court did not state if it was adopting either a contract or cross-conveyance theory, but regardless of the choice of theories the other royalty owners would be affected by the outcome of the litigation, because the plaintiff was seeking to terminate both the lease and the pooling.

In *Mallett v. Union Oil & Gas Corp. of Louisiana*, n198 the plaintiff was seeking to terminate the lease in question because of a lack of production at the end of the primary term. The lease contained a pooling clause, and near the end of the primary term the lessee pooled part of the plaintiff's acreage with adjacent acreage that already had a producing well located thereon. The court determined that the pooling clause only contemplated pooling with undeveloped lands, and therefore the pooling that was accomplished was beyond the lessee's authority. n199 If the cross-conveyance theory was applied, then the other royalty owners in the pooled unit would be indispensable parties. There was no indication in the opinion that the other owners were joined. The lessee apparently chose not to argue the cross-conveyance theory as a means of having the plaintiff's complaint dismissed.

### [b] Montana

Montana, like Louisiana, has reached some inconclusive results in several cases regarding the application of the cross-conveyance or contract theories. In *Toomey v. State Board of Land Commissioners,* n200 the plaintiff taxpayer sought to enjoin the state from entering into a unitization agreement that would pool state lands with private lands. The plaintiff urged, among other arguments, that the unitization would effectively cross-convey a fractional royalty interest from the state to the other private unitization owners, which would violate a restriction against the barter of public lands. The court rejected the argument but stated that the reason for the rejection was the fact that ownership of the gas was an incorporeal interest subject to the rule of capture. Since the state did not own the gas in place, there was no barter. While that argument may not be persuasive, one possible explanation of the holding is that the court did not believe the state was conveying its royalty interest by virtue of executing a unitization agreement. n201

In *Nadeau v. Texas Co.,* n202 a similar inference could be reached from a small part of a decision that relied on other grounds to reach its result. The plaintiff and defendant were rival claimants to oil and gas leases on the same land. The defendant had apparently signed a pooling agreement, and the other parties to the agreement had not been joined. The court dismissed the argument that the non-joined parties were indispensable by simply concluding that the controversy did not affect their rights but merely involved the validity of the lease. That conclusion is clearly erroneous since if the defendant lost, the other parties who agreed to pool their interests and apportion their royalties would have their interests substantially changed by the removal of the leased lands from the pooled unit. Again, no direct mention was made to the contract or cross-conveyance theories, and the point was the last of many that the court rejected in finding for the plaintiff. n203

Finally, in a Ninth Circuit decision ostensibly applying Montana law, the court developed at least four different answers to the question of why unitized royalty owners were not necessary or indispensable parties to a lawsuit when a lessor sought to invalidate a lease that had previously been committed to the unit. The case of *Stumpf v. Fidelity Gas Co.* n204 is a practitioner's nightmare and a law professor's dream. The facts were relatively simple. The plaintiff claimed that the lease he originally executed to the defendant had terminated for lack of production at the end of the primary term. Due to alleged fraud by the lessee, the plaintiff did not complain about the termination of the lease until well after the

primary term had expired. In the meantime the defendant lessee had, pursuant to a leasehold pooling clause, entered into a pooling agreement with another lessee who became the operator of the unit.

The defendant alleged that the suit must be dismissed because the plaintiff had not joined any of the pooled royalty owners who, he claimed, were indispensable parties. The court rejected that argument but the precise reason for the rejection is difficult to discern. The court seemingly rejects the *Veal* cross-conveyance doctrine, which it discusses at great length. However, the rejection of *Veal* may in part be based on the fact that *Veal* involved a community lease, and this case involved a pooling clause and pooling agreement. A second explanation is that the court is applying the *Nadeau* rationale that litigation between a lessor and lessee has no effect whatsoever on the other pooled royalty owners. As discussed earlier, the argument also lacks much merit. n205 On rehearing, the court realized that the termination of the lease would affect the non-joined owners, because the modified opinion concluded that the unitization agreement could not be revoked by the plaintiff because the disputed interest was validly committed to the unit when the agreement was executed. n206 Under *Erie,* the court was required to apply the law of Montana. *Nadeau* and *Toomey* are both decisions of the Montana Supreme Court that must be applied by the federal court. They suggest that pooling and unitization agreements are not cross-conveyances. Thus the court's analysis of *Veal* should have focused on whether the Montana Supreme Court would follow *Veal,* rather than the results suggested by *Nadeau* and *Toomey*.

The third explanation given by the court arises from the notice and demand clause contained in the lease. In the per curiam opinion on rehearing the court for the first time suggested that the lessee's power to pool could not be terminated unless the lessor complied with the notice and demand provisions of the lease. But that misstates the law as it relates to the termination of leases at the end of the primary term for lack of production. Montana, like most states, treats the habendum clause of a lease as a common-law fee simple determinable estate. Thus, it automatically terminates at the end of the primary term unless there was production, or the terms of a savings provision (such as a continuous operations clause) were met. n207 Normally, a lessor does not have to send notice, and demand a cure to the problem of lack of production when the primary term has expired. n208 Thus, one should question the reasons presented by the court in its opinion on rehearing.

A fourth explanation for finding the non-joined parties not indispensable was a specific provision of the unitization agreement that stated: "That nothing herein contained shall be construed as affecting or passing title to any lands, leases, or permits, but the Operator shall acquire operating rights only." n209

Finally, the holding is also based on *Hudson v. Newell,* n210 where when the plaintiffs disclaimed any right to change the nature of the unit agreement if they prevailed, the remaining royalty-and working-interest owners were held not to be indispensable parties. n211

Thus, the state of the law in Montana is unclear at best. Since all three decisions applying Montana law refused to find that pooled or unitized royalty owners were indispensable parties to litigation not directly involving the pooling or unitization agreement it might be inferred that Montana has in effect adopted a contract theory for unitized titles.

### [c] Pennsylvania

A very early case involving a coal lease suggests that Pennsylvania might follow a contract theory approach to the issue of the nature of the unitized title. In *Coolbaugh v. Lehigh & Wilkes-Barre Coal Co.,* n212 a coal lease covered two adjacent lots, numbers 28 and 29. An apportionment of royalties clause was contained in the joint lease. Eventually Lot 28 was sold, and the issue before the court was whether the grantor retained any share of the apportioned royalties from Lot 29 production. The court answered the question in the negative and suggested that the joint lease did not affect the "estates" of the individuals who contributed to the lease. The court suggested that the "titles remained distinct as they were before ... ." n213 Though it is weak authority, it again suggests that the court would not treat the signing of a community lease as a transfer of estates between the joint signers.

**FOOTNOTES:**

(n1)Footnote 101.  *Hover v. Cleveland Oil Co., 150 Kan. 531, 95 P.2d 264 (1939)* .

(n2)Footnote 102.  The exact language used by the court is as follows:

The very essence of the agreement was that the contracting parties were owners of adjacent properties suitable to be explored and exploited for oil and gas, and that any resulting royalties should be divided proportionately to their respective acreage. When the Hovers parted with their property what did they have to contribute to the common pool of possible royalties? Nothing. The agreement had quite properly provided the oil royalties should be shared until it was changed by the parties. But that result would follow when they sold their property if the agreement had not mentioned it.

*95 P.2d at 266* .

(n3)Footnote 103.  *Kenoyer v. Magnolia Petroleum Co., 173 Kan. 183, 245 P.2d 176, 1 O.&G.R. 1126 (1952)* .

(n4)Footnote 104.  For a discussion of the rule problem as it applies to pooling clauses, see *§ 8.07 above*.

(n5)Footnote 105.  *245 P.2d at 179, 10 O.&G.R. at 1131* . There are some ambiguities in the language just quoted. Are the pooling provisions contained in the transfer of a property interest (the lease) totally contractual in nature, or are they possibly in the nature of real covenants? The court does not delve into that murky area. In addition, the court's conclusion could simply be based on a traditional property-based theory that a pooling power is not the creation of a contingent future interest, and, therefore, the rule is simply not applicable.

In *Rosenbaum v. Texas Energies, Inc., 241 Kan. 295, 736 P.2d 888, 96 O.&G.R. 259 (1987)* the Kansas Supreme Court eschewed placing a label on the rights created by a unitization or pooling agreement, merely concluding that "Creation of a valid unit would create vested rights ... " *736 P.2d at 893* . Here the plaintiffs were seeking to stop their lessee from de-unitizing a unit because the lessee did not have the power to unitize the other joined interests. The court concluded that the other royalty owner's interests were not subject to a valid unitization clause and therefore there was never a valid unit created. Because no unit had been created no vested rights came into existence, and plaintiffs had no authority to challenge the de-unitization.

The court in *Coulter v. Anadarko Petroleum Corp., 1999 U.S. Dist. LEXIS 19817* (D. Kan. Oct. 8, 1999) (unpublished opinion) did not analyze *Kenoyer* or *Hover* when it decided not to aggregate the claims of royalty owners to pooling agreements in order to meet the federal jurisdictional requirement of having a minimum of $75,000 in damages. The court seemingly ignored the ramifications of the execution of the pooling agreement setting forth both a royalty fraction and a royalty calculation methodology that was binding on all signatory parties.

(n6)Footnote 106.  *Lusk v. Green, 1926 OK 169, 114 Okla. 113, 245 P. 636 (1926)* .

(n7)Footnote 107.  *245 P. at 637* .

(n8)Footnote 108.  L. Hoffman, *Voluntary Pooling and Unitization* 158-159 (1954) reads the *Lusk* case as supporting the cross-conveyance theory.

(n9)Footnote 109.  *Amis v. Bryan Petroleum Corp., 1939 OK 192, 185 Okla. 206, 90 P.2d 936 (1939)* . Amis involved the general validity of a municipal compulsory pooling statute. The Oklahoma City ordinance authorized its Board of Adjustment to force-pool mineral and/or royalty interests before it would authorize the issuance of a drilling permit. While having no trouble upholding the constitutionality of the ordinance, the court added the following language regarding the effect of the ordinance on the title of the parties who were force-pooled:

Here the city created the relationship as it now exists between the parties ... . The relationship in the nature of a tenancy in common resulted merely as an incident to the application of the city's police powers. The tenancy owes its existence to those powers and is entirely subject thereto. The parties cannot successfully assert their common law rights as tenants in common, for such a tenancy did not exist.

*90 P.2d at 939* .

Since tenancies in common require that a property interest be conveyed by one party to that party and another or to two other persons, the clear implication of the language cited above is that a pooling of mineral and/or royalty interests involves just such a conveyance.

(n10)Footnote 110.  *Griswold v. Public Service Co., 1951 OK 342, 205 Okla. 412, 238 P.2d 322, 1 O.&G.R. 108 (1951)* , *Brazell v. Brown, 1934 OK 520, 169 Okla. 623, 38 P.2d 17 (1934)* .

(n11)Footnote 111.  *See § 19.01[2][b][ii] supra* for a discussion of other cases dealing with Statute of Frauds problems.

(n12)Footnote 112.  *Sinclair Crude Oil Co. v. Oklahoma Tax Commission, 1958 OK 110, 326 P.2d 1051, 9 O.&G.R. 613 (Okla. 1958)* .

(n13)Footnote 113.  All parties conceded that without the unitization agreement the Indian allottees' royalty payments would be exempt from state taxation under the federal Cherokee Allotment Act.  *326 P.2d at 1051* .

(n14)Footnote 114.  *326 P.2d at 1055* .

(n15)Footnote 115.  *326 P.2d at 1056* . While there were some words of grant in the unitization agreement, they related solely to the granting of easements of rights of way over the surface estate in order to carry out the joint operations of the unit. That grant was considered separate and distinct from the overall purpose of the unitization agreement.

(n16)Footnote 116.  *326 P.2d at 1055* .

(n17)Footnote 117.  *326 P.2d at 1056-1057* . The court was aware that both Texas and California had adopted a cross-conveyance theory for similar language in pooling or unitization agreements. It nonetheless rejected that approach for the contract theory largely on the basis of the arguments presented by Leo Hoffman in his early work. L. Hoffman, *Voluntary Pooling and Unitization* (1954). Hoffman argued that the adoption of the cross-conveyance theory was dictum in the two major Texas cases embracing the concept. In addition, he supported the emphasis of the Oklahoma Supreme Court in its conclusion that parties who enter into pooling or unitization agreements do not intend to effect a cross-conveyance of their mineral or royalty interests. Hoffman, *op cit.* at 160. Finally, the court felt that the weight of persuasive authority favored adoption of the contract doctrine, although in its string citation of cases to support that conclusion the court includes some questionable authority. *See, e.g., Arkansas Louisiana Gas Co. v. Southwest Natural Production Co., 60 So. 2d 9, 221 La. 608, 1 O.&G.R. 1186 (1952)* ; *Shell Petroleum Corp. v. Calcasieu Real Estate & Oil Co., 185 La. 751, 170 So. 785 (1936)* ; and *Coolbaugh v. Lehigh & Wilkes-Barre Coal Co., 218 Pa. 320, 67 A. 615 (1907)* . The authors have classified both Louisiana and Pennsylvania as states that have taken ambiguous positions on the adoption of the contract or cross-conveyance theories. *See § 19.02[3][a]* and *[c] infra.* The court also cites *Kenoyer v. Magnolia Petroleum Co., 173 Kan. 183, 245 P.2d 176, 1 O.&G.R. 1126 (1953)* , which is explained in *§ 19.02[1][a] supra*  is very weak support for the adoption of the contract doctrine.

(n18)Footnote 118.  *Garvin v. Pettigrew, 1958 OK 158, 350 P.2d 970, 13 O.&G.R. 992 (Okla. 1958)* , *cert. denied, 364 U.S. 823, 81 S. Ct. 58, 5 L. Ed. 2d 52 (1960)* .

(n19)Footnote 119.  *350 P.2d at 972* . The agreement stated:

> It is agreed by and between all of the parties hereto that this contract shall in no wise interfere with or divest any party thereto of the right to separately lease his or her part of the lands hereinbefore described, for oil and gas purposes, and that the several interests set apart to each of the parties hereto, ... shall not attach to the royalties from oil and gas until oil and gas ... has been produced from the above described lands belonging to each of the other parties hereto.

> *Id.*

(n20)Footnote 120.  *See* n.119 *supra.* For a discussion of *Hover, see § 19.02[1][a] supra.*

(n21)Footnote 121.  Professors Williams and Meyers argue that *Garvin* can be read as interpreting pooling agreements to create appurtenant rights to the parties that attach to the lands that are contributed. Since the rights are appurtenant, only those who own the lands or interests contributed to the unit can claim an apportioned share of unit production. This would contrast with a finding that the rights created are in gross or personal to the contributing party, which would remain in the grantor unless expressly mentioned in a grant of the underlying interest, notwithstanding his transfer of the contributed mineral or royalty interest. 6 Williams & Meyers, *Oil & Gas Law* 572.1 (1988).

(n22)Footnote 122.  *350 P.2d at 974* . Lewis Mosburg, Jr., who wrote the Discussion Notes in this case, also opined that it was the death of the cross-conveyance theory in Oklahoma. But he was concerned by the lack of a strong statement by the majority that it was rejecting the cross-conveyance theory in general, as opposed to not applying it in this case because of the language of the agreement. *Discussion Notes, 13 O.&G.R. 1008-12* .

(n23)Footnote 123.  Again the Discussion Notes by Mr. Mosburg raise that issue and for him raised the unsettling possibility that the issue had not really been decided. After all, it would have been easy for the court to have cited *Sinclair* rather than the specific agreement language in finding that there were only contractual rights transferred by virtue of the pooling agreement. *Discussion Notes 13 O.&G.R. 1010-11* .

(n24)Footnote 124.  *Tenneco Oil Co. v. District Court, 1970 OK 21, 465 P.2d 468, 36 O.&G.R. 441 (Okla. 1970)* .

(n25)Footnote 125.  The court reiterated its support for the view that a compulsory pooling or unitization order does not create a cotenancy.  *Wakefield v. State, 1957 OK 10, 306 P.2d 305, 7 O.&G.R. 291 (Okla. 1957)* ; *Amis v. Bryan Petroleum Corp., 1939 OK 192, 185 Okla. 206, 90 P.2d 936 (1939)* . The language of the compulsory pooling statute in Oklahoma also supports the contract theory since it provides that there is no vesting or transfer of title by virtue of the compulsory pooling order. *Okla. Stat. Ann. tit. 52, § 287.9.*

  The *Tenneco Oil* and *Wakefield* analysis that a compulsory pooling order does not create a cotenancy relationship between the parties was followed in *Schulte v. Apache Corp., 1991 OK 61, 814 P.2d 469, 113 O.&G.R. 336 (Okla. 1991)* , *on later appeal, 949 P.2d 291 (Okla. 1995)* .

(n26)Footnote 126.  The court only cited *Sinclair Crude Oil* and L. Hoffman, Voluntary Pooling and Unitization (1954) in support of its holding. Neither *Lusk* nor *Garvin* was mentioned.  *465 P.2d at 468* .

(n27)Footnote 127.  *465 P.2d at 470* .

(n28)Footnote 128.  The unit operator had also claimed that the partition action was a collateral attack on the Corporation Commission order approving the unit. It was an attempt to dissolve the unit without going through the Corporation Commission. Professor Kuntz in the Discussion Notes following this case in the Oil and Gas Reporter suggests that since the agreement, in order to be approved, required a provision for unit dissolution, the commission would still have authority to dissolve the unit upon the petition of an interested party. *Discussion Notes, 36 O.&G.R.*

*445-447* .

(n29)Footnote 129.  *See § 12.03[1][a] supra,* which discusses the Oklahoma compulsory pooling system.

(n30)Footnote 130.  *Ranola Oil Co. v. Corporation Commission, 1988 OK 28, 752 P.2d 1116, 98 O.&G.R. 336* .

(n31)Footnote 131.  *Southern Union Production Co. v. Eason Oil Co., 1975 OK CIV APP 48, 540 P.2d 603, 53 O.&G.R. 62* .

(n32)Footnote 131.1.  *Unit Petroleum Co. v. Mobil Exploration & Production North America, Inc., 2003 OK CIV APP 95, 78 P.3d 1238, 157 O.&G.R. 908* , *cert. denied.*

(n33)Footnote 131.2.  The gas balancing aspects of this case are analyzed at *§ 19.05[1] below* .

(n34)Footnote 131.3.  *Harrell v. Samson Resources Co., 1998 OK 69, 980 P.2d 99, 142 O.&G.R. 62* .

(n35)Footnote 132.  *Phillips Petroleum Co. v. Peterson, 218 F.2d 926, 4 O.&G.R. 746, 4 O.&G.R. 756 (10th Cir. 1954)* , *cert. denied, 349 U.S. 947, 75 S. Ct. 871, 99 L. Ed. 1273, 4 O.&G.R. 1178 (1955)* .

(n36)Footnote 133.  *218 F.2d at 930* .

(n37)Footnote 134.  The 10th Circuit stated:

> Section 12 [the pooling clause] does not violate the rule against perpetuities, unless the unitization or pooling agreement accomplishes transfers of interests in real property, or, otherwise stated, effects cross-transfers of property interests among the parties to the agreement ... . Thus, it appears that the effect of unitization was to be only with respect to allocation of production and the computation of royalties and was not to effect cross-transfers of royalty interests ... .

> Moreover, an intent that there shall be no cross-transfers of royalty interests may be derived from a provision that proportions of the unit production shall be allocated to the respective tracts and that the portion so allocated to each tract shall be treated as if it had actually been produced from said tract.

*218 F.2d at 930-931* .

(n38)Footnote 135.  *218 F.2d at 931* . *See, e.g., Kenoyer v. Magnolia Petroleum Co., 173 Kan. 183, 245 P.2d 176, 1 O.&G.R. 1126 (1952)* ; *Coolbaugh v. Lehigh & Wilkes-Barre Coal Co., 218 Pa. 320, 67 A. 615 (1907)* ; *Lynch v. Davis, 79 W. Va. 437, 92 S.E. 427 (1917)* . The court did note that there was contrary authority principally in Texas and California and suggested that the Texas rule is different because Texas has adopted ownership-in-place theory for oil and gas. Such a rationale would not explain why California adopted the cross-conveyance theory, for it is a non-ownership jurisdiction. The court ultimately selected the contract theory, not because of the way the state classifies the ownership of oil and gas but because it is "supported by well-reasoned and more persuasive authority." *Id.*

The nature of unitized titles was explored in depth by the Utah Supreme Court in *Dye v. Miller & Viele, 587 P.2d 139, 63 O.&G.R. 136 (Utah 1978)* . The plaintiff and defendants disputed the title to certain lands. The plaintiff claimed through a chain of title tracing back to a 1927 tax deed. The defendants' claim was based on a 1928 sheriff's deed and by title through adverse possession. Their allegations relating to adverse possession were supported by the defendants' execution of a voluntary pooling agreement more than four years prior to the onset of this litigation. There had been production from a well on the unit but off of the disputed acreage. The evidence showed that the defendants were never in actual possession of the disputed acreage. The defendants' argument was that the pooling agreement and the off-acreage unit activities constituted constructive possession of the disputed lands. If the court had followed a

cross-conveyance theory, one might be able to argue constructive possession since the defendants would have in effect conveyed a fractional share of the royalty interest in the lands described in the 1928 royalty deed. The court, however, rejected that claim, not on the basis of the contract doctrine, but on the general proposition that actual possession cannot be claimed by remote control, *citing Phillips Petroleum Co. v. Peterson, 218 F.2d 926, 4 O.&G.R. 746, 4 O.&G.R. 756 (10th Cir. 1954)* , *cert. denied, 349 U.S. 947, 75 S. Ct. 871, 99 L. Ed. 1273, 4 O.&G.R. 1178 (1959)* . One could argue that if the defendants had in effect conveyed their royalty interest they would meet the requirement of constructive possession. The more difficult problem of attributing the actual possession of the premises to the off-premises activity of the pooled unit operator would still face the claimant.

(n39)Footnote 136.  *Lynch v. Davis, 79 W.Va. 437, 92 S.E. 427 (1917)* .

(n40)Footnote 137.  For a complete discussion of community leases, *see § 7.03[1] supra.*

(n41)Footnote 138.  *92 S.E. at 430* . The language of the court is somewhat confusing and contradictory. It stated:

> It is contended by appellee [drillsite owner] that to place this construction [non-apportionment] upon the contract involved in this case would, in effect, convey a part of the real estate of Lola M. Davis to her sisters, when there is in the lease no words which would effect such a conveyance. This argument is not well founded. The interpretation we give the contract, instead of having the effect declared, has the effect of preventing one of the parties from securing a part of the estate of the others without procuring a conveyance ... .

*Id.* The authors would not read the above paragraph as indicating a clear rejection of the cross-conveyance theory for community leases. For a contrary view, *see* L. Hoffman, *Voluntary Pooling and Unitization* 165-166 (1954).

(n42)Footnote 139.  There is some contrary language in a case decided one year later, *Pittsburgh & West Virginia Gas Co. v. Ankrom, 83 W.Va. 81, 97 S.E. 593, 596 (1918)* , which suggests that the community lessors may be tenants in common, a status that is only available if the community lease is treated as involving a conveyance of the respective royalty interests.

(n43)Footnote 140.  *Boggess v. Milam, 127 W.Va. 654, 34 S.E.2d 267 (1945)* .

(n44)Footnote 141.  *34 S.E.2d at 270* . The court said:

> In our opinion, the so-called unitization agreement does not effect a merger of title ... . It consolidates only the contractual interests under the leases to the United Fuel Gas Company. Boggess, having refused to become a party to the lease ..., acquired no contractual right subject to merger, and by remaining aloof, both from the lease and the unitization agreement, neither instrument affected his interest, either favorably or unfavorably.

*Id.*

(n45)Footnote 142.  *Bayside Land Co. v. Dabney, 90 Cal. App. 122, 265 P. 564 (1928)* .

(n46)Footnote 143.  *Jameson v. Chanslor-Canfield Midway Oil Co., 176 Cal. 1, 167 P. 369 (1917)* .

(n47)Footnote 144.  The court said: "Another feature of the *Jameson Case ( 176 Cal. 1 (1917))* will serve to distinguish it from the case presented here. In that case the lessors were all tenants in common of the entire tract leased ... . The relation of tenants in common between the corporation [plaintiff] and the subsequent lessors did not exist ... ." *265 P. at 566* .

(n48)Footnote 145.  In addition to *Bayside Land,* several later California decisions relating to the tax consequences of a pooling or unitization agreement also reached results that were more consistent with a contract theory than a cross-conveyance theory. But these cases were decided long after the strong commitment was made by the California Supreme Court to the cross-conveyance theory. *Compare Belridge Oil Co. v. Commissioner, 27 T.C. 1044, 7 O.&G.R. 673 (1957)* , *aff'd sub nom. Commissioner v. Belridge Oil Co., 267 F.2d 291, 7 O.&G.R. 673, 10 O.&G.R. 662 (9th Cir. 1959)* and *Whitwell v. Commissioner, 257 F.2d 548, 9 O.&G.R. 445 (9th Cir. 1958)* , *with Tanner v. Olds, 29 Cal. 2d 110, 173 P.2d 6 (1946)* and *Tanner v. Title Insurance & Trust Co., 20 Cal. 2d 814, 129 P.2d 383 (1942)* .

(n49)Footnote 146.  *Tanner v. Title Insurance & Trust Co., 20 Cal. 2d 814, 129 P.2d 383 (1946)* .

(n50)Footnote 147.  *129 P.2d at 386* . The court went on to add that the interest assigned was an in gross incorporeal hereditament in keeping with California's view that ownership of oil and gas is also an incorporeal hereditament.

(n51)Footnote 148.  For other cases following the *Tanner* conclusion, *see Tanner v. Olds, 29 Cal. 2d 110, 173 P.2d 6 (1946)* ; *Howard v. General Petroleum Corp., 108 Cal. App. 2d 25, 238 P.2d 145, 1 O.&G.R. 10 (1951)* , *on second appeal, 114 Cal. App. 2d 91, 249 P.2d 585, 1 O.&G.R. 1579 (1952)* , and *Friedrich v. Roland, 95 Cal. App. 2d 543, 213 P.2d 423 (1950)* .

(n52)Footnote 149.  *Southern California Title Clearing Co. v. Laws, 2 Cal. App. 3d 586, 83 Cal. Rptr. 8, 34 O.&G.R. 507 (1969)* .

(n53)Footnote 150.  For a discussion of how the cross-conveyance and contract doctrines effect the joinder of parties, including the principle of necessary and indispensable parties, *see § 19.01[2][a][i] supra.*

(n54)Footnote 151.  *83 Cal. Rptr. at 10* . The court also relies on a hard rock mineral partition case that raised similar issues. In *Hardie v. Chew Fish Yuen, 258 Cal. App. 2d 301, 65 Cal. Rptr. 594, 28 O.&G.R. 1 (1968)* , a hard rock mineral lease covered two separate parcels. The original lease had been executed by the mineral estate owners of one parcel, but on the second parcel only half of the mineral estate was clearly leased. The other half of the second parcel was only leased by the life tenant. The remaindermen did not execute the lease. The plaintiff eventually acquired all of the interest in the second parcel and brought this quiet title action claiming that the lease of the half interest was void because the remaindermen were not joined, and it would thus constitute an act of waste. None of the owners of the first parcel was joined in the lawsuit. Without citing *Tanner* the court concluded that the owners of the interests in the first parcel were indispensable parties because the community lease effected a cross-conveyance of royalties between both parcels that would be detrimentally affected by the plaintiff's quiet title action. The omitted parties would have had a right to share in the royalties from leasehold production on the second parcel, and therefore no action seeking to terminate the second parcel lease could be brought unless all of the parties to the original community lease were joined.

(n55)Footnote 152.  *LeBard v. Richfield Oil Corp., 56 Cal. 2d 532, 15 Cal. Rptr. 617, 364 P.2d 449, 15 O.&G.R. 1 (1961)* .

(n56)Footnote 153.  *Cal. Pub. Res. Code § 3608. See § 30.05A infra.*

(n57)Footnote 154.  Had the plaintiff prevailed on this issue, she would have been out of court in any event since under the rule of indispensable parties she would probably have had to join all of the other royalty owners in litigating the ownership rights that she claimed she owned. *See Southern California Title Clearing Co. v. Laws, 2 Cal. App. 3d 586, 83 Cal. Rptr. 8, 34 O.&G.R. 507 (1969)* .

(n58)Footnote 155.  *15 Cal. Rptr. at 617* .

(n59)Footnote 156.  *See § 19.01[3] supra.*

(n60)Footnote 157.  *15 Cal. Rptr. at 620* .

(n61)Footnote 158.  *Ragsdale v. Superior Oil Co., 40 Ill. 2d 68, 237 N.E.2d 492, 28 O.&G.R. 589 (1968) , rev'g, 85 Ill. App. 2d 467, 229 N.E.2d 299, 27 O.&G.R. 3 (1967)* .

(n62)Footnote 159.  The intermediate court relied on *Stumpf v. Fidelity Gas Co., 294 F.2d 886, 16 O.&G.R. 139 (9th Cir. 1961)* , in which the court had also found that the remaining pooled working-and royalty-interest owners were not indispensable parties. For a full discussion of *Stumpf, see § 19.01[2][a][i] supra.*

(n63)Footnote 160.  *237 N.E.2d at 494* . Note that the Illinois approach treats a pooling or unitization agreement as identical with the community lease. That is in sharp contrast with *LeBard v. Richfield Oil Corp., 56 Cal. 2d 532, 15 Cal. Rptr. 617, 364 P.2d 449, 15 O.&G.R. 1 (1961)* , which suggested that community leases and pooled units were different for purposes of applying the contract or cross-conveyance theories. *See § 19.02[2][a] supra.*

(n64)Footnote 161.  Two authorities well acquainted with Mississippi oil and gas law have also suggested that the cross-conveyance theory will probably be followed should the issue be raised. Custy & Knowlton, "Compulsory Field-Wide Unitization Comes to Mississippi," *36 Miss. L.J. 123, 135 (1965).*

(n65)Footnote 162.  *Merrill Engineering Co. v. Capital National Bank, 192 Miss. 378, 5 So. 2d 666 (1942)* .

(n66)Footnote 163.  *Hudson v. Newell, 172 F.2d 848* (5th Cir.) , *on reh'g 174 F.2d 546 (5th Cir. 1949)* . The *Hudson* case is also discussed in *§ 19.01[2][a][ii] supra,* in which the authors discuss the issue of indispensable parties, ratification of pooling unitization agreements, and the contract and cross-conveyance theories.

(n67)Footnote 164.  *172 F.2d at 852-853* . The court's use of the ownership-in-place theory is not critical to the court's conclusion that a cross-conveyance has occurred. California, as previously noted in the *Tanner* case, *§ 19.02[2][a] supra*  had also adopted the cross-conveyance doctrine even though it is a non-ownership theory state.

(n68)Footnote 165.  *174 F.2d at 546* . *See § 19.01[2][a][i] supra* for a more detailed analysis of the indispensable party issue.

(n69)Footnote 166.  *Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472 (1942)* . From its citation in other cases, it is clear that *Veal* has had a tremendous influence both in and out of Texas. For a complete discussion of *Veal, see § 19.01[2][a][i] supra*.

(n70)Footnote 167.  *159 S.W.2d at 476* .

(n71)Footnote 168.  *Belt v. Texas Co., 175 S.W.2d 622 (Tex. Civ. App. 1943)* , *writ ref'd*.

(n72)Footnote 169.  *See § 19.01[2][a][i]-[ii] supra* for a complete discussion of the indispensable party issue in the context of community leases and pooling and unitization agreements. As suggested therein, the real issue should not be the choice of theory but whether the non-joined parties are affected by the outcome. In *Belt,* the non-joined parties would not be affected and therefore they would not be indispensable.

(n73)Footnote 170.  *Brown v. Smith, 141 Tex. 425, 174 S.W.2d 43 (1943)* .

  The *Brown* commitment to the cross-conveyancing doctrine has been reaffirmed in *Browning Oil Co. v. Luecke, 38 S.W.3d 625, 634, 149 O.&G.R. 127* (Tex. App.--Austin 2000), *rev. denied*, , discussed in greater detail at *§ 8.05 above* ; *MCZ, Inc. v. Triolo, 708 S.W.2d 49, 52-53, 91 O.&G.R. 389* (Tex. App.--Houston [1st Dist.] 1986, writ ref'd n.r.e.) .

(n74)Footnote 171.  For a discussion of the problems relating to the issue of pooling non-executive interests, *see § 7.05 supra.*

(n75)Footnote 172. *174 S.W.2d at 46* . It is interesting to note that the *Brown* decision cited *Lusk v. Green, 1926 OK 169, 114 Okla. 113, 245 P. 636* , the early Oklahoma decision to support its conclusion that a cross-conveyance occurs merely upon the execution of a community lease. As seen earlier in *§ 19.02[1][b] supra* , Oklahoma has ignored the *Lusk* holding and adopted the contract theory as being applicable to the community lease or pooling and unitization agreement in the absence of language in the agreement to the contrary.

(n76)Footnote 173. The court reaffirmed its commitment to the cross-conveyance theory when it said:

> Had Mrs. Lee [the non-executive] ... joined in the execution of the oil and gas lease, she would have become a party to the pooling agreement contained in the lease and thereby, in effect, she would have conveyed to the owner of the 42.75 acres a part of her interest in the royalty in the 20 acres and would have become the owner of an undivided interest in the royalty in the 42.75 acres. Since Mrs. Lee did not join in the lease, the execution and delivery of it by [the executives] ... would neither divest her of any part of her royalty interest in the 20-acre tract nor vest in her any interest in the royalty in the 42.75-acre tract.

*174 S.W.2d at 46* .

(n77)Footnote 174. *Miles v. Amerada Petroleum Corp., 241 S.W.2d 822* (Tex. Civ. App.--El Paso 1950, writ ref'd n.r.e.) .

(n78)Footnote 175. *See also Rogers Nat'l Bank v. Pewitt, 231 S.W.2d 487* (Tex. Civ. App.--Texarkana 1950, writ ref'd) .

(n79)Footnote 175.1. In *MCEN 1996 Pshp. v. Glassell, 42 S.W.3d 262, 148 O.&G.R. 84* (Tex. App.--Corpus Christi 2001, rev. denied) , the court relied on *Montgomery v. Rittersbacher, 11 Tex. Sup. Ct. J. 186, 424 S.W.2d 210, 27 O.&G.R. 774 (Tex. 1968)* to conclude that the parties to a pooling agreement had cross-conveyed their respective interests. The court later concluded that the terms of the agreement had waived the pooled parties' power to partition the concurrently owned interest. *See § 19.01[2][a][iii] above*.

(n80)Footnote 176. *Renwar Oil Corp. v. Lancaster, 154 Tex. 311, 276 S.W.2d 774, 4 O.&G.R. 697 (1955)* .

*See also Wagner & Brown, Ltd. v. Sheppard, 198 S.W.3d 369* (Tex. App.--Texarkana 2006) ; *Kuklies v. Reinert, 256 S.W.2d 435, 2 O.&G.R. 794* (Tex. Civ. App.--Waco 1953, writ ref'd n.r.e.) .

(n81)Footnote 177. *276 S.W.2d at 776* .

(n82)Footnote 178. *Minchen v. Fields, 330 S.W.2d 683, 12 O.&G.R. 111 (Tex. Civ. App. 1959)* , aff'd in part, rev'd in part, *162 Tex. 73, 4 Tex. Sup. Ct. J. 198, 345 S.W.2d 282, 14 O.&G.R. 266 (1961)* .

(n83)Footnote 179. *Brown v. Smith, 141 Tex. 425, 174 S.W.2d 43* .

(n84)Footnote 180. *330 S.W.2d at 687* .

(n85)Footnote 181. *See § 19.01[2] supra.*

(n86)Footnote 182. *Texaco, Inc. v. Lettermann, 343 S.W.2d 726, 14 O.&G.R. 427 (Tex. Civ. App. 1961)* , *writ ref'd n.r.e.*

(n87)Footnote 183. The court said:

> However, our view is that if the 1957 and 1959 Units [the second units] were to be declared null and

void as to the appellees' interest as they do seek in count Nos. 1 and 3, this would have the effect of necessarily freeing appellees' land from these unitized units. In spite of appellees' argument to the contrary, we can not comprehend how, in such a situation, the other royalty owners' interest could not be affected. It seems clear that the rule laid down as to necessary parties in Veal ... would control in the case before us. Therefore if the 1957 and 1959 Units were to be declared null and void as to appellees' interest, which we do not so hold, the royalty owners under the other leases in the two unitized units would have such a royalty interest in the appellees' lease to make them necessary and indispensable parties.

*343 S.W.2d at 733-734* . For other Texas cases applying the cross-conveyance theory, *see Leach v. Brown, 251 S.W.2d 553, 1 O.&G.R. 1806 (Tex. Civ. App.--San Antonio 1950, writ ref'd)* , A federal case that followed *Veal was Whelan v. Placid Oil Co., 198 F.2d 39, 1 O.&G.R. 1453 (5th Cir. 1952)* . In *Matthews v. Landowners Oil Association, 204 S.W.2d 647 (Tex. Civ. App.--Amarillo 1947, writ ref'd n.r.e.)* , the cross-conveyance doctrine was applied to a landowners' royalty pool agreement. *See § 7.05[4] supra* for a discussion of landowners' royalty pools. In *Phillips Petroleum Co. v. Ham, 228 F.2d 217, 5 O.&G.R. 268 (5th Cir. 1955)* , the Fifth Circuit in applying the law of Texas found that the various interests in a communitization agreement are "homologated" into one lease, lending further support to the cross-conveyance theory.

(n88)Footnote 183.1. *Wagner & Brown, Ltd. v. Sheppard, 282 S.W.3d 419 (Tex. 2008)* , *rev'g 198 S.W.3d 369* (Tx. App.--Texarkana 2006) .

(n89)Footnote 184. *Kelln v. Brownlee, 517 S.W.2d 568, 50 O.&G.R. 548* (Tex. Civ. App.--Amarillo 1974, writ ref'd n.r.e) ,

(n90)Footnote 185. *Sohio Petroleum Co. v. Jurek, 248 S.W.2d 294, 1 O.&G.R. 977* (Tex. Civ. App.--Ft. Worth 1952, no writ) .

(n91)Footnote 186. The court's analysis, however, did not either distinguish *Veal* nor independently determine that the non-joined parties' interest were not indispensable. The court merely concluded:

We are of the opinion that the point is not well taken. Unitization is a conservation measure to permit economical and orderly development. The cases cited by appellants in support of their theory [cross conveyance] are: [ *Veal, Belt & French v. George, 159 S.W.2d 566 (Tex. Civ. App. 1942)* , *writ ref'd.* ] ... .

We are of the opinion that these cases are not in point and that the other land owners in this unit have acquired no such interest in Lot 3-B as to constitute them joint owners of the mineral interests thereunder. *248 S.W.2d at 298* .

(n92)Footnote 187. *See also Standard Oil Co. of Texas v. Marshall, 265 F.2d 46, 11 O.&G.R. 379 (5th Cir. 1959)* ; *Petroleum Producers Co. v. Reed, 135 Tex. 386, 144 S.W.2d 540* (Tex. Comm. App.) opinion adopted by the Texas Supreme Court (1940); *Gehrke v. State, 315 S.W.2d 684, 9 O.&G.R. 264* (Tex. Civ. App. San Antonio 1958; no writ) ; *Fussell v. Rinque, 269 S.W.2d 442* (Tex. Civ. App. 1954, writ ref'd n.r.e.) .

(n93)Footnote 187.1. The *Jurek* rationale was used by the 5th Circuit in *Howell v. Union Producing Co., 392 F.2d 95, 28 O.&G.R. 238 (5th Cir. 1968)* , to suggest that the cross-conveyance theory had to be tempered with doses of contractual analysis when it came to the effects or consequences of pooling. Although not vital to the decision, the court did suggest that the contract theory has some support in Texas, citing the *Jurek* decision. *392 F.2d at 103* [n.13 ].

(n94)Footnote 188. *Atlantic Richfield Co. v. Exxon Corp., 663 S.W.2d 858, 83 O.&G.R. 598* (Tex. Civ.

App.--Houston [1st] Dist. 3 1983) , *rev'd on other grounds, 28 Tex. Sup. Ct. J. 68, 678 S.W.2d 944, 83 O.&G.R. 623 (Tex. 1984)* .

(n95)Footnote 188.1. *See Rankin v. Naftalis, 21 Tex. Sup. Ct. J. 9, 557 S.W.2d 940, 946, 59 O.&G.R. 82 (Tex. 1977)* ; *Cass v. Stephens, 156 S.W.3d 38, 61, 160 O.&G.R. 27* (Tex. App.--El Paso 2004) ; *Donnan v. Atlantic Richfield, 732 S.W.2d 715, 717, 104 O.&G.R. 128* (Tex. App.--Corpus Christi 1987, writ denied) ; *Hamilton v. Texas Oil & Gas Corp., 648 S.W.2d 316, 321, 76 O.&G.R. 300* (Tex. App.--El Paso 1982, writ ref'd n.r.e.) .

(n96)Footnote 189. *Puckett v. First City Nat'l Bank, 702 S.W.2d 232, 90 O.&G.R. 144* (Tex. App. Eastland 1985, writ ref'd n.r.e.) .

(n97)Footnote 190. The court's statement was:

> the Pucketts argue that the pooling of their acreage resulted in a cross conveyance between all royalty owners under Veal v. Thomason, ... and, therefore, each royalty owner should be paid royalties based on the weighted average method. We disagree. The court in *Veal* was concerned with necessary parties. The court did not address the question of how to calculate royalties in a split stream sale of production from a pooled unit. Moreover, the Pucketts' lease specifically states that the entire acreage pooled in a unit shall be treated for all purposes, "except the payment of royalties on production from the pooled unit," as if it was included in the lease. The language of the lease shows an express intent not to effect a cross conveyance as to payments of royalty.

*702 S.W.2d at 237*

(n98)Footnote 190.1. *Parker v. HNG Oil Co., 732 S.W.2d 754, 97 O.&G.R. 429 (Tex. App. 1987)* .

(n99)Footnote 191. *Martel v. A. Veeder Co., 6 So. 2d 335, 199 La. 423 (1942)* .

(n100)Footnote 192. *See* L. Hoffman, *Voluntary Pooling and Unitization* 159 (1954).

(n101)Footnote 193. *Coyle v. North American Oil Consol., 9 So. 2d 473, 201 LA. 99 (1942)* .

(n102)Footnote 194. The court stated:

> we could not render judgment canceling the leases, for the reason that all of the parties who are at present interested in them are not before the court. It is alleged ... [that plaintiff's land] has been unitized with the 40 acres west of and adjacent to it by a pooling agreement entered into by the owners of mineral interests and royalties in these two 40's.

*9 So. 2d at 477* .

(n103)Footnote 195. *Vizier v. Howard, 165 So. 2d 655 (La. App. 1964)* .

(n104)Footnote 196. *Melancon v. Texas Co., 89 So. 2d 135, 230 La. 593, 6 O.&G.R. 623 (1956)* .

(n105)Footnote 197. *89 So. 2d at 146-147* .

(n106)Footnote 198. *Mallett v. Union Oil & Gas Corp. of Louisiana, 94 So. 2d 16, 232 La. 157, 7 O.&G.R. 434 (1957)* .

(n107)Footnote 199. *See* Chapter 8 *supra* for a complete discussion of leasehold pooling clauses.

(n108)Footnote 200. *Toomey v. State Bd. of Land Comm'rs, 106 Mont. 547, 81 P.2d 407 (1938)* .

(n109)Footnote 201. *81 P.2d at 415* . L. Hoffman, *Voluntary Pooling and Unitization* 159 [n.32] (1954).

(n110)Footnote 202. *Nadeau v. Texas Co., 104 Mont. 558, 69 P.2d 586 (1937)* .

(n111)Footnote 203.  The court said:

> it is contended that the action should have been abated until all of the persons who had signed the unit and pooling agreement ... were brought in as necessary parties ... . The controversy here was whether the lease of the defendant company was valid as against the plaintiff. No attempt was made to quiet the title of the plaintiff as against the whole world, or any person other than defendant ... . Hence, whatever rights may have been created by these negotiations and transactions ... could in no wise affect the rights of the plaintiff and, therefore, they are not necessary parties ... .

*69 P.2d at 592-593* . The court's language would suggest that the removal of acreage from a pooling or unitization agreement has no impact on the remaining parties. That would not be the case regardless of whether the agreements were treated as creating contractual rights or conveying property rights. The entire pooling or unitization agreement might be rendered economically useless, and, should there be existing production, it is clear that the apportionment fractions would be different if the leasehold acreage was involved. If the producing well was located on the withdrawn acreage, the impact on the remaining owners would be devastating.

(n112)Footnote 204. *Stumpf v. Fidelity Gas Co., 294 F.2d 886, 16 O.&G.R. 139 (9th Cir. 1961)* .

(n113)Footnote 205. *See* n.203 *supra* and *Nadeau v. Texas Co., 104 Mont. 558, 69 P.2d 586 (1937)* .

(n114)Footnote 206. *294 F.2d at 897-898* .

(n115)Footnote 207. *See generally* 3 P. Martin & B. Kramer, *Williams & Meyers, Oil and Gas Law § 604.1* (Matthew Bender).

(n116)Footnote 208.  4 P. Martin & B. Kramer, *Williams & Meyers, Oil and Gas Law § 682.2*, at 354.2-355 (Matthew Bender). There is a later Montana case that does apply the notice and demand clause to the payment of delay rentals, but it may have been an "or" lease rather than an automatically terminating "unless" lease. *Bingham v. Stevenson, 148 Mont. 209, 420 P.2d 839, 26 O.&G.R. 175 (1966)* .

(n117)Footnote 209. *294 F.2d at 895* . *See § 19.01[3] supra.* That section of the agreement also provided:

> That nothing herein contained, implied, or contemplated in relation hereto shall create or be deemed to create a partnership between the parties hereto, but they shall each hold their respective right, titles, and interests in their respective tracts according to existing leases, permits, operating agreements, and gas purchase or sales contracts and any extensions, renewals, substitutions, or modifications thereof, unchanged, except as to the right of the Operator to operate Unit No. 7.

*Id.* at 894-895 .

(n118)Footnote 210. *Hudson v. Newell, 172 F.2d 848* (5th Cir.) , *on reh'g, 174 F.2d 546 (5th Cir. 1949)* . *See § 19.01[2][a][ii] supra.*

(n119)Footnote 211.  For a discussion of Hudson, *see § 19.01[2][a][ii] supra.*

(n120)Footnote 212. *Coolbaugh v. Lehigh & Wilkes-Barre Coal Co., 218 Pa. 320, 67 A. 615 (1907)* .

(n121)Footnote 213. *67 A. at 615* .

## § 660 Classification of Royalty Interest as "In Gross" or as "Appurtenant"

Reference has been made elsewhere to a number of classifications applicable to royalty and other nonoperating interests in production. Thus for certain purposes it has been necessary to classify such interests as realty or as personalty,[1] as corporeal or incorporeal,[2] or as principal or in-come.[3] Classification of shut-in royalty has been required for the purpose of ascertaining the person or persons entitled to the receipt thereof under some circumstances.[4]

Yet another classification problem has given rise to some difficulty, *viz.,* whether a royalty interest created by a lease is in gross or is appurtenant to the lessor's mineral interest. Specifically, where a lessor conveys his interest in the premises (or in the minerals therein) without specific mention of the royalty interest arising under a previously executed lease, does such royalty interest pass with the conveyed interest?

Quite infrequently this matter may be resolved by an express lease provision to the effect that the benefits of the lessor under the lease shall be appurtenant to the land of the lessor.[5] In other instances an express "subject-to" clause in the conveyance itself may make it clear that the conveyance is intended to cover and include the grantor's benefits under the lease. We have discussed elsewhere certain of the construction problems arising from the employment of this clause.[6]

Current authority supports the position that a lessor's lease benefits, including his royalty interest, are appurtenant to his mineral interest and pass with a conveyance of such mineral interest even though

---

[1]   *See* §§ 212–214, *supra.*

[2]   *See* §§ 208–211, *supra.*

[3]   *See* §§ 512.2, 514.1, *supra.*

This problem of classification has arisen in a number of states by reason of constitutional or statutory provisions allocating various types of receipts from state-owned lands. See, *e.g.,* State *ex rel.* Fatzer v. Board of Regents, 176 Kan. 179, 269 P.2d 425, 3 O.&G.R. 1280 (1954). The question here was whether bonus, rentals and royalties were "moneys derived from the sale of lands," as that term was used in a statute allocating such moneys to a particular purpose. It was held that royalties were such moneys, but that bonus and rentals were not.

[4]   **Morriss v. First Nat'l Bank, 249 S.W.2d 269, 1 O.&G.R. 1371 (Tex. Civ. App. 1952, error ref'd n.r.e.)** (controversy over whether persons entitled to delay rentals or persons entitled to royalty were entitled to receipt of shut-in royalty; *held,* owners of royalty were entitled to receive such payment).

[5]   *E.g.,* the following provision of a California lease form:

> "The benefits of each Lessor under this lease, including rent and royalty accruing hereunder from the entire demised premises are appurtenant to the land of such Lessor included in this lease, and any transferee or subsequent owner of the title to the land of any Lessor shall, as between the parties to this lease, their successors or assigns, be entitled to receive such appurtenant benefits under this lease except to the extent that such benefits be expressly reserved or shall have been theretofore transferred in whole or in part."

[6]   See §§ 340–340.4, *supra.*

neither the lease nor the deed contains such clauses.[7] Earlier authority in Texas to the contrary[8] has been overruled.[9] By appropriate language in a deed or other conveyance, of course, a royalty interest may be severed from the mineral estate.[10]

## [Effect of pooling or unitization]

A somewhat more difficult problem concerns the effect of pooling or unitization. Where a lessor is bound by pooling or unitization, he gives up a portion of his royalty interest in his own premises (Blackacre) and receives a portion of the royalty in the other premises (*e.g.,* Whitacre) included in the unit. Or stated somewhat differently, he becomes entitled to an apportioned share of the royalty on

---

[7]  See, *e.g.,* the following:

Hardcastle v. McCluskey, 139 Kan. 757, 33 P.2d 127 (1934) (holding that mortgagor's royalty interest arising under a lease passes with a mortgage of the leased premises even though the mortgage contains no reference to the lease or royalty);

Williams' Adm'r v. Union Bank & Trust Co., 283 Ky. 644, 143 S.W.2d 297, 131 A. L. R. 1364 (1940) (same);

Merrill Engineering Co. v. Capital National Bank, 192 Miss. 378, 5 So. 2d 666 (1942) (same);

White v. McVey, 1934 OK 234, 168 Okla. 19, 31 P.2d 850, 94 A. L. R. 656 (1934).

See also Duquesne Natural Gas Co. v. Fefolt, 203 Pa. Super. 102, 198 A. 2d 608, 20 O.&G.R. 595 (1964) (treating the lessor's reserved royalty interest as appurtenant to his mineral or surface estate).

Oil payments and overriding royalties should also be viewed as appurtenant rather than in gross. See Minchen v. Fields, 162 Tex. 73, 345 S.W.2d 282, 14 O.&G.R. 266 (1961) (oil payment).

[8]  Caruthers v. Leonard, 254 S.W. 779 (Tex. Com. App. 1923) (holding that a mineral grantee acquired his grantor-lessor's possibility of reverter but no interest in delay rentals).

[9]  Harris v. Currie, 142 Tex. 93, 176 S.W.2d 302 (1943).

[10]  See § 301 *et seq., supra.*

A related problem was treated in Avery v. Moore, 150 W. Va. 136, 144 S. E. 2d 434, 23 O.&G.R. 1012 (1965). In the partition of a larger tract, plaintiff's predecessor in interest (the owner of a 1/5 undivided interest) received the 50-acre parcel involved in this action. The partition deed reserved coal and mining rights and provided that on the expiration of the existing oil and gas lease, the owner of each partitioned parcel would have leasing rights but the owners of the other partitioned parcels would share in the royalty on the basis of their interests prior to the partition. Plaintiff conveyed the 50-acre parcel to defendant by a deed reciting that it was subject to a provision in the partition deed with reference to leasing and development. In this declaratory judgment action, it was *held* that the deed from plaintiff to defendant conveyed plaintiff's entire interest in the oil and gas within and under the 50-acre parcel, subject to the rights of other claimants under the partition deed to share in the royalty, but that the deed did not convey to defendant any royalty interest in the other four partitioned parcels. In other words, the court held that plaintiff's interest in the royalty in the other four partitioned parcels was not appurtenant to his interest in the parcel he received by the voluntary partition.

In McCall v. McCall, 24 S.W.3d 508, 145 O.&G.R. 401 (Tex. App.—Houston [1st Dist.] 2000, writ denied), the court was faced with a similar problem as in *Avery*. After a partition deed, Ms. McCall was given a royalty interest in the mineral estates that had been given to third parties. She later conveyed to some of her children and a family-owned corporation the mineral estates she received from the partition along with the "appurtenances." One of the children asserted that the deeds conveyed the royalty interests burdening the third parties' mineral estates. The court disagreed, noting that these royalty interests were not "appurtenant" to the conveyed mineral estates. To be appurtenant, a thing must be incidental to or indispensable to the conveyed interest. The court thus distinguished Day & Co. v. Texland Petroleum, Inc., 786 S.W.2d 667, 105 O.&G.R. 590 (Tex. 1990), that had found an executive power appurtenant to a conveyed mineral estate. Because the royalty interests were not appurtenant, they did not pass in the general warranty deeds and were retained by Ms. McCall.

The rationale of McCall was not followed in Anadarko Petroleum Corp. v. BNW Property Co., 393 S.W.3d 846 (Tex. App.—El Paso 2012, rev. denied), and Chesapeake Exploration, LLC v. BNW Property Co., 393 S.W.3d 852 (Tex. App.—El Paso 2012, rev. denied), where the court concluded that a "naked" executive right appurtenant to a third party-owned non-executive mineral interest was conveyed when a fractional mineral interest containing all of the attributes of a mineral interest were conveyed.

production from the unit whether such production is from a well or wells located on the premises he leased or on some other portion of the unit. The question may arise in this instance whether his royalty interest in such other premises included within the unit (*e.g.,* Whiteacre) is appurtenant to his interest in Blackacre so that it will pass by a conveyance of his interest in Blackacre. California authority is to the effect that the royalty interest in Whiteacre under these circumstances is in gross and will not pass by a conveyance of Blackacre unless specially mentioned therein.[11] The preferable view is to the contrary, *viz.,* that the royalty interest in production from Whiteacre is appurtenant to the lessor's interest in Blackacre and passes with a conveyance of Blackacre unless specially reserved from such conveyance.[12] There is uncertainty in some states as to the applica-ble law on this matter. It is advisable, therefore, to include in any conveyance affecting premises included in a pooling, unitization or joint operating agreement express provision concerning the grantor's interest in production from other premises included in such agreement. The following clause has been suggested for this purpose:

> "It is agreed and made a part of this grant that if the interest hereby conveyed, in whole or in part, is now or hereafter, either or both, included in a valid pooling agreement or agreements, either or both, which includes all or any part of the above described land covered by this deed, then grantee, his heirs and assigns, shall be entitled to all payments and other rights accruing by reason of any such agreement or agreements as to the interest hereby conveyed; that is, this grant includes the right to participate in and under any such agreement insofar as it covers or may include the interest

---

[11]　*See* Tanner v. Title Insurance & Trust Co., 20 Cal. 2d 814, 129 P.2d 383 (1942). A community lease was executed by several landowners. The court declared that:

> "The royalty interest thus transferred by each landowner to his colessors is an incorporeal hereditament in gross … and the grantee's interest in the oil produced upon the property of one of the colessors is entirely separate and distinct from the royalty interest retained by him in oil which might be produced from his own premises. … Although the cases clearly establish that the percentage of the royalty reserved by a lessor in oil produced from his own land passes to a grantee of the fee as an incident of the conveyance …, except as such rights are reserved by the deed, the incorporeal hereditament owned by the grantor in the oil produced from the land of the colessors, existing in gross, obviously does not follow the conveyance of the lessor's land, but can only be conveyed by a specific transfer of that interest." 129 P.2d at 386–387.

Another California case has held that a contract to sell land does not include the vendor's royalty interest under a community oil and gas lease covering such land. Agajanian v. Cuccio, 141 Cal. App. 2d 828, 297 P.2d 755, 6 O.&G.R. 1 (1956).

In Sutter Youth Organization, Inc. v. Borsen, 214 Cal. App. 2d 676, 29 Cal Rptr. 628, 18 O.&G.R. 273 (1963), a deed was reformed to include the rights of the grantor in a community oil and gas lease that covered the land in question.

See also Howard v. General Petroleum Corp., 108 Cal. App. 2d 25, 238 P.2d 145, 1 O.&G.R. 10 (1951), (Blackacre and Whiteacre were included in community lease; subsequent conveyance of Blackacre did not include the owner's interest in royalty on production from Whiteacre), *on later appeal,*, 114 Cal. App. 2d 91, 249 P.2d 585, 1 O.&G.R. 1579 (1952) (holding that the lease had been terminated and therewith any right to royalty).

*But cf.* LeBard v. Richfield Oil Corp., 56 Cal. 2d 532, 15 Cal. Rptr. 617, 364 P.2d 449, 15 O.&G.R. 1 (1961) (California statute prohibiting drilling by owner of small tract entitled the owner of such tract to share in proceeds of oil and gas production from adjoining lands; held that such interest was appurtenant and passed with a conveyance of the land without express mention therein).

[12]　*See, e.g.,* Merrill Engineering Co. v. Capital National Bank, 192 Miss. 378, 5 So. 2d 666 (1942) (holding that unitization agreement gave each lessor a royalty interest in other premises included in the unit and that such royalty interest was appurtenant to the lessor's mineral interest and passed with a conveyance thereof).

Huie, "Apportionment of Oil and Gas Royalties," 78 *Harv. L. Rev.* 1113, 1137 n.65 (1965), also urged that the preferable view is that the royalty interest in unit production is appurtenant.

hereby conveyed to exactly the same extent as grantor would have such right as to such interest in the absence of this grant."[13]

The pooling clause of the lease may itself include a provision to the effect that the payments made shall ordinarily be appurtenant to the premises.[14]

Williams & Meyers, Oil and Gas Law

Copyright 2014, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

---

[13]   Discussion Notes, 1 O.&G.R. 17 (1952).

[14]   *See* § 669.21, *infra.*

## § 929 *Pooling* or *Unitization* Agreement as Cross-Conveyance or Contract: Introduction

Stated in simplest terms, a *pooling* or *unitization* agreement authorizes the exploration and/or development of separate parcels of land as if there were a single owner thereof and provides for the allocation of the expenses and proceeds of such operations among the owners of interests in the several parcels. Thus, if the agreement affects Blackacre and Whiteacre, the owners of each tract will share in production on a basis specified in the agreement, whether such production is from Blackacre or Whiteacre.

A number of cases and writers[1] have raised the question whether a *pooling* or *unitization* agreement is a cross-conveyance of interests in land or is a mere contract; that is, does the agreement have the effect of conveying to the owner of Blackacre some interest in Whiteacre and of conveying to the owner of Whiteacre some interest in Blackacre, or does the agreement have the effect merely of giving each owner a contract right to share in the production from premises other than those he has contributed to the agreement. Upon the answer to this question, a number of important consequences are said to depend. In the subsections which follow we indicate the consequences said to flow from the answer given this question and the effect of lease provisions expressly negating any intent to effect a cross-conveyance. Thereafter, we examine the case authority on the matter in a number of states.

§ 929.1    *Pooling* or *unitization* agreement as cross-conveyance or contract: Consequences
A number of important legal consequences have been said to turn upon the answer to the question whether a *pooling* or *unitization* agreement effects a cross-conveyance of interests in the affected premises among the parties to the agreement or merely creates contract rights in such parties. The more important of these consequences sometimes viewed as turning upon this question relate to the following matters:

[Indispensable parties to suit]

(1) Indispensable parties to title or other suits involving premises included in a *pooling* or *unitization* agreement.

The problem of indispensable parties to litigation affecting land included in a *pooling* and *unitization* agreement has been discussed herein.[1] For many years in Texas, the case of *Veal v. Thomason*,[2] established the proposition that a *pooling* or *unitization* agreement effects a cross-conveyance and that,

---

[1]   See, *e.g.,* the following:

Hoffman, *Voluntary* Pooling and Unitization 144–189 (1954) (strongly opposing the cross-conveyance theory);

French and Elliott, "Legal Effect of Voluntary Pooling and Unitization: Theories and Party Practice," 35 *Tex. L. Rev.* 401 (1957);

Masterson, "The Nature of Unitized Title," 10 *Sw. L.J.* 146 (1956).

[1]   *See* §§ 928–928.5, *supra*.

[2]   Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472 (1942).

therefore, all persons having an interest in the **_pooled_** or unitized premises are necessary parties to an action involving one such parcel included in the agreement. As was noted earlier, the *Veal* rule can have a debilitating effect on the substantive rights of the parties. A change in the Texas Rules of Civil Procedure, however, has cast a doubt on the continuing validity of that part of the *Veal* rule that finds such parties indispensable. While not challenging the cross-conveyance doctrine, a recent Texas court of appeals decision refused to apply the necessary and indispensable party part of the *Veal* rule to a suit brought by a royalty owner seeking to invalidate a **_pooling_** of its interest without requiring the joinder of all other **_pooled_** royalty owners.[2.1]

### [Consent to agreement]

(2) Necessity of consent to a **_pooling_** or **_unitization_** agreement.

The theory that a **_pooling_** or **_unitization_** agreement effects a cross-conveyance of interests among the parties thereto was viewed in *Brown v. Smith*[3] as requiring the joinder of royalty owners in a **_pooling_** or **_unitization_** agreement if such agreement was to be fully effective. The plaintiffs in this action sought to recover the bonus agreed to be paid for the execution of a unitized lease but plaintiffs had failed to obtain the joinder of the owner of a royalty interest in a 20-acre portion of the 62.75-acre tract covered by the lease. In holding that plaintiffs were not entitled to recover since the tendered lease did not measure up to the unitized lease contracted to be given, the court noted that without joinder of the royalty owner, the lease would not divest the owner of her interest in the 20-acre tract nor vest in her any interest in the royalty in the 42.75 acres; as a result, the lessee's freedom of operation on the 62.75-acre tract would be materially affected. We discuss elsewhere herein (§§ 925–925.6 *supra*) the state of authority regarding parties whose consent to a voluntary **_pooling_** or **_unitization_** agreement is necessary. It suffices here to observe that the cross-conveyance theory is said to make necessary the consent of all persons having operating or nonoperating interests in premises affected by a **_pooling_** or **_unitization_** agreement.[4]

### [Conveyancing requirements]

(3) Application of the statute of frauds or conveyancing statutes to voluntary **_pooling_** or **_unitization_** agreement.

Obviously if the cross-conveyance theory is followed, then a voluntary **_pooling_** or **_unitization_** agreement involves the conveyance of interests in land and the requirements of the statute of frauds

---

[2.1] Sabre Oil & Gas Corp. v. Gibson, 72 S.W.3d 812, 815 (Tex. App.—Eastland 2002).

The *Sabre Oil* rationale was extended to cover Federal Rule of Civil Procedure 19 joinder issues in HS Resources, Inc. v. Wingate, 327 F.3d 432 (5th Cir. 2003).

[3] Brown v. Smith, 141 Tex. 425, 174 S.W.2d 43 (1943).

[4] *See* Minchen v. Fields, 162 Tex. 73, 345 S.W.2d 282, 14 O.&G.R. 266 (1961).

and of conveyancing statutes must be satisfied.[5] In states rejecting the cross-conveyance theory, it may be held that ***pooling*** and ***unitization*** agreements are not within the statute of frauds.[6]

## [Rule against Perpetuities]

(4) Application of the Rule against Perpetuities to the ***pooling*** clause of a lease.

In Phillips Petroleum Co. v. Peterson,[7] the court apparently accepted the view that a ***pooling*** clause of a lease might be invalid under the Rule against Perpetuities if the cross-conveyance view were adopted but that such clause was valid under the contract view of the effect of a ***pooling*** or ***unitization*** agreement. This matter will be discussed in a later section.[8]

## [Venue questions]

(5) Application of venue statutes to actions involving the construction or validity of a ***pooling*** or ***unitization*** agreement.

Adoption of the cross-conveyance or of the contract theory as to the effect of a ***pooling*** or ***unitization*** agreement may affect the application of a venue statute to various controversies. Thus, in Texas, a venue statute provided that "suits for the recovery of lands or damages thereto, or to remove encumbrances upon the title to land, or to quiet the title to land, or to prevent or stay waste on lands, must be brought in the county in which the land, or a part thereof, may lie."[9] In *Renwar Oil Corp. v. Lancaster*[10] it was held that this statute was applicable to a declaratory judgment action in which an adjudication was sought concerning the effectiveness of a ***unitization*** agreement. The court noted that:

---

[5] *See, e.g.,* Kuklies v. Reinert, 256 S.W.2d 435, 2 O.&G.R. 794 (Tex. Civ. App.—Waco 1953, error ref'd n.r.e.) (dealing with the question of the sufficiency of the description of the affected premises in the unit agreement);

Paddon Hughes Dev. Co. v. Pancontinental Oil Ltd., [1992] 5 W.W.R. 106 at 123 (Alta. Q.B. 1992) (the court implicitly adopted the contract, rather than the cross-conveyance, theory of ***pooling*** by ruling that the ***pooling*** agreement there in question "was not a deed for which physical delivery of the document is required").

[6] See, *e.g.,* the following:

Griswold v. Public Service Co., 1951 OK 342, 205 Okla. 412, 238 P.2d 322, 1 O.&G.R. 108 (holding a lessor bound by an oral ***pooling*** agreement; the opinion contains no mention of a statute of frauds problem);

Brazell v. Brown, 1934 OK 520, 169 Okla. 623, 38 P.2d 17 (oral agreement by lessors of separate tracts to share in royalties paid by lessee).

[7] Phillips Petroleum Co. v. Peterson, 218 F.2d 926, 4 O.&G.R. 746 (10th Cir. 1954), cert. denied, *349 U.S. 947, 75 S. Ct. 871, 99 L. Ed. 1273, 4 O.&G.R. 1178 (1955)*.

[8] *See* § 936, *infra.*

[9] Vernon's Annotated Texas Civil Statutes, Article 1995, subdivision 14.

[10] Renwar Oil Corp. v. Lancaster, 154 Tex. 311, 276 S.W.2d 774, 4 O.&G.R. 697 (1955).

*Renwar* was distinguished in *In re* Riata Energy, Inc., 2001 Tex. App. LEXIS 7806 (Tex. App.—Houston [1st Dist.] Nov. 21, 2001) (unpublished opinion), where the operator under a joint operating agreement unsuccessfully argued that Tex. Civ. Prac. & Rem. Code § 15.011 (venue provision for actions affecting real property) required a suit challenging various operator actions and seeking removal of the operator to be brought in the county where the well was located. The court interpreted the non-operator's pleadings as seeking monetary damages for breach of the JOA, fraud remedies, and conversion of the production based on a wrongful allocation under the JOA.

"[P]laintiffs seek an adjudication that certain *unitization* agreements are void and ineffective as to them. Since these agreements are essentially a conveyance of an interest in realty, *Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472*, this constitutes an effort to remove cloud from title, even though alleged as an effort to construe a contract."[11]

[Conveyance not mentioning agreement]

(6) Effect of conveyance by lessor which does not mention the *pooling* or *unitization* agreement.

A possible impact of the cross-conveyance theory upon the construction of certain instruments has been suggested by one able writer, Leo J. Hoffman. He raises the possibility that should the owner of a separate tract included in a unit conveyance convey such tract without mention of his rights in the unit agreement, such conveyance would not affect his interest in such other premises.[12] In other words, if Blackacre is included in a *pooling* or *unitization* agreement affecting Blackacre and Whiteacre, a subsequent conveyance of Blackacre which made no reference to the agreement would not convey the grantor's interest in royalty on *pooled* production from Whiteacre.

Although mention of this suggestion must be made for purpose of completeness of discussion of possible impact of the cross-conveyance theory in various contexts, we must also emphasize our disagreement with the suggestion itself. In our view the question is one of intent of the parties, not whether *pooling* or *unitization* effects cross-conveyances. The court should give effect to a properly manifested intent of the parties as to whether the grantor's interest in unit production from Whiteacre is conveyed with Blackacre. But where the parties have failed adequately to manifest their intent in this regard, the question becomes one of judicially ascertained intent and, in our opinion, the courts should usually take the position that the grantor's interest in unit production is included in a conveyance of the premises he has committed to the unit. In other words, the interest of a party in unit production should ordinarily be viewed as appurtenant to his interest in premises committed to the unit rather than "in gross."[13] Decisions on this matter do not appear to have been affected by the adoption or rejection of the cross-conveyance theory; thus, both in California and in Mississippi the cross-conveyance theory appears to have been adopted, but the two states differ in answering the question whether a party's interest in unit production is appurtenant or in gross.[14]

[Operation of recordation statutes and bona fide

purchaser doctrine]

(7) Effect of *pooling* or *unitization* agreement upon prior unrecorded interests in affected lands.

If a *pooling* or *unitization* agreement is viewed as a conveyance it may be contended that execution of such an agreement brings into play doctrines relating to the operation of recordation statutes and the

---

[11]   *Renwar Oil Corp. v. Lancaster*, 4 O.&G.R. at 700.

[12]   Hoffman, *Voluntary **Pooling** and **Unitization*** 169–172 (1954).

[13]   *See* § 660 at notes 11–14, *supra*.

[14]   Application of the cross-conveyance theory in California and in Mississippi is discussed in §§ 930.1, 930.4, *infra*. The cases dealing with the effect of a conveyance which fails to mention the *pooling* or *unitization* agreement are discussed in § 660 at note 11 and 12, *supra*.

bona fide purchaser doctrine. Thus, if subsequent to the creation of unrecorded legal or equitable interests in Blackacre, the record title owner commits Blackacre to a ***pooling*** or ***unitization*** agreement, will such unrecorded legal or equitable interests be defeated insofar as inconsistent with the interests of other parties claiming under the agreement? In *Sohio Petroleum Co. v. Jurek,*[15] it was urged that by virtue of the ***pooling*** of Blackacre, the lessors of other ***pooled*** tracts became the owners of undivided interests in Blackacre, thereby cutting off the equitable interests of the plaintiffs therein under the bona fide purchaser doctrine. The court in this case refused to apply the cross-conveyance theory. This holding is contrary to the weight of Texas authority,[16] but in the instant case it enabled the court to avoid addressing itself to this issue. As indicated by a student note, the logic of the cross-conveyance theory requires application of the bona fide purchaser doctrine and the recording statutes to ***pooling*** agreement.[17]

[Tax consequences]

(8) Tax treatment of participant in ***pooling*** or ***unitization*** agreement.

The characterization of a unit agreement is also of significance for federal tax purposes. One theory is that the ***unitization*** agreement effects a series of nontaxable exchanges and another is that no exchange of depletable properties takes place upon ***unitization*** but that the parties merely agree contractually to devote their depletable properties to common use and to share in the common product. The problem is discussed in the papers noted below.[18] It suffices here to observe that the conclusion whether a particular state has adopted the cross-conveyance or the contract theory as to the effect of a ***pooling*** or ***unitization*** agreement should not be determinative of federal tax consequences.[19]

In *Wyoming State Tax Commission v. BHP Petroleum Company,*[19.1] the court held that delinquent *ad valorem* property taxes on mineral production could not be assessed and collected from the unit operator of a federal exploratory unit, as opposed to the working interest owners. The court distinguished an earlier case, *BHP Petroleum Company v. Wyoming Tax Commission,*[19.2] which had held that the unit operator could be assessed the delinquent severance tax on all production attributed to working interest owners. It concluded that the *ad valorem* tax was levied on the *owner* of the mineral

---

[15]   Sohio Petroleum Co. v. Jurek, 248 S.W.2d 294, 1 O.&G.R. 977 (Tex. Civ. App.—Ft. Worth 1952, writ ref'd n.r.e.).

[16]   *See* § 930.8, *infra*.

[17]   German, "Oil and Gas—Formation of ***Pooling*** Unit Does Not Defeat Outstanding Equitable Interests," 31 *Tex. L. Rev.* 340 (1953).

[18]   See the following papers discussing the tax consequences of treating ***unitization*** as an exchange or a contract:

Benjamin, "A Different View of the Nature of ***Unitization***," 9 *Oil & Gas Tax Q.* 212 (1960);

Chodorow, "Federal Tax Consequences of an Oil and Gas ***Unitization***," 37 *Tex. L. Rev.* 877 (1959);

Benjamin, "Recent Developments in Field of Taxation Affecting Oil and Gas Transactions," 9 *Sw. Legal Fdn. Oil & Gas Inst.* 549 at 573 *et seq.* (1958).

[19]   This is the conclusion of the court in Killam v. Comm'r, 39 T.C. 680, 18 O.&G.R. 406 (1963).

[19.1]   Wyoming State Tax Commission v. BHP Petroleum Co., 856 P.2d 428, 125 *O.&.G.R.* 207 (Wyo. 1993) .

In Amoco Production Co. v. Board of County Commissioners of County of Sweetwater, 2002 WY 154, 55 P.3d 1246, 154 O.&G.R. 559, the court held that the non-operator waived its rights to contest the assessment of its share of unitized real property when it failed to appeal the notice of assessment sent to the unit operator for which the non-operator had actual or constructive notice.

[19.2]   BHP Petroleum Co. v. Wyoming Tax Commission, 784 P.2d 621, 105 *O.&.G.R.* 661 (Wyo. 1989) .

products produced, while the severance tax was levied on the person (i.e., the unit operator) *extracting* the mineral products. The unit agreements were held to create an agency relationship rather than to transfer an ownership interest. Thus, the unit operator was not an *owner* but, rather, was the *extractor* of the share of production attributable to the working interest owners.

Unit operators also are responsible for dealing with the problems associated with multiple taxing jurisdictions.[19.3]

Another tax problem relating to exemption from taxation of certain Indian lands in Oklahoma is discussed hereinafter.[20]

[Application of "two-grant" theory to conveyance]

(9) Application of the two-grant theory to a conveyance "subject-to" an existing lease.

In §§ 340–*340.5*, the effect of a "subject to" clause in a mineral conveyance is discussed at length. As is there noted, some courts have viewed the clause in a mineral deed reciting that the conveyance is "subject to" an existing lease but covers and includes a specified interest in lease benefits has the effect of conveying an interest in existing lease benefits which may be different from the benefits which pass under the habendum clause of the mineral deed.

A Texas case, *Kelln v. Brownlee,*[21] applied the two-grants theory to a conveyance of minerals "subject to" an existing lease which had been ***pooled*** with other leases in Section 59 to form a ***pooled*** unit for the entire section. The grantor owned undivided interests in portions of the section but not in other portions. The court applied the cross-conveyance theory and concluded that the grantee was entitled to an apportioned share of royalty on unit production from any portion of Section 59, but on termination of the ***pooling*** pursuant to the ***pooling*** clauses of the grantors' lease, the grantee's rights would be measured by the habendum clause of the mineral deed as applied to the interests in the section owned by the grantors.

§ 929.2    ***Pooling*** or ***unitization*** agreement as cross-conveyance or contract: Effect of express provision negating intent to make cross-conveyance

By reason of fear of certain consequences thought to follow from treatment of a ***pooling*** or ***unitization*** agreement as a cross-conveyance rather than as a mere contract, many such agreements contain express

---

[19.3]   In Shell Western E & P, Inc. v. Dolores County Board of Commissioners, 948 P.2d 1002 (Colo. 1997), the unit operator mistakenly failed to attribute a portion of unit production to lands located within a certain county. Therefore, it did not make the required production reports or the proper payments. The unit operator was found liable for the unpaid taxes and could not use the statute of limitations as a defense, because it had an affirmative duty to report the production to the county tax officers. *See also* Amoco Production Co. v. Wyoming State Board of Equalization, 7 P.3d 900 (Wyo. 2000) (challenge to the unit operator's allocation of unit production between two counties). On remand, the Board reaffirmed its earlier decision that Amoco, the unit operator, had misallocated production so that it would be paying a lower tax rate in one of the two counties straddled by the unitized oil and gas reservoir. The Wyoming Supreme Court affirmed the Board decision in BP America Production Co. v. Department of Revenue, 2006 WY 27, 130 P.3d 438.

[20]    See the discussion in § 930.6, *infra,* of Sinclair Crude Oil Co. v. Oklahoma Tax Commission, 1958 OK 110, 326 P.2d 1051, 9 O.&G.R. 613.

[21]    Kelln v. Brownlee, 517 S.W.2d 568, 50 O.&G.R. 548 (Tex. Civ. App. 1974, error ref'd n.r.e.).

clauses designed to negate or prevent cross-conveyances. Examples of such provisions are collected elsewhere herein.[1]

The effect of such a provision in the agreement remains uncertain. There is some authority for the contention that it will be given effect by the courts. In *Phillips Petroleum Co. v. Peterson,*[2] for example, in holding that the Rule against Perpetuities was inapplicable to a ***pooling*** clause in an oil and gas lease, the court emphasized certain language in the ***pooling*** clause said to indicate that "the effect of ***unitization*** was to be only with respect to allocation of production and the computation of royalties and was not to effect cross-transfers of royalty interests."[3] It further noted that the ***unitization*** agreement itself clearly provided that "[n]othing herein … shall be construed to transfer title to any land or to any lease or operating agreement."[4] *And a distinguished writer on the law of **unitization*** has essayed the following conclusions:

> "There can hardly be any objection in the law to such an express agreement that the ***pooling*** or ***unitization*** shall not constitute an exchange or transfer of real property interests. Presumably such a provision is valid and, therefore, effective for the purpose of nullifying any cross-conveyancing which could otherwise result."[5]

The authors hereof are not so sanguine on the matter. Although parties to an agreement may "make their own law" in many respects by contract, they may not do so for all purposes. If, for example, application of the Rule against Perpetuities to a lease ***pooling*** clause or to a ***pooling*** or ***unitization*** agreement or if the question of indispensable parties in a title or other suit involving unitized premises turn upon whether the agreement effects a cross-conveyance or is a "mere" contract, it seems difficult to believe that a characterization given by the parties to their agreement will be effective to determine such important legal consequences.

Williams & Meyers, Oil and Gas Law
Copyright 2014, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

---

[1]   See § 921.6, *supra.*

[2]   Phillips Petroleum Co. v. Peterson, 218 F.2d 926, 4 O.&G.R. 746 (10th Cir. 1954), cert. denied, ***349 U.S. 947, 75 S. Ct. 871, 99 L. Ed. 1273, 4 O.&G.R. 1178 (1955).***

[3]   4 O.&G.R. at 750. See also the discussion in § 928.2, *supra,* of Stumpf v. Fidelity Gas Co., 294 F.2d 886, 16 O.&G.R. 139 (9th Cir. 1961).

[4]   *Ibid.*

[5]   Hoffman, *Voluntary **Pooling** and **Unitization*** 168 (1954).

See also, to the same effect, Doggett, "Practical Legal Problems Encountered in the Formation, Operation and Dissolution of Fieldwide Oil and Gas Units," 16 *Okla. L. Rev.* 1 at 10 (1963).

# TEXAS LAW OF OIL AND GAS

## SECOND EDITION

## VOLUME 1

**Ernest E. Smith**
*Rex G. Baker Centennial Chair in Natural Resources Law*
*University of Texas School of Law*

**Jacqueline Lang Weaver**
*A.A. White Professor of Law*
*University of Houston Law Center*

2014

*Filed Through:*
RELEASE NO. 16,  JUNE 2014



## QUESTIONS ABOUT THIS PUBLICATION?

For questions about the **Editorial Content** appearing in these volumes or reprint permission, please call:

Jeff Slutzky, J.D. at ............................................................. 1-800-306-5230 Ext. 6733388

Email: ................................................................... jeffrey.slutzky@lexisnexis.com

For assistance with replacement pages, shipments, billing or other customer service matters, please call:

Customer Services Department at .......................... (800) 833-9844
Outside the United States and Canada, please call ................ (518) 487-3000
Fax Number ...................................... (518) 487-3584
Customer Service Website .................. http://www.lexisnexis.com/custserv/
For information on other Matthew Bender publications, please call

Your account manager or .............................. (800) 223-1940
Outside the United States and Canada, please call ................. (518) 487-3000

Library of Congress Card Number: 98-067071
ISBN: 978-0-327-00195-9 (print)
ISBN: 978-0-3271-6901-7 (eBook)

*Cite this publication as:*

[Vol. no.] Ernest E. Smith and Jacqueline Lang Weaver, Texas Law of Oil and Gas § [sec. no.] (LexisNexis Matthew Bender 2014).

*Example:*

1 Ernest E. Smith and Jacqueline Lang Weaver, Texas Law of Oil and Gas § 1.1 (LexisNexis Matthew Bender 2014).

Because the section you are citing may be revised in a later release, you may wish to photocopy or print out the section for convenient future reference.

This publication is designed to provide authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional services. If legal advice or other expert assistance is required, the services of a competent professional should be sought.

LexisNexis and the Knowledge Burst logo are registered trademarks of Reed Elsevier Properties Inc., used under license. Matthew Bender and the Matthew Bender Flame Design are registered trademarks of Matthew Bender Properties Inc.

Copyright © 2014 Matthew Bender & Company, Inc., a member of LexisNexis. All Rights Reserved. Originally published in: 1998

No copyright is claimed by LexisNexis or Matthew Bender & Company, Inc., in the text of statutes, regulations, and excerpts from court opinions quoted within this work. Permission to copy material may be licensed for a fee from the Copyright Clearance Center, 222 Rosewood Drive, Danvers, Mass. 01923, telephone (978) 750-8400.

Editorial Offices
121 Chanlon Rd., New Providence, NJ 07974 (908) 464-6800
201 Mission St., San Francisco, CA 94105-1831 (415) 908-3200
www.lexisnexis.com

MATTHEW◆BENDER

(Rel. 16-6/2014  Pub.82572)

## 2.4　ROYALTY AND SIMILAR INTERESTS

### A.　In General

The word "royalty" is a chameleon-hued term. It changes meaning with the context in which it is used. As commonly understood, a royalty is a real property interest with two distinguishing characteristics. It is nonpossessory and it is free of production and operating expenses. The owner of such an interest has no right to explore, drill, or produce oil and gas; similarly, he normally has no right to execute oil and gas leases. The principal benefit conferred by royalty ownership is the right to a fraction of oil, gas, or mineral production free of drilling, mining, and operating expenses.[287.1]

This common understanding of the term "royalty" is correct in a general sense, but it is both underinclusive and overinclusive. It is underinclusive because it does not fully encompass all contexts in which the word is used. Hybrid interests can be created. The separation of all possessory rights from a mineral fee interest will not automatically transform it into a royalty,[288] and, conversely, rights normally attached to a mineral fee interest, even including the right to participate in leases,[289] can be attached to a royalty. More commonly the royalty owner is given specified rights to use the surface and subsurface or rights to share in lease benefits in addition to production.[290] Although instruments creating such interests almost invariably create problems of interpretation and lead to litigation over whether the interest is a royalty or a fractional interest in the mineral fee,[291] they are encountered with surprising frequency.

Additionally, the word "royalty" is used in oil and gas leases and

---

[287.1] There is an exception for some overriding royalties carved from leases subject to a joint operating agreement. *See, e.g.*, Boldrick v. BTA Oil Producers, 222 S.W.3d 672 (Tex. App.—Eastland 2007) and refer to Section 17.3(E) of this treatise.

[288] *See, e.g.*, Buffalo Ranch Co. v. Thomason, 727 S.W.2d 331 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.).

[289] Elick v. Champlin Petroleum Co., 697 S.W.2d 1 (Tex. App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.).

[290] *See, e.g.*, Brady v. Security Home Inv. Co., 640 S.W.2d 731 (Tex. App.—Houston [14th Dist.] 1982, n.w.h.); Neel v. Alpar Resources, Inc., 797 S.W.2d 361 (Tex. App.—Amarillo 1990, n.w.h.).

[291] *See, e.g.*, Altman v. Blake, 712 S.W.2d 117 (Tex. 1986); Diamond Shamrock Corp. v. Cone, 673 S.W.2d 310 (Tex. App.—Amarillo 1984, writ ref'd n.r.e.). Problems of interpreting such instruments are discussed at Section 3.5(B) of this treatise. *See also* Bruce M. Kramer, *Conveying Mineral Interests—Mastering the Problem Areas,* 26 TULSA L.J. 175 (1990).

occasionally in other instruments to describe payments that are not based on production. The most common example is shut-in royalties, which are payments made to maintain a lease where all wells have been shut in for lack of a market. Minimum royalties and some forms of compensatory and in lieu royalties may also not be tied entirely to production.[292] Royalty owners have argued that settlements between gas producers and purchasers over the purchasers' failure to take or pay for contracted amounts of production should also be subject to royalty payments.[293] The term has also been used to refer to a lessor's share of oil or gas after they have been produced or to the money payable to the lessor from the sale of such production.[294]

The common understanding of royalty is overinclusive in that it encompasses interests not usually referred to as royalties. For example, the owner of a production payment has a nonpossessory interest which entitles her to an expense-free share of production, but she is not usually considered to own a "royalty."

This section will attempt to describe the variety of interests that, either through common usage or by their nature, may fairly be considered forms of royalty or closely related thereto. Its major focus will be on the traditional royalty interests: the lessor's royalty, the royalty created by grant or reservation in a deed, and the overriding royalty carved from a working interest. Except when otherwise indicated, the term "royalty" will be used in accordance with its commonly understood meaning.

## B. Types, Duration, and Size of Royalties

A royalty is usually categorized in accordance with the transaction in which it was created. These are principally the execution of an oil and gas lease, the transfer of an interest in land by deed, and the assignment of all or part of a lessee's working interest. Regardless of how created, all such royalties are interest in real property and are governed by the doctrines applicable to real property.[294.1]

---

[292] Refer to Sections 4.5(C) and (F) of this treatise, dealing with shut-in royalty and minimum royalty provisions.

[293] This issue is discussed in Section 4.6(E)(4) of this treatise.

[294] *See* Jones v. O'Brien, 251 S.W. 208 (Tex. Comm'n App. 1923).

[294.1] *See, e.g.,* Sheffield v. Hogg, 77 S.W.2d 1021, 124 Tex. 290 (1934), *mot. overruled*, 80 S.W.2d 741, 124 Tex. 290 (1935) (landowner's royalty reserved in executing oil and gas lease); Kelly Oil Co., Inc. v. Svetlik, 975 S.W.2d 762 (Tex. App.—Corpus Christi 1998) (overriding royalty assigned from lessee's working interest); Quigley v. Bennett, 227 S.W. 3d

The names used for royalties created in these transactions are not, strictly speaking, legal terms. They have evolved from common industry usage. Although widely used, the terminology has not been consistent over time or from location to location. Hence a draftsman who uses a term such as "overriding royalty" should be careful to define it rather than rely on common understanding within the industry.

In analyzing rights of royalty owners, Texas courts have tended to ignore distinctions between types of royalties. *Alameda Corp. v. Transamerican Natural Gas Corp.*[295] and *Condra v. Quinoco Petroleum, Inc.*[296] are good examples. The courts in both cases apparently assumed that the doctrines articulated were applicable to all types of royalty; for much of the judicial language refers to lease royalty, even though the royalty claims were not based on the royalty clause of an oil and gas lease. *Alameda Corp.* involved a nonparticipating royalty and *Condra* involved an overriding royalty. Because of this judicial approach, most of the discussion of the calculation and payment of lease royalties in Section 4.6 of this treatise is also applicable to nonparticipating and overriding royalties. It should be noted, however, that some issues, such as the lessee's ability to pool a royalty without first obtaining the express consent of the royalty owner, require a consideration of the distinctions between the types of royalty and the context in which the royalty was created.[296.1] A lessee's right to pool royalties is treated in Section 4.8.

### 1. The Landowner's Royalty

The most common transaction in which a royalty is created is probably the execution of an oil and gas lease. The landowner who executes an oil and gas lease invariably retains a right to a specified fraction of gross production. This royalty, which is frequently called a "landowner's royalty," terminates when the lease terminates. This limitation on its duration has practical consequences primarily in situations where the original lessor has transferred all or part of his landowner's royalty to another person, for the transferee's interest will not outlast the lease.

The landowner's royalty varied considerably in size during the first two

---

51 (Tex. 2007) (agreement to compensate geologist by conveying overriding royalty subject to the statute of frauds.) Refer to Section 2.4(E).

[295] 950 S.W.2d 93 (Tex. App.—Houston [14th Dist.] 1997, writ ref'd).

[296] 954 S.W.2d 68 (Tex. App.—San Antonio 1997, writ ref'd.]

[296.1] *See, e.g.,* Union Pac. Resources Co. v. Hutchison, 990 S.W.2d 368 (Tex. App.—Austin 1999).

decades of this century[297] and then became standardized at 1/8 during the 1920s and early 1930s. Landowners' royalties that are larger than 1/8 became increasingly common in oil and gas leases executed after the mid-1970s. It is unusual to find a lease executed within the last 20 years that provides for a royalty of less than 1/6, and many now provide for a royalty of 1/5 or even 1/4. On state-owned lands the royalty is commonly set at 1/4.

The landowner's royalty is dealt with in detail in Chapter 4 of this treatise.

## 2. The Nonparticipating Royalty

Royalties are also frequently created in deeds of real estate, by either grant or reservation. A royalty created in such a transaction is sometimes referred to as a "nonparticipating royalty."[298] Its duration may be perpetual or, as discussed in Section 2.5 of this chapter, it may be limited to a defined period. A royalty owner's right to share in production accrues monthly as oil and gas are produced, and the statute of limitations begins to run when the owner receives information that puts him on notice that there is production from or attributable to the land subject to his royalty.[299]

The size of this type of royalty may be stated in two different ways. The deed may either specify a stipulated fraction of gross production, such as 1/16,[300] or it may specify a fraction of the royalty reserved in an oil and gas lease.[301] The owner of a royalty stated as a set fraction of gross production will be entitled to that fraction, regardless of the terms of any existing or future oil and gas lease.[302] If, however, the interest creates a right to a fraction of royalty, the owner's share of production will vary with the size of the royalty reserved in an oil and gas lease. Thus, the owner of a right to "one-fourth of royalty" will receive 1/32 of the gross production from a lease providing for a 1/8 royalty, but he will receive 1/24 of the gross production from a lease providing for a 1/6 royalty.

An unfortunately common formulation combines these two basic methods

---

[297] *Compare* Southern Oil Co. v. Colquitt, 69 S.W. 169 (Tex. Civ. App. 1902) (1/10 royalty) *with* Consumers' Gas Trust Co. v. Littler, 162 Ind. 320, 70 N.E. 363 (1904) (1/6 royalty).

[298] This term as applied in this context is obviously underinclusive, for all royalties are nonparticipating in the sense that they bear no share of the capital or operating costs.

[299] Harrison v. Bass Enters. Prod. Co., 888 S.W.2d 532 (Tex. App.—El Paso 1994).

[300] *E.g.,* the instrument in Watkins v. Slaughter, 144 Tex. 179, 189 S.W.2d 699 (1945).

[301] *See, e.g.,* the deed in Schlittler v. Smith, 128 Tex. 628, 101 S.W.2d 543 (1937).

[302] *See, e.g.,* Winslow v. Acker, 781 S.W.2d 322 (Tex. App.—San Antonio 1989, n.w.h.); Tiller v. Tiller, 685 S.W.2d 456 (Tex. App.—Austin 1985, n.w.h.).

of stating the size of the nonparticipating royalty. An example is the reservation of "an undivided one-half interest in and to all of the royalty that may be payable under any and all oil and gas leases, by which royalty is meant one-eighth of production." Language such as this, which clearly states that the parties were thinking in terms of a 1/8 landowner's royalty, has the effect of limiting the royalty to the specified fraction of 1/8. Thus the grantor is entitled to only 1/16 of the gross production, even though an oil and gas lease provides for a royalty larger than the standard 1/8.[303] Variations on this language often lead to litigation over the intent of the parties to the deed.[303.1]

Regardless of size or the manner of describing the fractional interest, the owner of a nonparticipating royalty is limited to receiving a share of gross production. Other lease benefits, such as bonus and delay rentals, are not shared with the owner of a nonparticipating royalty unless the instrument creating the royalty expressly provides for participation in these benefits.[304]

### 3. The Overriding Royalty

The term "overriding royalty" has at least two, somewhat different meanings. In earlier years it was occasionally used in referring to any portion of a landowner's royalty which exceeds 1/8. For example, the lease litigated in *Martin v. Glass*[305] provided for a 1/8 royalty and an additional "overriding royalty in the aggregate amount of 1/32nd of 7/8ths of all oil, gas and other minerals saved, produced or sold from the premises." This use of "overriding royalty" is quite uncommon today, however, and the term is typically used in referring to a gross production interest created in a transaction between an oil and gas lessee and a person other than the landowner. Thus an oil and gas lessee may assign all or part of its leasehold interest and reserve an overriding royalty in any production obtained from the assigned acreage. In some instances, a condition may be attached to the overriding royalty, such as a provision that if it is not paid within a specified period after production commences, the assignor has the right to terminate the assignment.[305.1]

Alternatively, an overriding royalty may be carved out of the leasehold

---

[303] *See, e.g.,* Ray v. Truitt, 751 S.W.2d 205 (Tex. App.—El Paso 1988, n.w.h.).

[303.1] *See* Section 3.7[A] of this Chapter.

[304] Schlittler v. Smith, 128 Tex. 628, 101 S.W.2d 543 (1937).

[305] 571 F. Supp. 1406 (N.D. Tex. 1983).

[305.1] Circle Ridge Prod. v. Kittrell Family Minerals, LLC, 2013 Tex. App. LEXIS 8790 (Tex. App.—Texarkana July 17, 2013).

estate and assigned to a third party.[305.2] Assignments of overriding royalties are commonly used to obtain financing and as a method of compensating landmen, geologists, and other persons for services or information provided to the oil and gas company.[305.3]

Because an overriding royalty is created from the lessee's interest, it will not outlast the lease.[306] unless there is an express savings clause, such as a provision that the overriding royalty will apply to all amendments, extensions, renewals, or new leases taken out within a specified period after termination of the current lease. Although there may be some occasional exceptions where deliberate fraud is involved, in the absence of an express savings clause all interests which are dependent upon the lease will normally terminate when the lease terminates. For example, in one situation, the lessee allowed a lease subject to overriding royalties to terminate by not spending a rather minimal amount of money to repair the well's broken rod and then obtained a new lease which would not be subject to the overriding royalties. The court conceded that there was some support for the proposition that a lessee that deliberately engages in conduct in order to wash out an overriding royalty is subject to liability, but went on to point out that Texas courts have generally been reluctant to impose any type of duty—either an implied contractual covenant or a fiduciary obligation—on a lessee in favor of the holder of an overriding royalty.[306.1]

Whether reserved or assigned, the fraction of gross production included in the overriding royalty should be clearly specified. Because overriding royalties are created from the lessee's working interest, which is always less

---

[305.2] For special issues connected with overriding royalties carved from a working interest that is subject to a joint operating agreement, refer to Section 17.3(E) of this treatise.

[305.3] *See, e.g.,* Mobil Exploration and Producing, U.S., Inc. v. Dover Energy Exploration, L.L.C., 56 S.W.3d 772 (Tex. App.—Houston [14th Dist.] 2001), where a drilling company received access to a second company's proprietary information concerning offshore drilling prospects in exchange for an agreement to grant an overriding royalty to the second company if it acquired a lease on any of the second company's prospects; and Quigley v. Bennett, 227 S.W. 3d 51 (Tex. 2007), involving a geologist whose compensation was typically based on an overriding royalty of the leases he agreed to evaluate.

[306] *See, e.g.,* Sunac Petroleum Corp. v. Parkes, 416 S.W.2d 798 (Tex. 1967); The Exploration Co. v. Vega Oil & Gas Co., 843 S.W.2d 123 (Tex. App.—Houston [14th Dist.] 1992, writ denied); Sasser v. Dantex Oil & Gas, Inc., 906 S.W.2d 599 (Tex. App.—San Antonio 1995, writ denied); SM Energy Co. v. Sutton, 376 S.W.3d 787 (Tex. App.—San Antonio 2012). Problems involving duration of overriding royalties are discussed in Section 16.5(A)(3) of this treatise.

[306.1] Stroud Prod., L.L.C. v. Hosford, 405 S.W.3d 794 (Tex. App.—Houston [1st Dist.] 2013).

than 100 percent of production, the language creating the overriding royalty must be carefully drafted to indicate the size of the fraction. There may be, for example, confusion whether a 1/16 overriding royalty entitles its owner to 1/16 of total production or only 1/16 of the production to which the lessee was entitled, e.g., 1/16 of 7/8.

### C.    Benefits Included in a Right to a Fraction "of Royalty"

Unless the word "royalty" is defined, a grant or reservation of a fraction "of royalty" may lead to disputes over the royalty owner's right to share in a variety of lease benefits. The Texas courts have generally construed the word "royalty" when used in this context to mean payments from production which will continue throughout the life of an oil and gas lease. Hence, the owner of "one-fourth of royalty" will receive her stated fraction from all royalty reserved in an oil and gas lease, even though the payments from gross production exceed one-eighth, which was the standard royalty throughout much of the twentieth century, and are labeled "excess royalty" or "bonus."[307] This definition excludes from royalty a lease benefit payable from production which will terminate when a specified sum has been received. Such payments, commonly designated "oil payments" or "production payments," are sometimes used to provide additional or deferred bonus money, and the owner of a fraction "of royalty" is not entitled to share them.[308]

The Texas courts have frequently dealt with other lease benefits on an ad hoc basis, without express reference to a general definition. Thus a "compensatory" royalty that a lessee paid from production of a well draining the leased tract in settlement of its obligation to drill an offset well was deemed a royalty within the meaning of a prior deed which had conveyed a right to one-fourth "of the oil royalty, gas royalty and royalty in casinghead gas, gasoline, and royalty in other minerals in and under, and that may be produced and mined" from the premises.[309] The same treatment has been accorded "minimum royalty," which is a sum payable under a lease clause

---

[307] Griffith v. Taylor, 156 Tex. 1, 291 S.W.2d 673 (1956); Lane v. Elkins, 441 S.W.2d 871 (Tex. Civ. App.—Eastland 1969, writ ref'd n.r.e.).

[308] See, e.g., State Nat'l Bank v. Morgan, 135 Tex. 509, 143 S.W.2d 757 (Tex. Comm'n App. 1940, opinion adopted).

[309] Andretta v. West, 415 S.W.2d 638 (Tex. 1967).

stipulating that royalties from production must at least equal the lease delay rental.[310]

It is arguable that both types of payments fall within the concept of "royalty" as a payment from production continuing over the life of the lease. The royalty paid in lieu of drilling an offset well was pegged to production from a draining well and would presumably continue until either the well ceased producing or the recipients' lease terminated. Minimum royalty falls even more clearly within the definition. Although such payments are pegged to the delay rental, they are clearly required only if the lease is maintained by production. The fact that they are not based on the sale price of production does not distinguish them from other common lease royalties, such as those paid on production which

*(Text continued on page 2-67)*

---

[310] Morriss v. First Nat'l Bank, 249 S.W.2d 269 (Tex. Civ. App.—San Antonio 1952, writ ref'd n.r.e.).

is used off the premises or those based on the market value of natural gas.

The right of an owner of a fraction "of royalty" to share shut-in payments is more problematic. Although one appellate court has indicated that the royalty owners would share in such payments,[311] the language was dictum, because that issue was not before the court. Shut-in payments do not fall within the concept of payments based on production because they are expressly paid in lieu of production. Moreover, treating shut-in payments as royalty is arguably inconsistent with the long line of cases holding that shut-in payments do not maintain a term royalty interest beyond its initial specified term.[312]

### D. Interests Similar to Royalties

There are several types of interests in gross production that, although not generally called royalties, are similar to them.

A "production payment" is a right to a specified fraction of production until a specified sum has been received. Occasionally the parties creating it may provide for its termination upon some other event.[313] Because a production payment is almost always carved out of the lessee's interest in an oil and gas lease, the terminating event must be something other than lease termination, or the interest in production will be classified as a royalty.[314] Like a royalty, it does not bear any of the costs of drilling, completing, or operating the well. A production payment may be limited to certain categories of production, such as oil, gas well gas, or casinghead gas, and may be payable in kind rather than in cash. Such an interest may be given to a lessor as a means of providing him with an additional bonus,[315] to a lender as a means of repaying or providing security for a loan, or to a person, such as a geologist, who has performed services for the lessee and receives the production payment as compensation. It may also be consideration for the assignment of an oil and gas lease.[316]

---

311. *Id.*

312. Archer County v. Webb, 161 Tex. 210, 338 S.W.2d 435 (1960). Refer also to the discussion in Section 2.5 of this chapter.

313 *See, e.g.,* First City Nat'l Bank v. Concord Oil Co., 808 S.W.2d 133 (Tex. App.—El Paso 1991) (production payment terminates when 10% of the oil beneath the tract remains unproduced).

314. Griffith v. Taylor, 156 Tex. 1, 291 S.W.2d 673 (1956).

315. *See* State Nat'l Bank v. Morgan, 135 Tex. 509, 143 S.W.2d 757 (Tex. Comm'n App. 1940, opinion adopted).

316. *See, e.g.,* First City Nat'l Bank v. Concord Oil Co., 808 S.W.2d 133 (Tex. App.—El Paso 1991).

A "net profits" interest is a right to a specified share of profits. It has some similarity to a royalty in that its owner is not personally liable for drilling or operating expenses. Unlike the royalty, however, it entitles its owner only to a share of profits after expenses have been paid. The method of computing net profits, the manner and time of payment, and the costs to be taken into account are determined by the instrument creating the interest. Because the term "net profits" has no fixed legal definition, it is essential that the parties creating such an interest set out in detail the method for determining net profits. For example, they should specify whether the owner is entitled to payment only after drilling and completion costs have been recouped, or whether his interest is subject only to operating expenses. In lieu of a definition, the parties may well have their rights determined by the same doctrines which are applicable to a cotenant who does not participate in leasing or developing. Such a co-owner has a form of net profits interest as a matter of law, although he is more commonly spoken of as having a carried interest.

The term "carried interest" is used in a variety of contexts. Such an interest may arise by operation of law, as in the case of cotenants, or it may arise through contractual agreement. The term is, therefore, only generally descriptive of any interest which entitles its owner to a specified fraction of production, while not subjecting him to personal liability for certain expenses. The carrying party is responsible for those expenses but is entitled to recoup them from the carried party's share of production. Unlike the net profits interest, which normally continues for the duration of the underlying oil and gas lease, the carried interest terminates when the agreed-upon costs have been recouped by the carrying party. At that point the carried interest is transformed into a fractional share of the working interest, and its owner is liable for costs and entitled to a share of production like other working interest owners. Thus the point to which the interest is "carried" is crucial to a determination of the parties' rights and liabilities. This point will vary from agreement to agreement, but frequently the owner is carried either "to the casing point," in which case he is not personally liable for the drilling and testing costs but is subject to his proportionate share of completion and operating costs, or "to the tanks or pipeline," in which case he is freed from liability for virtually all expenses, including operating expenses. Joint operating agreements commonly include a provision whereby a party who does not wish to commit funds for additional wells may be carried to well completion but is not entitled to any share of production until the carrying parties have recovered some multiple of the carried party's share of cost from his share of production. This type of interest is sometimes referred to as a "Manahan" type of

interest.[317] Like other common forms of carried interests, it received its name from a case litigating tax implications.[318]

### E. Nature and Incidents of Royalty Ownership

All varieties of royalties,[319] overriding royalties,[320] and production payments[321] are nonpossessory interests in land, whether payable in money or payable in kind.[322] The same analysis is usually made of carried interests[323] and net profits interests.[324] They are thus subject to ad valorem taxes as interests in land,[325] and an instrument creating or transferring them must meet the requirements of the statute of frauds.[326] Because such interests are nonpossessory, their owners normally are not entitled to compel a suit for partition[327] or to invoke possessory remedies, such as a trespass to try title.[328] Moreover, because the owner

---

317. *See* Railroad Comm'n v. Olin Corp., 690 S.W.2d 628 (Tex. App.—Austin 1985, writ ref'd n.r.e.).

318. *See* Manahan Oil Co. v. Commissioner, 8 T.C. 1159 (1947). *See also* Commissioner v. Abercrombie, 164 F.2d 338 (5th Cir. 1947), *overruled as to tax consequences;* United States v. Cocke, 399 F.2d 433 (5th Cir. 1968), *cert. denied,* 344 U.S. 922 (1969); Herndon Drilling Co. v. Commissioner, 6 T.C. 628 (1946).

319. Sheffield v. Hogg, 124 Tex. 290, 77 S.W.2d 1021 (1934), *rehearing denied,* 124 Tex. 290, 80 S.W.2d 741 (1935).

320. Frost v. Standard Oil Co., 107 S.W.2d 1037 (Tex. Civ. App.—Galveston 1937, no writ); T-Vestco Litt-Vada v. Lu-Cal One Oil Co., 651 S.W.2d 284, 291 (Tex. App.—Austin 1983, writ ref'd n.r.e.).

321. Sheppard v. Stanolind Oil & Gas Co., 125 S.W.2d 643 (Tex. Civ. App.—Austin 1939, writ ref'd); Tenannt v. Dunn, 130 Tex. 285, 110 S.W.2d 53 (1937); Roberts v. Lone Star Producing Co., 369 S.W.2d 373, 376 (Tex. Civ. App.—Eastland 1963, no writ).

322. Sheffield v. Hogg, 124 Tex. 290, 77 S.W.2d 1021 (1934), *rehearing denied,* 124 Tex. 290, 80 S.W.2d 741 (1935).

323. *See* Paine v. Moore, 464 S.W.2d 477 (Tex. Civ. App.—Tyler 1971, no writ).

324. LaRue v. Wiggins, 277 S.W.2d 808 (Tex. Civ. App.—Waco 1955, writ ref'd n.r.e.).

325. Sheffield v. Hogg, 124 Tex. 290, 77 S.W.2d 1021 (1934), *rehearing denied,* 124 Tex. 290, 80 S.W.2d 741 (1935).

326. LaRue v. Wiggins, 277 S.W.2d 808 (Tex. Civ. App.—Waco 1955, writ ref'd n.r.e.). In refusing a writ of error in Hydrocarbons, Inc. v. Pecos Dev. Corp., 797 S.W.2d 265 (Tex. App.—Corpus Christi 1990, writ denied), the Texas Supreme Court issued a memorandum opinion stating that "a majority of the court disapproves that portion of the court of appeals opinion holding that the conveyance of an overriding royalty in future production from unleased land is not subject to the statute of frauds." 803 S.W.2d 266, 267 (Tex. 1991).

327. Chaffin v. Hall, 210 S.W.2d 191 (Tex. Civ. App.—Eastland 1948, writ ref'd n.r.e.).

328. T-Vestco Litt-Vada v. Lu-Cal One Oil Co., 651 S.W.2d 284 (Tex. App.—Austin 1983, writ ref'd n.r.e.).

of a nonpossessory interest has no power or right to affect the way in which a well is drilled, operated, or maintained, he is not liable in tort for personal injuries resulting from negligence or from the condition of the premises.[329] Conversely, such interests should not be subject to loss to an adverse possessor of the surface estate.

Traditionally, all forms of royalties and production payments have been free of all costs of drilling, completing, and operating the well; however, unless the instrument creating it specifies to the contrary, the royalty must bear its proportionate share of costs incurred subsequent to production.[330] Occasionally, the instrument creating the royalty will specify what these expenses are; more commonly, the instrument is silent on the subject. Most of these disputes have arisen in the context of the landowner's royalty created by an oil and gas lease and are treated in Chapter 4 of this treatise.

## 2.5.    TERM INTERESTS

Royalty interests and interests in the mineral estate presumptively last in perpetuity.[331] Such interests may, however, be for a more limited duration. Term interests, whether created by grant or reservation, are quite common in Texas. The most typical term interest is for a specified period of time, such as five years, and so long thereafter as oil, gas, or other minerals are produced from the described lands. The interest created by such language normally terminates at the end of the specified period if there is no production at that time. If there is production, the interest will extend beyond the specified period and terminate only when production terminates.

### A.  What Constitutes Production

Probably the most frequently litigated issue that arises under an instrument creating a term interest is the meaning of "production." In the absence of language to the contrary in the instrument creating the term interest, the payment of shut-in royalty under an oil and gas lease does not constitute "production" that will extend the term interest past its specified period. In Archer County v. Webb,[332] the Texas Supreme

---

329. Davis v. Esperado Mining Co., 750 S.W.2d 887 (Tex. App.—Houston [14th Dist.] 1988, no writ).

330. Refer to Section 4.6(C) of this treatise.

331. Dubois v. Jacobs, 533 S.W.2d 149 (Tex. Civ. App.—Austin 1976), *on remand and appeal*, 551 S.W.2d 147 (Tex. Civ. App.—Austin 1977, no writ).

332. 161 Tex. 210, 338 S.W.2d 435 (1960).

# TEXAS LAW OF OIL AND GAS

## SECOND EDITION

### VOLUME 1

**Ernest E. Smith**
*Rex G. Baker Centennial Chair in Natural Resources Law*
*University of Texas School of Law*

**Jacqueline Lang Weaver**
*A.A. White Professor of Law*
*University of Houston Law Center*

### 2014

*Filed Through:*
RELEASE NO. 16, JUNE 2014



LexisNexis·

## QUESTIONS ABOUT THIS PUBLICATION?

For questions about the **Editorial Content** appearing in these volumes or reprint permission, please call:

Jeff Slutzky, J.D. at ................................................. 1-800-306-5230 Ext. 6733388
Email: .................................................. jeffrey.slutzky@lexisnexis.com

For assistance with replacement pages, shipments, billing or other customer service matters, please call:

Customer Services Department at ........................... (800) 833-9844
Outside the United States and Canada, please call ................ (518) 487-3000
Fax Number ....................................... (518) 487-3584
Customer Service Website ................. http://www.lexisnexis.com/custserv/
For information on other Matthew Bender publications, please call

Your account manager or .................................. (800) 223-1940
Outside the United States and Canada, please call ................. (518) 487-3000

Library of Congress Card Number: 98-067071

ISBN: 978-0-327-00195-9 (print)

ISBN: 978-0-3271-6901-7 (eBook)

*Cite this publication as:*

[Vol. no.] Ernest E. Smith and Jacqueline Lang Weaver, Texas Law of Oil and Gas § [sec. no.] (LexisNexis Matthew Bender 2014).

*Example:*

1 Ernest E. Smith and Jacqueline Lang Weaver, Texas Law of Oil and Gas § 1.1 (LexisNexis Matthew Bender 2014).

Because the section you are citing may be revised in a later release, you may wish to photocopy or print out the section for convenient future reference.

This publication is designed to provide authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional services. If legal advice or other expert assistance is required, the services of a competent professional should be sought.

LexisNexis and the Knowledge Burst logo are registered trademarks of Reed Elsevier Properties Inc., used under license. Matthew Bender and the Matthew Bender Flame Design are registered trademarks of Matthew Bender Properties Inc.

Copyright © 2014 Matthew Bender & Company, Inc., a member of LexisNexis. All Rights Reserved. Originally published in: 1998

No copyright is claimed by LexisNexis or Matthew Bender & Company, Inc., in the text of statutes, regulations, and excerpts from court opinions quoted within this work. Permission to copy material may be licensed for a fee from the Copyright Clearance Center, 222 Rosewood Drive, Danvers, Mass. 01923, telephone (978) 750-8400.

Editorial Offices
121 Chanlon Rd., New Providence, NJ 07974 (908) 464-6800
201 Mission St., San Francisco, CA 94105-1831 (415) 908-3200
www.lexisnexis.com

MATTHEW BENDER

(Rel. 16-6/2014 Pub.82572)

*Abilene, N.A. v. Westwood Energy, Inc.,*[66] a nonoperator had signed an unrecorded operating agreement giving the operator a lien on the nonoperator's working interest to secure the payment of all sums due the operator. The nonoperator subsequently borrowed money from MBank Abilene and gave the bank a deed of trust as security. When the nonoperator defaulted on his obligation to pay his share of the operating expenses, the operator sued to foreclose its lien on the nonoperator's working interest. MBank, which was made a party to the suit, alleged priority of its deed of trust over the unrecorded operator's lien. The court rejected MBank's argument on the ground that the bank was deemed to have taken its lien with notice of the preexisting operator's lien. Under the rule of the *Westland* case, MBank was on notice of every recital and reference in its chain of title, and recorded assignments of the nonoperator's working interest had contained references to the operating agreement.

## 3.4    STANDARD RULES OF CONSTRUCTION AND CONSTRUCTIONAL PREFERENCES

Grants and reservations of mineral interests are frequently unclear. The language used to describe the interest may be equally consistent with a royalty and a mineral fee. The instrument may be silent on what substances are included in the term "minerals." The size of the interest created may be the subject of dispute. In resolving such issues, the parties' intent is determined, if possible, by considering the instrument as a whole. "The primary duty of the courts in interpreting a deed is to ascertain the intent of the parties. But it is the intent of the parties as expressed within the four corners of the instrument which controls."[67] Unless there is an irreconcilable conflict, all provisions of an instrument will be given effect. Thus, apparently contradictory and inconsistent language will be given a construction which harmonizes all provisions in the instrument.[68]

---

[66] 723 S.W.2d 246 (Tex. App.—Eastland 1986, no writ).

[67] Altman v. Blake, 712 S.W.2d 117, 118 (Tex. 1986). *See also, e.g.,* Garrett v. Dils Co., 299 S.W.2d 904, 906 (Tex. 1957); Luckel v. White, 819 S.W.2d 459, 461 (Tex. 1991); JVA Operating Co. v. Kaiser-Francis Oil Co., 11 S.W.3d 504, 506 (Tex. App.—Eastland 2000).

[68] Benge v. Scharbauer, 152 Tex. 447, 259 S.W.2d 166 (1953); DuBois v. Jacobs, 533 S.W.2d 149 (Tex. Civ. App.—Austin 1976), *appeal after remand,* 551 S.W.2d 147 (Tex. Civ. App.—Austin 1977, no writ); Selman v. Bristow, 402 S.W.2d 520 (Tex. Civ. App.—Tyler 1966, writ ref'd n.r.e.); Neel v. Alpar Resources, Inc., 797 S.W.2d 361 (Tex. App.—Amarillo 1990, *n.w.h.*); Luckel v. White, 819 S.W.2d 459 (Tex. 1991); Jupiter Oil Co. v. Snow, 819 S.W.2d 466 (Tex. 1991); Hunsaker v. Brown Distrib. Co., 373 S.W.3d 153 (Tex. App.—San Antonio 2012); Dodd v. Wiatrek, 2012 Tex. App. LEXIS 8976 (Tex. App.—San Antonio Oct. 31, 2012).

In many instances this process is aided by the use of standard rules of construction and constructional preferences.[69] There is, for example, a general preference for construing a deed in favor of the grantee and for interpreting it as transferring the largest estate that is consistent with the language of the instrument.[70] Thus a reservation will not be implied, and must be stated in clear language.[70.1] All the incidents and attributes of the mineral estate are deemed transferred to a grantee unless they are expressly reserved. In *Lesley v. Veterans Land Bd.*,[70.2] the court rejected an argument that a subdivision developer had impliedly retained the exclusive executive right by making the deeds to the lots in the subdivision subject to a recorded covenant prohibiting oil and gas development and had thus stripped the grantees of the right to execute oil and gas leases. Interests such as royalty and executive right that are appurtenant to the granted estate will pass to the grantee even though they are not specifically mentioned in the deed.[70.3] The general rule against implying grounds for forfeiture[71] is a logical extension of this doctrine.

Of course the doctrine that all incidents of a mineral estate are transferred

---

[69] Bruce M. Kramer, *The Sisyphean Task of Interpreting Mineral Deeds and Leases: An Encyclopedia of Canons of Construction,* 24 TEX. TECH L. REV. 1 (1993), is the definitive discussion of the rules and canons of construction used and applied by Texas courts. The same rules of construction used in construing conveyances of mineral interests are also often used in construing provisions of wills devising mineral interests. *See, e.g.,* the discussion in Grisham v. Lawrence, 298 S.W.3d 826 (Tex. App.—Tyler 2009).

[70] *See, e.g.,* Day & Co., Inc. v. Texland Petroleum, Inc., 786 S.W.2d 667 (Tex. 1990); Lott v. Lott, 370 S.W.2d 463 (Tex. 1963); Texas Pac. Coal & Oil Co. v. Masterson, 160 Tex. 548, 334 S.W.2d 436 (1960); Monroe v. Scott, 707 S.W.2d 132 (Tex. App.—Corpus Christi 1986, writ ref'd n.r.e.); Temple-Inland Forest Prods. Corp. v. United States, 988 F.2d 1418 (5th Cir. 1993); GXG, Inc. v. Texacal Oil & Gas, 977 S.W.2d 403, 418–19 (Tex. App.—Corpus Christi, 1998, pet. denied); Eastin v. Dial, 288 S.W.3d 491 (Tex. App.—San Antonio 2009); MPH Prod. Co. v. Smith, 2012 Tex. App. LEXIS 3989 (Tex. App.—Texarkana May 18, 2012).

[70.1] Sharp v. Fowler, 252 S.W.2d 153 (Tex. 1952); Melton v. Davis, 443 S.W.2d 605, 608 (Tex. Civ. App.—Tyler 1969, writ ref'd n.r.e.); Eastin v. Dial, 288 S.W.3d 491 (Tex. App.—San Antonio 2009). *See* Section 3.9(C), *infra.*

[70.2] 352 S.W.3d 479 (Tex. 2011).

[70.3] *E.g.,* Day & Co., Inc. v. Texland Petroleum, Inc., 786 S.W.2d 667 (Tex. 1990); Alfrey v. Ellington, 285 S.W.2d 383 (Tex. Civ. App.—Eastland 1955, writ ref'd n.r.e.). There is an exception for a tax foreclosure deed, which will transfer only the interest in land subject to the tax lien, even though the deed contains no exceptions or exclusions from the grant. Pounds v. Jurgens, 296 S.W.3d 100 (Tex. App.—Houston [14th Dist.] 2009).

[71] Cambridge Oil Co. v. Huggins, 765 S.W.2d 540 (Tex. App.—Corpus Christi 1989, writ denied).

to a grantee will not be applied to transfers of an estate or interest entirely different from that described in the instrument. For example, an instrument assigning a grantor's lien on the surface estate will not operate to transfer the grantor's interest in a severed mineral estate in the same land, even though the granting clause states that it conveys "all liens and titles held by me in and to said land."[72] Similarly, interests such as nonparticipating royalties that are appurtenant to other lands are not impliedly included in a conveyance, even though such lands were once part of a larger, single tract and the grantor received the interests when the larger tract was partitioned.[72.1] The oil and gas lease is an important exception to the rule favoring the grantee in deed construction, for it is usually construed against the lessee and in favor of the lessor-grantor.[73] A related doctrine which usually (although not always) results in a deed interpretation favorable to the grantee is the rule that the granting clause prevails in the event of an irreconcilable conflict with other deed clauses. The importance of this doctrine as applied to mineral deeds has diminished, however, as a result of the Texas Supreme Court's decision in *Luckel v. White*.[74] The *Luckel* opinion overruled an earlier case, *Alford v. Krum*,[75] which involved a deed that granted "one-half of the one-eighth interest" in the mineral estate, covered and included "1/16th of all royalties due" under an existing lease, and provided that under future oil and gas leases "the lease interests and all future rentals . . . shall be owned jointly by [the grantor and grantee] each owning a one-half interest." The *Alford* court held that the granting clause should prevail because it was in irreconcilable conflict with the future-leases clause. Prior to *Luckel*, appellate decisions[76] interpreted *Alford* as mandating

---

[72] Smith v. Williams, 786 S.W.2d 665 (Tex. 1990); Humphreys-Mexia Co. v. Gammon, 113 Tex. 247, 254 S.W. 296 (1923).

[72.1] McCall v. McCall, 24 S.W.3d 508 (Tex. App.—Houston [1st Dist.] 2000).

[73] *See* McMahon v. Christmann, 157 Tex. 403, 303 S.W.2d 341 (1957). This rule applies only if the lease is ambiguous. TSB Exco, Inc. v. E.N. Smith, III Energy Corp., 818 S.W.2d 417 (Tex. App.—Texarkana 1991, no writ).

[74] 819 S.W.2d 459 (Tex. 1991).

[75] 671 S.W.2d 870 (Tex. 1984).

[76] *E.g.,* Snow v. Jupiter Oil Co., 802 S.W.2d 354 (Tex. App.—Eastland 1990), *rev'd,* 819 S.W.2d 466 (Tex. 1991). Hawkins v. Texas Oil & Gas Corp., 724 S.W.2d 878 (Tex. App.—Waco 1987, writ ref'd n.r.e.); Stag Sales Co. v. Flores, 697 S.W.2d 493 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.). For critiques of the repugnant-to-the-grant doctrine, see Snow v. Jupiter Oil Co., 802 S.W.2d 354 and Tevis Herd, *Deed Construction and the "Repugnant to the Grant" Doctrine,* 21 TEX. TECH L. REV. 635 (1990).

use of the repugnant-to-the-grant doctrine when interpreting a deed granting fractional interests.

In addition to the foregoing, there are, of course, many other rules of construction that may be used in interpreting instruments creating royalty and mineral interests. Thus handwritten or typewritten language which has been added to a form deed will usually prevail over inconsistent printed language in the body of the instrument.[77] The presumption against intestacy may lead a court to interpret a will as devising a mineral fee rather than merely a royalty.[78] If there are multiple grantees, there is a presumption that they have received equal undivided shares of the interest conveyed unless the deed provides otherwise.[79] The doctrine of estoppel by deed precludes the parties to a deed from disavowing any of its provisions. Although the doctrine has occasionally been invoked to prevent a grantee from disavowing recitals or reservations in a deed he has accepted,[79.1] it is used far more commonly when a grantor attempts to assert a reservation in derogation of the grant. The cases that have arisen in this context are dealt with in a separate section of the treatise.[79.2]

Rules of grammar may also be used to aid in deed construction.[79.3] Whether a deed is ambiguous is a question of law, determined by an examination of the entire document.[79.4] If it is impossible to resolve an ambiguity through the use of rules of grammar or construction, extrinsic

---

[77] McMahon v. Christmann, 157 Tex. 403, 303 S.W.2d 341 (1957); Gibson v. Watson, 315 S.W.2d 48 (Tex. Civ. App.—Texarkana 1958, writ ref'd n.r.e.); Minchen v. Hirsch, 295 S.W.2d 529 (Tex. Civ. App.—Beaumont 1956, writ ref'd n.r.e.); TSB Exco, Inc. v. E.N. Smith, III Energy Corp., 818 S.W.2d 417 (Tex. App.—Texarkana 1991, no writ).

[78] Drach v. Ely, 237 Kan. 654, 703 P.2d 746 (1985).

[79] John Hancock Mut. Life Ins. Co. v. Bennett, 133 Tex. 450, 128 S.W.2d 791 (1939).

[79.1] Sauceda v. Kerlin, 164 S.W.3d 892 (Tex. App.—Corpus Christi 2005); Freeman v. Stephens Production Co., 171 S.W.3d 651 (Tex. App.—Corpus Christi 2005).

[79.2] *See* Section 3.7(C).

[79.3] *See, e.g.,* Stewman Ranch, Inc. v. Double M. Ranch, Ltd., 192 S.W.3d 808 (Tex. App.—Eastland 2006), considering the rule of grammar that a restricting clause that is not set off by commas modifies the word or phrase immediately preceding it, but rejecting its application on the ground that it would render the restricting clause superfluous.

[79.4] Morrison v. Robinson, 2006 Tex. App. LEXIS 7905 (Tex. App.—Waco Aug. 30, 2006).

evidence may be admitted to determine the parties' intent.[80]

## 3.5  DISTINGUISHING A MINERAL INTEREST FROM A ROYALTY INTEREST

### A.  Traditional Language

The language used in a grant or reservation determines whether a mineral fee or a royalty has been created. The traditional language used to create a mineral fee is a reference to the oil, gas, and other minerals in, on, and under the described land.[81] Specific rights of ingress and egress and surface and subsurface easements are also commonly included.[82] Although most of these rights would be implied in favor of the mineral fee owner in any event, setting them out specifically may accomplish three things. First, it makes much clearer the intent to create a mineral fee with its concomitant rights to explore, drill, and produce. Second, it reduces the possibility of disputes with the surface owner over the rights held by the mineral fee owner. The surface owner is more likely to be convinced by written language than by an argument based on implied rights. Third, it gives the draftsman an opportunity to list specific rights which might not be implied in the mineral owner's favor or which are broader than implied rights.

A royalty is typically created simply by using the word "royalty." Thus a landowner may grant "a 1/16th royalty" or a right to "1/14th of royalty," and in either event it is clear that the grantee will receive a fraction of gross production.[83] The same result can be accomplished by using the form of language in *Barker v. Levy*,[84] where a deed granting a "one/one hundred and sixtieth (1/160th) part of all oil, petroleum, sulphur and all other minerals that may be produced and saved" was held to have unambiguously transferred a royalty rather than an undivided interest in the mineral fee.

### B.  Deeds with Conflicting or Atypical Language

Unfortunately, mineral and royalty deeds and wills devising such interests

---

[80] Brown v. Havard, 593 S.W.2d 939 (Tex. 1980).

[81] *See, e.g.,* Altman v. Blake, 712 S.W.2d 117 (Tex. 1986); Richardson v. Hart, 143 Tex. 392, 185 S.W.2d 563 (1945).

[82] *E.g.,* Richardson v. Hart, 143 Tex. 392, 185 S.W.2d 563 (1945); Prairie Producing Co. v. Schlachter, 786 S.W.2d 409 (Tex. App.—Texarkana 1990, writ denied).

[83] Caraway v. Owens, 254 S.W.2d 425 (Tex. Civ. App.—Texarkana 1953, writ ref'd); Neel v. Alpar Resources, Inc., 797 S.W.2d 361 (Tex. App.—Amarillo 1990, *n.w.h.*) (reservation clause).

[84] 507 S.W.2d 613 (Tex. Civ. App.—Houston [14th Dist.] 1974, writ ref'd n.r.e.).